IN THE SUPERIOR COURT OF PENNSYLVANIA

COPY
ORIGINAL FILED IN
SUPERIOR COURT

MAY 9 1996

PHILADELPHIA

PHILADELPHIA DISTRICT

NO. 4273

PHILADELPHIA 1995

COMMONWEALTH OF PENNSYLVANIA

v.

BRUCE MURRAY,
APPELLANT

---

BRIEF FOR APPELLANT

---

APPEAL FROM THE ORDER OF THE COURT OF COMMON PLEAS
OF PHILADELPHIA COUNTY ON NOVEMBER 30, 1995, AT NO. 1109,
NOVEMBER TERM, 1982, DENYING APPELLANT'S PETITION
FOR RELIEF UNDER THE POST CONVICTION RELIEF ACT

---

SHERYL S. CHERNOFF, ESQUIRE
ATTORNEY FOR APPELLANT
ATTORNEY I.D. NO. 25523
816 ONE EAST PENN SQUARE
PHILADELPHIA, PA  19107
(215) 567-2726

# TABLE OF CONTENTS

TABLE OF CITATIONS

STATEMENT OF JURISDICTION ........................................... 1

STATEMENT OF SCOPE AND STANDARD OF REVIEW ................... 2

ORDER IN QUESTION ................................................... 3

STATEMENT OF THE QUESTIONS INVOLVED ......................... 4

STATEMENT OF THE CASE ............................................. 5

SUMMARY OF THE ARGUMENT ....................................... 10

ARGUMENT ............................................................. 12

    I.   FIRST APPELLATE COUNSEL WAS INEFFECTIVE FOR
FAILING TO RAISE IN DEFENDANT MURRAY'S DIRECT APPEAL
THE ISSUE OF THE PROSECUTOR'S RACIALLY
DISCRIMINATORY USE OF HIS PEREMPTORY CHALLENGES IN
VIOLATION OF THE UNITED STATES SUPREME COURT'S
MANDATE IN <u>BATSON v. KENTUCKY</u>. ............................. 12

    II.  AFTER-DISCOVERED EXCULPATORY EVIDENCE ENTITLES
DEFENDANT MURRAY TO A NEW TRIAL. ........................ 29

    III. DEFENDANT MURRAY WAS UNFAIRLY PREJUDICED BY THE
USE AT TRIAL OF THE REDACTED STATEMENT OF CO-
DEFENDANT TYRONE WESSON. .................................. 36

    IV.  THE COURT ILLEGALLY SENTENCED DEFENDANT MURRAY
FOR BOTH POSSESSION OF AN INSTRUMENT OF CRIME AND
CRIMINAL CONSPIRACY. ........................................ 44

CONCLUSION ........................................................... 46

AFFIDAVIT OF DOUGLAS HAUGHTON ....................... EXHIBIT A

STATEMENT OF TYRONE WESSON .......................... EXHIBIT B

ORDER OF PENNSYLVANIA SUPREME COURT OF 11/26/86 ....... EXHIBIT C

TRIAL COURT OPINION OF 2/6/96 (SAVITT, J.)

# TABLE OF CITATIONS

## CASES

Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712,
90 L.Ed. 2d 69 (1986) ................................ passim

Bruton v. United States, 391 U.S. 123,
20 L.Ed. 2d 476 (1968) ......................... 10, 36, 38

Commonwealth v. Sanabria, 487 Pa. 507, 410 A.2d 727 (1980) .... 33

Commonwealth v. Barnes, 388 Pa. Super. 327,
565 A.2d 777 (1989) ................................ 45

Commonwealth v. Bonaccurso, 425 Pa. Super. 479,
625 A.2d 1197 (1993) ................................ 32

Commonwealth v. Bond, 539 Pa. 299, 652 A.2d 308 (1995) ........ 41

Commonwealth v. Davis, 518 Pa. 77, 541 A.2d 315 (1988) ........ 27

Commonwealth v. Dinwiddie, 529 Pa. 66,
601 A.2d 1216 (1992) ........................ 13, 15, 19-21

Commonwealth v. Durst, 522 Pa. 2, 559 A.2d 504 (1989) .......... 2

Commonwealth v. Gaddy, 492 Pa. 494, 424 A.2d 1268 (1981) .. 33, 35

Commonwealth v. Galloway, 433 Pa. Super. 222,
640 A.2d 454 (1994) ................................ 31

Commonwealth v. Gonzalez, 297 Pa. Super. 66,
443 A.2d 301 (1982) ................................ 44

Commonwealth v. Hassine, 340 Pa. Super. 318,
490 A.2d 438 (1985) ................................ 44

Commonwealth v. Horne, 535 Pa. 406, 635 A.2d 1033 (1994) ...... 22

Commonwealth v. Jackson, 280 Pa. Super. 522,
421 A.2d 845 (1980) ................................ 44

Commonwealth v. Jackson, 386 Pa. Super. 29,
562 A.2d 338 (1989) ............................ 20, 25

Commonwealth v. Johnson, 474 Pa. 410, 378 A.2d 859 (1977) ..... 38

Commonwealth v. Jones, 374 Pa. Super. 493, 543 A.2d 579
(1988), reversed, 525 Pa. 323, 580 A.2d 308 .......... 16, 17

Commonwealth v. Krysiak, 369 Pa. Super. 293,
535 A.2d 165 (1987) ................................ 45

Commonwealth v. Lasch, 464 Pa. 573, 347 A.2d 690 (1975) ....... 37

Commonwealth v. McCormick, 359 Pa. Super. 461,
519 A.2d 442 (1986) .................................... 14, 16, 19

Commonwealth v. Morales, 508 Pa. 51, 404 A.2d 367 (1985) ...... 37

Commonwealth v. Oliver 431 Pa. Super. 1,
635 A.2d 1045 (1993) ................................... 39, 41

Commonwealth v. Rawls, 276 Pa. Super. 89,
419 A.2d 109 (1980) ........................................ 39

Commonwealth v. Rico, 443 Pa. Super. 507,
662 A.2d 1076 (1995) ........................... 13, 16, 19, 22

Commonwealth v. Smulsky, 415 Pa. Super. 461,
609 A.2d 843 (1992) ........................................ 22

Commonwealth v. Thomas, 396 Pa. Super. 92,
578 A.2d 422 (1990) ......................................... 2

Commonwealth v. Tolassi, 489 Pa. 41, 413 A.2d 1003 (1980) ..... 37

Commonwealth v. Weaver, 390 Pa. Super. 434,
568 A.2d 1252 (1989) ...................................... 21

Commonwealth v. Wharton, 530 Pa. 127,
607 A.2d 710 (1992) .......................... 38, 39, 40, 41

Commonwealth v. Wheeler, 435 Pa. Super. 266,
645 A.2d 853 (1994) ................................... 22, 24

Harrison v. Ryan, 909 F.2d 84 (3d Cir. 1990) ................ 28

Powers v. Ohio, 499 U.S. 400, 111 S. Ct. 1364,
113 L.Ed. 2d 411 (1991) ............................... 13, 28

Swain v. Alabama, 380 U.S. 202, 85 S. Ct. 824,
12 L.Ed. 2d 759 (1965) ........................... 13, 20, 27

## STATUTES

18 Pa. C.S. §903 ............................................. 44

18 Pa. C.S. §906 ...................................... 4, 11, 44

18 Pa. C.S. §907 ............................................. 44

42 Pa. C.S. §742 .............................................. 1

42 Pa. C.S. §9543(a) ................................... 2, 27, 31

Pa. R. App. P. 341(a) ......................................... 1

## STATEMENT OF JURISDICTION

This court has jurisdiction over this appeal pursuant to:

(a) 42 Pa. C.S. §742 (exclusive appellate jurisdiction in the Superior Court of Pennsylvania from final orders of the Court of Common Pleas); and

(b) Pa. R. App. P. 341(a) (appeals as of right from final orders of a lower court).

1

## STATEMENT OF SCOPE AND STANDARD OF REVIEW

This court is to determine whether the post-conviction court committed an abuse of discretion or an error of law that controlled the outcome of the case.

In assessing ineffectiveness of counsel, this court is to review the record to determine if the underlying issue is of arguable merit, if the course chosen by prior counsel had no reasonable basis designed to effectuate the client's interests and if prior counsel's omissions prejudiced the defendant. Commonwealth v. Durst, 522 Pa. 2, 559 A.2d 504 (1989).

Furthermore, in the context of a PCRA claim, a petitioner must also prove that counsel's ineffectiveness "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." Commonwealth v. Thomas, 396 Pa. Super. 92, 98, 578 A.2d 422, 425 (1990) (quoting 42 Pa. C.S. §9543(a)(2)(ii).

As to a claim of after-discovered evidence, a petitioner must prove the unavailability at the time of trial of exculpatory evidence that has subsequently become available and that would have affected the outcome of the trial if it had been introduced." 42 Pa. C.S. §9543(a)(2)(vi).

With regard to the defendant's sentencing claim, he must prove the imposition of a sentence greater than the lawful maximum. 42 Pa. C.S. §9543(a)(2)(vii).

2

## ORDER IN QUESTION

The order that is the subject of this appeal is an order entered on November 30, 1995, by the Honorable David N. Savitt of the Court of Common Pleas of Philadelphia County, at Nos. 1109-1113, November Term, 1982, which denied the appellant's petition for post-conviction relief.

<u>STATEMENT OF THE QUESTIONS INVOLVED</u>

I.   Was prior appellate counsel ineffective for failing to raise on appeal the issue of the prosecutor's racially discriminatory use of his peremptory challenges in violation of <u>Batson v. Kentucky</u>, by exercising at least thirteen peremptory challenges to intentionally exclude black venirepersons, and was prior post-conviction counsel ineffective for failing to couch this issue in terms of appellate counsel's ineffectiveness?

(Underlying issue answered in the negative by court below)

II.   Did the PCRA court err in denying the defendant a new trial based on the after-discovered exculpatory testimony by both Douglas Haughton and Tyrone Wesson that Murray had not participated in any way in the robbery or shooting in question?

(Answered in the negative by court below)

III.   Did the PCRA court err in not granting the defendant permission to file a petition for allowance of appeal <u>nunc pro tunc</u> on the basis of prior counsel's ineffectiveness in failing to timely file a petition for allowance of appeal raising the issue that the defendant was prejudiced by a violation of the rule in <u>Bruton v. United States</u> through the use at trial of a co-defendant's redacted statement that failed to disguise the co-defendant's implication of the defendant as a perpetrator?

(Answered in the negative by court below)

IV.   Is the sentence for both criminal conspiracy and possession of an instrument of crime illegal where convictions of both offenses were improper under the former 18 Pa. C.S. §906?

(Answered in the negative by the court below)

4

## STATEMENT OF THE CASE

### 1. Procedural History and Prior Determinations

This is an appeal from a denial of defendant Bruce Murray's petition under the Post Conviction Relief Act (PCRA), 42 Pa. C.S. §9541 et seq. Murray was arrested on September 11, 1982, and charged in Bills of Information Nos. 1109 through 1114, November Term, 1982, with murder and other offenses.

Murray, represented by Pamela P. Cohen, Esquire, made a timely request that his trial be severed from that of co-defendants Tyrone Wesson and Gregory Holden. On January 20, 1983, the Honorable Paul Ribner denied the motion to sever.

Murray, along with co-defendants Wesson and Holden, was tried before the Honorable David N. Savitt and a jury from May 31 until June 24, 1983. Each defendant was found guilty of criminal conspiracy (Bill No. 1109), second-degree murder (Bill No. 1110), robbery as a felony of the first degree (Bill No. 1112) and possessing an instrument of crime (Bill No. 1113).

Murray filed post-trial motions, which the court denied on April 23, 1984. On the same date, the court sentenced Murray to life imprisonment for the murder charge, one to two years' imprisonment for conspiracy (to run consecutively to the life sentence), and one to two years' imprisonment for possessing an instrument of crime (to run concurrently with the life sentence). Murray appealed to this court, at No. 1505 Philadelphia 1984, and on November 1, 1985, this court affirmed the judgment of sentence. Counsel for Murray filed a petition for allowance of

5

appeal on his behalf on December 5, 1985 (three days beyond the expiration of the appeals period). The petition was denied by the Pennsylvania Supreme Court on November 26, 1986, without prejudice to Murray's right to seek post-conviction relief.

On December 30, 1986, Murray filed a pro se petition under the former Post Conviction Hearing Act. Irene Cotton, Esquire, was appointed to represent him and filed a supplemental petition on March 14, 1988. After the Commonwealth filed a motion to dismiss, the Honorable James McCrudden dismissed all but five of Murray's issues. As to the remaining issues, an evidentiary hearing as to both Murray and Holden was held on July 25, 1991, before Judge McCrudden. In addition, Murray's trial counsel (now a Philadelphia Common Pleas Court judge) submitted answers to interrogatories regarding her representation of Murray, and co-defendant Holden's trial counsel (now a Philadelphia Municipal Court judge) was deposed by Holden's PCRA counsel.

Thomas McGill, Esquire, was appointed as new counsel for Murray following the death of attorney Cotton, and the case was subsequently transferred back to Judge Savitt. After hearing argument, Judge Savitt on November 30, 1995, denied the petition for post-conviction relief. The defendant again filed an appeal to this court, and present counsel then was appointed to represent the defendant in connection with his appeal.

2.   Trial Judge

The judge whose decision is to be reviewed is the Honorable David N. Savitt.

6

### 3. Statement of Facts

This case stems from the shooting death of Eric DeLegal (also known as Kaboobie) on the evening of December 16, 1980. At trial, the Commonwealth's evidence consisted in large part of the testimony of Douglas Haughton.

As brought out on direct examination, Haughton, originally a co-defendant in this case, had pleaded guilty, prior to the trial of his co-defendants, to robbery and conspiracy and open to third-degree murder. His plea would result in a maximum sentence of ten to twenty years, to run concurrently with a sentence Haughton was then serving in Colorado for bank robbery. In connection with his plea, Haughton was required by the Commonwealth to testify in this case (N.T. 6/1/83, p. 214-17). Haughton's trial testimony is summarized as follows:

At 5 p.m. of the date of the incident, Haughton, Murray and Wesson met at Holden's house and discussed robbing DeLegal (N.T. 6/1/83, p. 217-22). They planned to rob DeLegal for marijuana that DeLegal had failed to supply to Haughton after Haughton had paid for the drugs several weeks earlier (N.T. 6/1/83, p. 274-75, 363). It was decided that Holden and Haughton would be lookouts, while Murray and Wesson would knock on DeLegal's door (N.T. 6/1/83, p. 225-26). Murray had a .32 caliber handgun, and Holden gave Wesson a 20-gauge bolt-action shotgun (N.T. 6/1/83, p. 226).

The men then went to DeLegal's house. Haughton and Holden took their lookout positions in the school yard across the street from the house, while Murray and Wesson were let into the house (N.T. 6/1/83, p. 237-41). Shortly thereafter, Haughton heard a

7

shotgun blast and the sound of five handgun shots, and he fled (N.T. 6/1/83, p. 241-42).

Later that night, according to Haughton's testimony, Wesson told Haughton that after they entered DeLegal's house, he and DeLegal had a tussle, and both Wesson and Murray told Haughton that they had shot DeLegal during the struggle (N.T. 6/1/83, p. 243-47). Wesson was wounded in the arm (N.T. 6/1/83, p. 244).

On cross-examination, defense counsel pointed out numerous instances of inconsistencies between Haughton's trial testimony and his testimony as previously given at the preliminary hearings in this case, regarding many of the important aspects of the plan and the incident itself, as will be discussed infra.

Another key part of the Commonwealth's case was the introduction of a redacted statement allegedly given by defendant Wesson to Philadelphia police. In the statement, Wesson described the plans made by himself and "three other guys" and the implementation of those plans. He admitted that he and "one other guy" were present when DeLegal was shot and that he was armed with a 20-gauge shotgun, but he stated that the gun accidentally went off during his struggle with DeLegal (N.T. 6/15/83, p. 681-86; Exhibits C-15, C-18).

Defendant Murray testified in his own behalf and denied any involvement in the robbery or shooting of Eric DeLegal (N.T. 6/16/83, p. 956). Murray presented alibi testimony from Robin Johnson (N.T. 6/16/83, p. 879-84), David Elliott (N.T. 6/16/83, p. 1126-27), and Deborah Frazier (N.T. 6/17/83, p. 1456-58).

8

At the post-conviction-relief hearing on July 25, 1991, however, Haughton testified that neither Murray nor Holden were involved at all with the shooting or robbery of DeLegal, and that what he wrote to Murray's trial counsel on May 11, 1985, was the truth. In that May 1985 letter, Haughton told Murray's trial counsel that he had lied at trial in order to receive a lighter sentence, and that he and Wesson had gone to DeLegal's house to buy some marijuana at Wesson's request, and that only Haughton and Wesson were present during the shooting incident. A former cellmate of Haughton's, Eugene Thomas, testified that Haughton had told him after the trial that he (Haughton) had lied at trial in order to obtain a more lenient sentence, and that Thomas subsequently contacted Murray to tell him of his conversation with Haughton.

Also at the post-conviction-relief hearing, defendant Wesson testified that he and Haughton were the only ones at DeLegal's house at the time of the shooting (where they had gone in order to buy marijuana), but that he could not relate these facts at trial because his attorney had advised him not to take the stand. Wesson further testified that the statement attributed to him was never made by him.

4. <u>Order Under Review</u>

The defendant has filed this appeal for review of the order of November 30, 1995, which denied the defendant's petition for post-conviction relief.

9

## SUMMARY OF THE ARGUMENT

Defendant Murray's first appellate counsel was ineffective for failing to raise, in Murray's direct appeal, the claim that the prosecutor used his peremptory challenges in a racially discriminatory manner, in violation of <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S. Ct. 1712, 90 L.Ed. 2d 69 (1986). The prosecutor exercised at least thirteen of eighteen peremptory challenges to exclude African-American venirepersons from the jury, and, despite defense counsel's repeated objections, the prosecutor failed to articulate a racially neutral basis for each exclusion.

Defendant Murray is entitled to a new trial based on the after-discovered exculpatory testimony by both Douglas Haughton and Tyrone Wesson, presented at the evidentiary hearing on Murray's PCRA petition, that they were the only two individuals involved in the shooting death of Eric DeLegal and that Murray had not participated in any way in the incident. This evidence was brought to trial counsel's attention almost immediately after trial and was presented to the court at the earliest opportunity.

The PCRA court erred in failing to permit Murray to file a petition for allowance of appeal <u>nunc pro tunc</u> on the basis that he was unfairly prejudiced by a violation of the rule laid down in <u>Bruton v. United States</u>, 391 U.S. 123, 20 L.Ed. 2d 476 (1968), through the use at trial of co-defendant Wesson's redacted statement, which failed to disguise Wesson's implication of Murray as a perpetrator, and first appellate counsel's failure to timely file a petition for allowance of appeal raising this issue constituted ineffective assistance of counsel.

10

Murray's convictions of two inchoate crimes that fall within Chapter 9 of the Crimes Code (criminal conspiracy and possession of an instrument of crime) were improper under 18 Pa. C.S. §906 as it existed prior to February 9, 1987, thereby rendering the resulting sentence illegal. Therefore, the sentence on one of the two charges must be vacated.

ARGUMENT

I.    FIRST APPELLATE COUNSEL WAS INEFFECTIVE FOR
      FAILING TO RAISE IN THE DEFENDANT'S DIRECT
      APPEAL THE ISSUE OF THE PROSECUTOR'S
      RACIALLY DISCRIMINATORY USE OF HIS
      PEREMPTORY CHALLENGES IN VIOLATION OF THE
      UNITED STATES SUPREME COURT'S MANDATE IN
      BATSON v. KENTUCKY.

Defendant Murray's first appellate counsel rendered
ineffective assistance when she failed to raise, in Murray's
direct appeal, his claim that he was denied his state and federal
constitutional right of equal protection under the law when the
prosecutor used his peremptory challenges in a racially
discriminatory manner to exclude African-Americans from the jury.
The prosecutor's actions were in violation of the United States
Supreme Court's mandate in Batson v. Kentucky, 476 U.S. 79, 106
S. Ct. 1712, 90 L.Ed. 2d 69 (1986) and a new trial is required.

In Batson, the Court held that the Equal Protection Clause
guarantees a criminal defendant the right not to have the state
exclude members of his race from the jury venire solely because
of their race or on the assumption that African-American jurors
as a group will be unable impartially to consider the state's
case against an African-American defendant.

The Pennsylvania Superior Court observed last year that the
evolution of the law under Batson and its progeny "consistently
demonstrates that three distinct interests are implicated":

          First, a litigant has the right to a jury
     selection process free of discrimination.  Second, a
     prospective juror has a right to participate in this
     essential civic duty with confidence that he or she was
     evaluated by virtue of ability to serve, regardless of
     race or ethnic heritage, and "free from state-sponsored

12

group stereotypes rooted in, and reflective of historical prejudice." J.E.B., ___U.S. at ___, 114 S. Ct. at 1421, 128 L.Ed. 2d at ___. Lastly, the community has the right to an unquestioned belief that our system of justice operates without discrimination at every level. [Commonwealth v.] Dinwiddie, [529 Pa. 66, 75, 601 A.2d 1216, 1220-21 (1992)]. Only if all three "multiple ends" identified by the Supreme Court are served is equal protection afforded to all. Powers [v. Ohio], [499 U.S. 400, 111 S. Ct. 1364, 113 L.Ed. 2d 411 (1991)]; Dinwiddie, supra.

Commonwealth v. Rico, 443 Pa. Super. 507, 662 A.2d 1076 (1995).

The Supreme Court in Batson changed the manner in which the defendant was required to prove that a prosecutor discriminatorily exercised peremptory challenges as they relate to African-American venire members and held that an African-American could make out a prima facie case of purposeful discrimination by showing that the "totality of relevant facts" pertaining to the defendant's own trial gives rise to an inference of discriminatory purpose.[1]

The Pennsylvania Superior Court summarized the burden of proof set forth in Batson as follows:

The Batson requirements for establishing a prima facie case of intentional racial discrimination are: 1) that the defendant is a member of a cognizable racial group and that the prosecution used peremptory challenges to remove from the venire members of that defendant's race; 2) that the defendant can rely on the presumption that peremptory challenges to veniremen permit discrimination by those inclined to do so; and

---

[1] Prior to Batson, the controlling law was Swain v. Alabama, 380 U.S. 202, 85 S. Ct. 824, 12 L.Ed. 2d 759 (1965), under which a defendant had to establish a pattern of discriminatory practice by the Commonwealth as a whole, or by the particular trial prosecutor, in the use of peremptory challenges. At that point, the burden shifted to the prosecutor to explain the reasons for the exercise of peremptory challenges. A prosecutor was not permitted to use peremptory challenges in a racially discriminatory manner but the defendant did not make a prima facie showing of purposeful racial discrimination by relying solely on the facts of that case.

> 3) that the facts and relevant circumstances raise the
> inference that the prosecutor used the peremptory
> challenges to racially discriminate. Once these three
> requirements are satisfied, the burden shifts to the
> prosecution to explain the adequate racial exclusion.

Commonwealth v. McCormick, 359 Pa. Super. 461, 468-69, 519 A.2d
442, 446 (1986).

Following the Batson decision, the Pennsylvania Superior
Court held that "Batson shall be applied retroactively to cases
pending on direct appeal at the time Batson was decided where the
objection to the Commonwealth's use of peremptory challenges has
been properly preserved." Commonwealth v. McCormick, 359 Pa.
Super. at 476, 519 A.2d at 450.

It is clear from the record that Batson is applicable to
Murray's underlying issue regarding the Commonwealth's use of
peremptory challenges. Batson was decided on April 30, 1986. A
petition for allowance of appeal to the Pennsylvania Supreme
Court in this case was filed on Murray's behalf on December 5,
1985, and was denied on November 26, 1986. Thus, Murray's case
was pending on direct appeal at the time of the Batson decision.
Furthermore, trial counsel preserved this issue at trial--defense
counsel objected throughout voir dire to the prosecutor's use of
his peremptory strikes to exclude African-Americans from the
jury--and in post-trial motions. See, e.g., N.T. 5/19/83, p.
146, 283. Thus, the controlling law is that of Batson.

Based on the standard set forth in Batson, defendant Murray
submits that he was denied a fair trial when the prosecutor
intentionally and discriminatorily used his peremptory challenges

14

to strike African-Americans from the jury resulting in the defendant being tried by practically an all-white jury.

## A. DEFENDANT MURRAY HAS ESTABLISHED AN OVERWHELMING PRIMA FACIE CASE.

The Court in <u>Batson</u> set forth some of the indicia reflecting a purposeful exclusion of a racial class from the jury:

> In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during <u>voir</u> <u>dire</u> examination and in exercising his challenges may support or refute an inference of discriminatory purpose.

476 U.S. at 96-97, 106 S. Ct. at 1723.

The Court further declared that statistical analysis "is an acceptable manner of showing that the totality of relevant facts gives rise to an inference of discriminatory purpose." 476 U.S. at 94. Statistical analysis can "for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds." 476 U.S. at 93.

In <u>Commonwealth v. Dinwiddie</u>, 529 Pa. 66, 601 A.2d 1216 (1992), the Pennsylvania Supreme Court held that the inference that arose from the prosecutor's use of five of six peremptory challenges to strike African-Americans, resulting in the defendant being tried by a jury composed of ten whites and two African-Americans, satisfied the defendant's burden:

> Instantly, it is undisputed that appellee is a black man and that the prosecutor exercised his

> peremptory challenges to strike five (5) blacks from
> the panel. Defense counsel on two separate occasions
> made timely objections to the prosecutor's use of his
> peremptory challenges and on each occasion the
> prosecutor refused to justify his use of them. The
> inference which arises from this course of conduct, we
> believe, sufficiently satisfies the prima facie
> requirements to suggest purposeful discrimination under
> Batson, thus shifting the burden to the prosecution,
> requiring it to provide an adequate and legitimate
> explanation for striking the potential black jurors in
> question.

601 A.2d at 1218.

Also, in Commonwealth v. McCormick, supra, the Superior
Court found that the Commonwealth's peremptory strikes of all of
the black venire members reached on voir dire in the trial of a
black defendant raised the inference that the peremptory
challenges were used to discriminate, so as to establish a prima
facie case of racial discrimination under Batson.

In addition, in Commonwealth v. Rico, supra, the
prosecutor's exercise of seven peremptory challenges to exclude
venirepersons of apparent Italian descent established an
inferential pattern of discriminatory intent so as to shift the
burden to the prosecution. See also Commonwealth v. Jones, 374
Pa. Super. 493, 543 A.2d 579 (1988), reversed, 525 Pa. 323, 580
A.2d 308 (prosecutor's use of peremptory challenge to remove sole
black juror from venire establishes prima facie case).

In this case, the notes of testimony from the voir dire
examination show that of the eighteen peremptory challenges used
by the prosecutor, he exercised at least thirteen, and possibly
as many as sixteen, to exclude African-American individuals from

16

those ultimately selected to serve on the jury at the defendant's trial.[2]

Murray's trial counsel raised her first objection after the prosecutor had exercised two of his first three peremptory challenges the first day of voir dire to exclude African-American venirepersons Deborah Barnes and Willie Reynolds (N.T. 5/19/83, p. 105, 145-46). Trial counsel noted at that early stage that it appeared to be the prosecutor's "practice of striking every black juror" (N.T. 5/19/83, p. 146). When the prosecutor exercised two more peremptory challenges that day to exclude venirepersons Clyde Jones and Thomas Hart (N.T. 5/19/83, p. 204, 214), trial counsel objected both times, noting that both prospective jurors were African-American (N.T. 5/19/83, p. 204, 214-15).

The next day, after the prosecutor exercised another peremptory challenge to exclude an African-American, Orilee Simpson (N.T. 5/20/83, p. 282-83), trial counsel again objected and requested the court to declare that a pattern of excluding black venirepersons was taking place (N.T. 5/20/83, p. 283).

After noting that five of the Commonwealth's six peremptory challenges thus far were used to exclude African-Americans, the court stated:

> I have been presiding in several murder cases, and it does appear that there are substantial number of challenges where the defendants are black and it is out of proportion to what would ordinarily be expected.

---

[2] The court allowed seven peremptory challenges for each defendant and twenty-one for the prosecution (N.T. 5/19/83, p. 30).

17

N.T. 5/20/83, p. 284-85. In addition, the court acknowledged "what is occurring" (N.T. 5/20/83, p. 287).

The prosecutor exercised another peremptory challenge later that day to exclude John Daniel, whose background and area of residence suggest that he was also African-American, although the record did not make clear that fact (N.T. 5/20/83, p. 324-30).

During the subsequent day of voir dire examination, the prosecutor exercised two peremptory challenges, to exclude Edward Boyd and Geneva Womack (N.T. 5/25/83, p. 436, 484), both of whom were African-Americans (N.T. 5/25/83, p. 438, 485). And again, the next day, the prosecutor exercised six peremptory challenges, of which five were used to exclude the following African-American individuals: Marcus Jones, Helen Williams, Dorothy Janifer, Gloria Courtney, and Reginald Johnson (N.T. 5/26/83, p. 591, 636, 637, 764, 783, 807). Finally, on the last day of voir dire, the prosecutor exercised three peremptory challenges, of which at least one was used to exclude a black individual, Harvey Smaw (N.T. 5/27/83, p. 898). The record did not indicate the race of the individuals who were excluded by the other two peremptory challenges used by the prosecutor that day (venirepersons Mamie Foster and Mary Tillman) (N.T. 5/26/83, p. 893, 963).

In total, out of eighteen peremptory challenges exercised by the prosecutor, thirteen were noted on the record to have been used to exclude African-American venirepersons, with only two having been used against white venirepersons. The race of the remaining three venirepersons was not noted for the record.

18

Put another way, of the fifteen peremptory challenges exercised by the prosecutor where the race of the venireperson has been recorded, thirteen were exercised to exclude African-American individuals. As a result, defendant Murray was tried by a jury consisting of, in all likelihood, one African-American juror, with one African-American alternate juror. See Deposition of Judge Lydia Kirkland (N.T. 10/28/92, p. 18-19).

This statistical analysis alone sustains the defendant's burden. As in Dinwiddie, McCormick and Rico, the prosecutor in this case used his peremptory challenges to strike virtually all venirepersons of the defendant's ethnic background from the jury and to force the defendant, an African-American, to be tried before a jury that was not a cross-section of the community. This fact raises the inference that the peremptory challenges were used to discriminate, Commonwealth v. McCormick, 359 Pa. Super. at 469, 519 A.2d at 446, and satisfies Murray's burden of establishing a prima facie case of racial discrimination.

Furthermore, the characteristics of the African-Americans who were stricken from the panel were no different from those of the white panel members who were retained. For example, black panel member Willie Reynolds (who was stricken) worked for SEPTA, as did white venireperson John Montelione (who was retained) (N.T. 5/19/83, p. 138-46; 5/26/83, p. 748-55); black venireperson Thomas Hart (who was stricken) was a disabled factory worker, while white venireperson Fred Picarelli (who was retained) was a disabled grocery store owner (N.T. 5/19/83, p. 203-14; 5/26/83, p. 592-620); and excluded black panel member Gloria Courtney was

19

a factory worker whose husband worked for the post office, while a majority of the white members who were retained worked in similar types of blue-collar job as Courtney and several worked for the post office (N.T. 5/19/83, p. 68-90, 217-23; 5/20/83, p. 250-59; 5/26/83, p. 780-837). Such similarities are "warning signs of possible discrimination." Commonwealth v. Jackson, 386 Pa. Super. 29, 562 A.2d 338 (1989).

Moreover, as early as the second day of voir dire examination, the trial court's statements indicate that the court itself had detected an inferential pattern of discriminatory intent (N.T. 5/20/83, p. 284-87). See Commonwealth v. Dinwiddie, 373 Pa. Super. at 602, 542 A.2d at 105 (court's directive that prosecutor provide explanation for striking black venirepersons "evidences that the court was fully satisfied that appellant had presented a prima facie showing of discrimination ).

The facts of this case more than satisfy the defendant's burden of establishing a prima facie case of racial discrimination under Batson and its progeny so as to properly shift the burden to the prosecutor to provide legitimate, race-neutral explanations for exercising peremptory challenges against African-American venirepersons. [3]

---

[3] Even if the prior rule of Swain v. Alabama, supra, governed this claim, which it does not, a pattern of discrimination by the Commonwealth is made out, thus shifting the burden of proof to the Commonwealth. The discriminatory use of peremptory challenges by the Philadelphia District Attorney's Office during the early to mid-1980s, as found in numerous other cases, shows a pattern of conduct by the Commonwealth to remove African-Americans from the jury and subject African-American defendants to trial by mostly white juries. See, e.g., Edward Sistrunk v. Vaughn, C.A. No. 90-1415 (E.D. Pa.) (habeas corpus relief granted and new trial ordered where prosecutor used peremptory challenges

### B. THE COMMONWEALTH HAS COMPLETELY FAILED TO REBUT DEFENDANT MURRAY'S PRIMA FACIE CASE.

The Court in <u>Batson</u> set forth the prosecution's burden of proof concerning its rebuttal of a prima facie case of racially discriminatory use of peremptory challenge as follows:

> But the prosecutor may not rebut the defendant's prima
> facie case of discrimination by stating merely that he
> challenged jurors of the defendant's race on the
> assumption--or his intuitive judgment--that they would
> be partial to the defendant because of their shared
> race.... Just as the Equal Protection Clause forbids
> the States to exclude black persons from the venire on
> the assumption that blacks as a group are unqualified
> to serve as jurors, ... so it forbids the States to
> strike black veniremen on the assumption that they will
> be biased in a particular case because the defendant is
> black. The core guarantee of equal protection... would
> be meaningless were we to approve the exclusion of
> jurors on the basis of such assumptions, which arise
> solely from the juror's race. Nor may the prosecutor
> rebut the defendant's case merely by denying that he
> had a discriminatory motive or "affirming his good
> faith in individual selections." [T]he prosecutor ...
> must articulate a neutral explanation related to the
> particular case to be tried. The trial court will then
> have the duty to determine if the defendant has
> established purposeful discrimination.

476 U.S. at 97-98, 106 S. Ct. at 1723-24.

Thus, the prosecutor's proffered explanation must be "clear and reasonably specific." <u>Batson</u>, 476 U.S. at 98 n.20. A bald

---

to strike all blacks from jury); <u>Charles Diggs v. Vaughn</u>, C.A. No. 90-2083 (E.D. Pa.) (habeas corpus relief granted and new trial ordered where prosecutor used fourteen of sixteen peremptory challenges to exclude blacks from jury); <u>Harrison v. Ryan</u>, 909 F.2d 84 (3d Cir. 1990) (new trial ordered based on prosecutor's use of peremptory challenges to exclude one black juror); <u>Commonwealth v. Dinwiddie</u>, <u>supra</u> (remanded for new trial where prosecutor used five of six peremptory challenges to exclude black venirepersons); <u>Commonwealth v. Weaver</u>, 390 Pa. Super. 434, 568 A.2d 1252 (1989) (remanded for evidentiary hearing where prosecutor exercised five of eight peremptory challenges to remove all black venirepersons).

statement that the prosecutor's actions involved "no racial motive," or were undertaken in good faith, is insufficient to meet the burden of production necessary to rebut a prima facie case. Commonwealth v. Wheeler, 435 Pa. Super. 266, 271, 645 A.2d 853, 855 (1994) (citing Commonwealth v. Smulsky, 415 Pa. Super. 461, 465, 609 A.2d 843, 844-45 (1992).

As stated by the Superior Court in Rico, impermissible discrimination has occurred in violation of Batson "[i]f any identifiable group is excluded on the basis of race, gender, ethnicity, or other reason not related to a perception that the individual member would be unable to adequately perform the functions and duties required of a juror in the case presented." 662 A.2d at 1079.

Thus, the prosecutor's use of a peremptory challenge to strike an African-American venireperson because he came from a "high crime area" was not race-neutral as applied to the individual juror excluded, since residence is too closely tied to race to accept the prosecutor's explanation. Commonwealth v. Horne, 535 Pa. 406, 635 A.2d 1033 (1994) (Nix, C.J., Opinion in Support of Affirmance).

Batson also teaches us that "the prosecutor's questions and statements . . . during voir dire examination . . . may support an inference of discriminatory purpose." 476 U.S. at 97.

The record in this case shows that the Commonwealth absolutely failed to meet its burden of proof of providing legitimate, race-neutral reasons for the exercise of its peremptory challenges against African-American venirepersons.

22

Although the prosecutor's reasons for striking many of the venirepersons do not appear on the record because the trial court did not require the prosecutor to place his reasons on the record, a review of the record shows that the prosecutor declined to present any reasons at all for several of the peremptory challenges he exercised even in the face of defense objections, and that any reasons that the prosecutor did give were either inadequate or pretextual in nature and represent disparate treatment of black and white jurors, all in violation of <u>Batson</u> and its progeny.

With regard to seven of the peremptory challenges exercised by the prosecutor during voir dire, the prosecutor simply maintained his silence after defense counsel lodged objections to the prosecutor's use of his peremptory challenges to strike black venirepersons, as follows: N.T. 5/19/83, p. 146 (Barnes and Reynolds), p. 204 (Jones), p. 214-15 (Hart); 5/25/83, p. 485 (Womack); 5/26/83, p. 764 (Janifer); 5/27/83, p. 898 (Smaw). As recognized in <u>Batson</u>, the prosecutor's silence on all these occasions is an indication of discriminatory purpose.

Although the trial court called upon the prosecutor three times to explain his use of peremptory challenges as to venireperson Orilee Simpson and to comment upon an alleged policy within the District Attorney's Office of excluding African-American jurors, the prosecutor twice responded that he had "nothing at all" to say (N.T. 5/20/83, p. 284, 291), while the third time he gave only the following vague answer:

> [THE PROSECUTOR]: My position is that the Court has awarded 21 peremptory challenges to the

Commonwealth, and the Commonwealth can use them as it
best sees fit to choose a fair, unprejudiced, impartial
and competent juror, and that's what the Commonwealth
is doing.

N.T. 5/20/83, p. 285.

This unsupported response by the prosecutor shed no light
whatsoever as to his specific reason for excluding this
particular venireperson and was insufficient to rebut the
defendant's prima facie case, pursuant to Batson and Commonwealth
v. Wheeler, supra.

The prosecutor made a similar inadequate statement with
regard to venireperson Reginald Johnson, when the prosecutor
stated that he was "using his peremptory challenges to pick a
jury that he feels would be fair, unprejudiced, impartial and
competent in this case" (N.T. 5/26/83, p. 809-10).

The prosecutor's reasons for challenging Edward Boyd and
Helen Williams were clearly pretextual.  The prosecutor initially
challenged Boyd for cause, arguing that Boyd had testified that
because of a recent burglary to his home, he might "lean against
the criminal element" (N.T. 5/25/83, p. 427).  This stated
reason, however, was clearly pretextual.  As the court, in
denying the challenge for cause, noted, "[T]hat would be a reason
for the defense challenging him" (N.T. 5/25/83, p. 425).
Moreover, as defense counsel pointed out, Boyd had made it clear
upon further questioning that he had no preconceived notions
about this case, that he could apply the court's instructions,
that he understood his duty to separate the burglary from the

24

facts of this case, and that he felt he could be fair at that particular time (N.T. 5/25/83, p. 411, 415, 419, 420, 429).

A clear indication that the prosecutor's stated reason was merely a pretext is that the prosecutor found white panel member Hugh McNally acceptable--and even argued against a defense motion to strike McNally for cause--despite McNally's testimony that he might draw a negative inference against a defendant based merely on the fact that a policeman had arrested the defendant (N.T. 5/26/83, p. 650-52, 655-57). Any inference that could be drawn from Edward Boyd's statement was no different from that which could be drawn from McNally's statement; the reason proffered by the prosecutor could not have been the true basis for his peremptory challenge against Boyd but, instead, was evidence of the prosecutor's discriminatory intent. See, e.g., Commonwealth v. Jackson, 562 A.2d at 350 ("An explanation which at first blush would appear to be clear, specific, and legitimate may be exposed as a pretext for racial discrimination when considered in light of the entire voir dire proceeding").

Almost the same circumstances are presented with regard to panel member Helen Williams. The prosecutor again attempted a challenge for cause but, after the challenge was denied, then exercised another peremptory challenge (N.T. 5/26/83, p. 636). The prosecutor then argued to the court that Williams had indicated that because she had a young son she might be influenced by the youth of the defendants (N.T. 5/26/83, p. 636-37). But, as the court noted, Williams had stated that she would follow the court's instructions (N.T. 5/26/83, p. 637). As in

25

the case of venireperson Boyd, this was undoubtedly yet another
pretextual reason on the part of the prosecutor.

In fact, cogent evidence of the prosecutor's discriminatory
use of peremptory challenges is found in his own responses to the
defense's objection to two of his peremptory strikes. When
defense counsel objected to the prosecutor's use of a peremptory
challenge against Marcus Jones, an African-American venireperson,
the prosecutor responded (inaccurately) that the defense "has
struck all white veniremen, the last several veniremen all this
morning (N.T. 5/26/83, p. 591). Then, after the defense objected
to his use of a peremptory challenge against yet another black
venireperson, this time Gloria Courtney, the prosecutor stated,
"The one previously was a white venireman" (N.T. 5/26/83, p.
784). These instinctive responses in themselves are an
acknowledgment that race was the very basis for the prosecutor's
use of peremptory challenges.

Thus, a review of the record fails to show that the
Commonwealth articulated a racially neutral basis for each
challenge to which a timely objection was made, as it was
required to do under Batson in order to rebut the defendant's
prima facie case. Rather, the totality of the circumstances in
this case show that the prosecutor intentionally used his
peremptory challenges to eliminate African-Americans from the
jury that heard defendant Murray's case.

Despite this, first appellate counsel failed to raise this
claim in the defendant's direct appeal. There can be no
reasonable basis for her failure to do so. This is not a

question of appellate counsel's failing to predict future
developments in the law. <u>Swain</u> had been decided in 1965, and, of
course, the Equal Protection clauses of the United States and
Pennsylvania Constitutions also governed this issue at the time
of the trial in this case. Based upon the law as it existed at
the time of trial, trial counsel (who was also the defendant's
first appellate counsel) had objected again and again during voir
dire to the prosecutor's discriminatory use of peremptory
challenges (N.T. 5/19/83, p. 146, 204, 214-15; 5/20/83, p. 283;
5/25/83, p. 438, 485; 5/26/83, p. 591, 637, 764, 783, 807;
5/27/83, p. 898), moved unsuccessfully for a mistrial (N.T.
5/20/83, p. 289-90), and preserved this issue in post-trial
motions. Thus, she had a basis for raising this issue on appeal
but simply failed to do so. This omission constitutes
ineffective assistance of counsel. <u>See</u> <u>Commonwealth v. Davis</u>,
518 Pa. 77, 541 A.2d 315 (1988) (trial counsel ineffective for
failing to raise issue where abundant authority exists). In
addition, prior post-conviction counsel's failure to couch this
issue in terms of appellate counsel's ineffectiveness similarly
constitutes ineffective assistance of counsel.

In view of the strong principles underlying the <u>Batson</u>
decision and since the very essence of <u>Batson</u> is that a
discriminatory jury-selection process implicates the truth-
determining process, it is also clear not only that prior
counsel's inaction prejudiced defendant Murray, but that
counsel's ineffectiveness "so undermined the truth-determining

process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa. C.S. §9543(a).

The remedy of a new trial upon a finding of but one juror challenged due to racial reasons has been recognized by the United States Supreme Court in Batson. As the Pennsylvania Supreme Court said in granting a new trial in Dinwiddie, "the improper exclusion of a single juror based upon race is sufficient to 'taint' the proceedings, and the number of members of his race that survives to remain on the jury is irrelevant for purposes of legitimizing the selection process." 529 Pa. at 72 n.10, 601 A.2d at 1219 n.10 (citing Powers v. Ohio, 499 U.S. 400, 111 S. Ct. 1364, 1371, 113 L.Ed. 2d 411, 426 (1991)).

In addition, as the Third Circuit said in Harrison v. Ryan, 909 F.2d 84 (3d Cir. 1990), "the Batson court placed the requirements of justice and equal protection above the burden placed on the Commonwealth to retry the defendant before a jury from which no one has been excluded for a racially motivated reason." 909 F.2d at 88.

In this matter, the remedy of a new trial is likewise mandated. The PCRA court's decision to dismiss the claim regarding the Commonwealth's use of peremptory challenges was an abuse of discretion, and the defendant is entitled to a new trial. In the alternative, the case should be remanded for an evidentiary hearing at which the prosecutor must be called upon to explain the basis for exercising up to sixteen of his eighteen peremptory challenges against African-American jurors.

28

## II. AFTER-DISCOVERED EXCULPATORY EVIDENCE ENTITLES DEFENDANT MURRAY TO A NEW TRIAL.

Defendant Murray is entitled to a new trial in view of the after-discovered exculpatory testimony by both Douglas Haughton and Tyrone Wesson, presented at the evidentiary hearing on Murray's PCRA petition, that they were the only two individuals involved in the shooting death of Eric DeLegal and that Murray had not participated in any way in the incident.

Haughton testified at trial pursuant to an agreement with the Commonwealth, whereby he would receive a maximum ten- to twenty-year prison sentence in this case for third-degree murder, to run concurrently with a five-year sentence he was already serving in Colorado for bank robbery (N.T. 6/1/83, p. 214-15). According to his trial testimony, he, Murray, Holden and Wesson planned the robbery of DeLegal and, while he and Holden served as lookouts, Murray and Wesson, both armed, went into DeLegal's house. He further testified that he later was told that both Murray and Wesson shot DeLegal (N.T. 6/1/83, p. 217-46).

Also at trial, Wesson's alleged statement, which said substantially the same thing, was read to the jury (N.T. 6/15/83, p. 681-86; Exhibits C-15, C-18).

However, almost immediately after trial, both Haughton and Wesson acknowledged that they were the only participants in the robbery and/or shooting death of Eric DeLegal.

With regard to Haughton, he alerted Murray's trial counsel shortly after trial that he had lied at trial in order to obtain a lighter sentence. By way of affidavit dated April 11, 1985,

Haughton notified Murray's trial counsel that his trial testimony was false and that neither Murray nor Holden was involved at all in the incident (N.T. 7/25/91, 18-19). Instead, as Haughton said in his affidavit, Wesson approached him on the street and asked him where he could buy some marijuana, that he and Wesson went to DeLegal's house to buy marijuana, a gun struggle ensued, and both Wesson and DeLegal were stuck by bullets. See Affidavit of Douglas Haughton, attached as Exhibit A.

At the PCRA hearing, Haughton testified that his trial testimony was false, that he had testified against Murray in order to obtain a lighter sentence, that the events as related in his affidavit were true, and that neither Holden nor Murray participated at all in the incident that culminated in DeLegal's death (N.T. 7/25/91, p. 15, 19).

Haughton's testimony was corroborated by Eugene Thomas, who testified at the PCRA hearing that he was a former cellmate of Haughton, and that Haughton had confided to him that he had lied at trial in order to obtain a lighter sentence for himself and was feeling guilty that his false testimony resulted in an innocent man--Bruce Murray--being convicted and sentenced to life imprisonment (N.T. 7/25/91, p. 4-6).

As to Wesson, he told the court at the time of sentencing that he had wanted to testify at trial and that neither Holden nor Murray had any involvement with the crime; however, the court told him that the sentencing proceeding was not the proper forum in which to address these issues (N.T. 4/23/84, p. 15; 7/25/91, p. 46). Indeed, Wesson at all times had denied having made the

30

statement attributed to him; he contended at his own suppression hearing and at the PCRA hearing that the statement purportedly made by him was not in fact his statement, that he had not read the document, and that he had signed the document without the advice of counsel despite his request for counsel (N.T. 7/25/91, p. 65-67).

At the PCRA hearing, Wesson testified that only he and Haughton were involved in the incident (N.T. 7/25/91, p. 47). More specifically, he testified that he had asked Haughton where he could obtain some marijuana and that Haughton led him to DeLegal's house. He further testified that his alleged statement was false and that neither Holden nor Murray were involved in any way, but that he could not state these facts at trial because his attorney had advised him not to testify so as not to jeopardize a possible appeal (N.T. 7/25/91, p. 39-46).

To grant post-conviction relief on the basis of after-discovered evidence under 42 Pa. C.S. §9543(a)(2)(vi), the court must be satisfied that the evidence "could not have been obtained at trial by reasonable diligence, that it is not cumulative or of such a nature that it merely impeaches credibility, and that it would be likely to compel a different result." Commonwealth v. Galloway, 433 Pa. Super. 222, 640 A.2d 454 (1994).

In this case, the exculpatory evidence could not have been obtained at trial by reasonable diligence. Neither Haughton's nor Wesson's testimony existed at the time of trial. Instead, the evidence was presented at the first opportunity available to Murray's counsel. With regard to the evidence pertaining to

31

Haughton, this case was on appeal to the Superior Court at the time trial/appellate counsel received Haughton's affidavit in April 1985. Counsel requested the Superior Court to remand the matter for a hearing on the new evidence, but the Superior Court denied her request. Post-conviction counsel raised this issue in the amended PCHA petition and presented this evidence at the first opportunity to do so, which was not until July 25, 1991, at the evidentiary hearing on the post-conviction petition.

Similarly, the evidence pertaining to Wesson was presented at the first opportunity available. Wesson did not testify at trial, upon the advice of counsel, and at his first opportunity to speak in court, which was at sentencing, the court advised him that it was not appropriate for him to present facts about the crime at that time. Thus, the first chance to present the exculpatory evidence was at the PCRA hearing on July 25, 1991.

The Superior Court in Commonwealth v. Bonaccurso, 425 Pa. Super. 479, 625 A.2d 1197 (1993), held that a witness' testimony was "unavailable" for purposes of determining whether after-discovered evidence warranted a new trial, where the witness left the murder scene and lied to police about whether he had seen any of the day's events.

Similarly, in this case, as of the time of trial the exculpatory testimony of neither Haughton nor Wesson existed. All that existed were Haughton's false statements to police and Wesson's purported statement to police. Wesson's exculpatory version of the events did not even become known by Murray's attorney until sentencing, and Haughton's exculpatory statements

32

did not become known until he sent counsel the affidavit in April
1985. The evidence was therefore unavailable.

In addition, the testimony is not merely cumulative nor
merely impeaches credibility but, rather, is independent
substantive evidence that entirely exculpates defendant Murray.
Murray at all times has maintained his innocence and even
presented alibi witnesses, and the after-discovered exculpatory
evidence would certainly compel a different result at trial.

Although recanted testimony is ordinarily considered to be
unreliable, Commonwealth v. Gaddy, 492 Pa. 494, 424 A.2d 1268
(1981), and although a convicted defendant is ordinarily not
entitled to a retrial merely because a co-defendant later decides
to testify on the defendant's behalf Commonwealth v. Sanabria,
487 Pa. 507, 410 A.2d 727 (1980), the situation presented in this
case is different from the typical case involving recanted
evidence or exculpatory testimony by a co-defendant.

Unlike the typical situation where recanted testimony, or
exculpatory testimony by a co-defendant, comes forth for the
first time many years after trial and at no risk to the person
offering the new testimony, in this case the exculpatory
testimony was offered almost immediately after trial. Haughton
notified Murray's attorney as early as April 1985 that he had
lied at trial, while Wesson attempted to exonerate Murray at the
sentencing proceeding, just ten months after his conviction.

Furthermore, both Haughton and Wesson had nothing to gain
but much to lose by coming forth when they did and saying that
they were entirely responsible for the shooting death of DeLegal.

33

At the time that Haughton wrote to Murray's trial counsel in April 1985, he was still serving a five- to ten-year sentence in this case (N.T. 7/25/91, p. 14). He was not paroled until March 18, 1989, and at the time of the PCRA hearing he was incarcerated as a technical violator (N.T. 7/25/91, p. 15). The Commonwealth could have sought to vacate his sentence or to deny parole, on the basis that he breached his agreement with the Commonwealth.

Moreover, as acknowledged by the prosecution, his attempt to recant his testimony came within the statutory limitations period for perjury (N.T. 7/25/91, p. 20).

In addition, Haughton's trial testimony was drastically called into question upon cross-examination. The defense attorneys pointed out innumerable instances in which Haughton had contradicted prior statements he had made. For example, whereas Haughton testified at trial that Murray was armed with a gun, Haughton previously testified that only Wesson had a gun (N.T. 6/1/83, p. 334-36). In fact, Haughton even contradicted his own prior testimony regarding his own possession of a gun on the date of the incident; whereas he previously testified that he had a gun on that date, he testified at trial that he had no gun at all on that date (N.T. 6/1/83, p. 390-91; 6/2/83, p. 445).

Other inconsistencies in Haughton's testimony that were brought to the jury's attention concerned such important details as where and when the plan was devised, the number of guns distributed, where the guns were obtained, who made the decisions about the plan, the number of shots he heard, other persons present in DeLegal's house, the quantity of narcotics Haughton

had consumed before the incident, where Haughton went after he heard the shots, and whether Haughton had ever heard the sound of a shotgun blast before (N.T. 6/1/83, p. 254-55, 269, 277-82, 284, 310, 340, 371-74, 390-91; 6/2/83, p. 469-70, 498-99, 511, 576). When pressed, Haughton repeatedly stated that his present recollection was better than his recollection at the time of the earlier preliminary hearings (see, e.g., N.T. 6/1/83, p. 281-82).

A review of Haughton's incredible trial testimony makes his subsequent recantation all the more plausible, particularly when combined with the corroborating testimony of Eugene Thomas.

Wesson, too, had nothing to gain by presenting testimony to exculpate Murray. Instead, by attempting to offer this testimony before he was sentenced, he was putting himself at risk, and the fact that he was willing to do so renders his testimony reliable.

Finally, it must be pointed out that the judge who heard the testimony of both Haughton and Wesson at the PCRA hearing was not the judge who rendered the decision denying the PCRA petition. Whereas questions of credibility with regard to recanted testimony are ordinarily matters for the PCRA court due to the fact that the PCRA court had the opportunity observe the demeanor of the witnesses, Commonwealth v. Gaddy, supra, this general rule does not apply in this case, where the judge who observed the witnesses was not the one who rendered the decision.

Defendant Murray therefore submits that the after-discovered evidence in this case warrants the granting of a new trial.

### III. DEFENDANT MURRAY WAS UNFAIRLY PREJUDICED BY THE USE AT TRIAL OF THE REDACTED STATEMENT OF CO-DEFENDANT TYRONE WESSON.

The PCRA court erred in failing to grant permission to Bruce Murray to file a petition for allowance of appeal nunc pro tunc on the basis that he was unfairly prejudiced by a violation of the rule laid down in Bruton v. United States, 391 U.S. 123, 20 L.Ed. 2d 476 (1968), through the use at trial of co-defendant Wesson's redacted statement, and first appellate counsel's failure to timely file a petition for allowance of appeal raising this issue constituted ineffective assistance of counsel.

Prior to the trial in this case, the court denied the timely request by defendant Murray that his trial be severed from those of defendants Wesson and Holden. Subsequently, at the trial in this case, and over the objections of defense counsel, the Commonwealth read to the jury a statement allegedly made by co-defendant Wesson, which, although redacted, failed to disguise Wesson's implication of Murray as a perpetrator. Because Wesson did not take the stand, defendant Murray could not cross-examine him. In view of the prejudicial effect of Wesson's statement, the court abused its discretion in failing to sever the trial of Murray from those of his co-defendants. See copy of statement that was read to the jury, attached as Exhibit B.

The issue of the prejudicial effect of the court's failure to sever the defendant's trial was rejected by the Superior Court on direct appeal, but because Murray's attorney failed to timely file a petition for allowance of appeal, the Supreme Court denied

36

the petition, but without prejudice to Murray's right to seek post-conviction relief. <u>See</u> copy of Supreme Court order, attached as Exhibit C. Later, the PCRA court rejected Bruce Murray's petition for allowance of appeal <u>nunc pro tunc</u> with regard to this and other issues. The PCRA court's decision was in error.

Pa. R. Crim. P. 1127A(2) provides:

Defendants charged in separate indictments or informations may be tried together if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.

Pa. R. Crim. P. 1128 provides:

The court may order separate trials of offenses or defendants or provide other appropriate relief, if it appears that any party may be prejudiced by offenses or defendants being tried together.

It is clear that the decision of whether to sever trials of co-defendants is one within the sound discretion of the trial judge and will not be disturbed on appeal absent a manifest abuse of discretion. <u>Commonwealth v. Morales</u>, 508 Pa. 51, 404 A.2d 367 (1985). The defendant must show real potential for prejudice and not mere speculation. <u>Commonwealth v. Tolassi</u>, 489 Pa. 41, 413 A.2d 1003 (1980). Although the general policy of the law is to encourage joinder of offenses and consolidation of indictments when judicial economy can thereby be effected, the interest in judicial economy must be balanced against the need to minimize the prejudice that may be caused to a defendant by consolidation. <u>Commonwealth v. Lasch</u>, 464 Pa. 573, 347 A.2d 690 (1975).

In this case, the redacted statement of Wesson violated the <u>Bruton</u> rule because the redaction failed to disguise Wesson's

37

implication of defendant Murray, and Murray was severely prejudiced due to the denial of the motion to sever.

In <u>Bruton v. United States</u>, <u>supra</u>, the United States Supreme Court held that a defendant is denied his or her Sixth Amendment right to confrontation when a non-testifying co-defendant's statement naming the defendant as a participant in the crime is admitted at their joint trial. The Court's rationale, as summarized by the Pennsylvania Supreme Court, was that "the possibility of prejudice arising from the introduction of such a confession by a non-testifying codefendant is so great that a new trial is required even where the court specifically instructs the jury that the codefendant's confession must be considered as evidence only against that codefendant." <u>Commonwealth v. Wharton</u>, 530 Pa. 127, 607 A.2d 710, 716 (1992).

In response, our courts have approved the use of redaction as a method of protecting defendants' rights under <u>Bruton</u> by eliminating all references to an accused by name. <u>See</u> <u>Commonwealth v. Johnson</u>, 474 Pa. 410, 378 A.2d 859 (1977).

As cautioned more recently by this court, however, redacted testimony does not always cure a Sixth Amendment violation:

> Redacting testimony is not a magic curative elixir, but still requires a court to balance the potential prejudice to the defendant against the probative value of the evidence, the possibility of minimizing prejudice, and the benefits to the criminal justice system of conducting joint trials. Redacted testimony may still violate the <u>Bruton</u> rule if it is "powerfully incriminating" and lends "substantial, perhaps critical weight" to the prosecution's case.

38

<u>Commonwealth v. Oliver</u> 431 Pa. Super. 1, 635 A.2d 1045 (1993)
(quoting <u>Commonwealth v. Rawls</u>, 276 Pa. Super. 89, 97, 419 A.2d
109, 113 (1980)).

This court in <u>Oliver</u> went on to explain the need for caution
with regard to redaction:

> Our Supreme Court has recently underscored the
> importance of avoiding any return to pre-<u>Bruton</u>
> prejudice through unrealistic faith in the curative
> powers of redaction. In <u>Commonwealth v. Wharton</u>,
> Pennsylvania Supreme Court rejected as "too facile" the
> rationalization that the jury couldn't positively know
> who "the other person" is in a redacted confession.
> <u>Wharton, supra</u>, 530 Pa. at 142, 607 A.2d at 718.
> There, as here, a jury could easily fill in the blanks
> in the redacted testimony and thus could not help but
> use the testimony in assessing defendant's guilt.

<u>Commonwealth v. Oliver</u>, 635 A.2d at 1045.

Based on these principles, this court in <u>Oliver</u> held that
the defendant was entitled to a new trial because he was unfairly
prejudiced by the introduction of the entire confessions of the
nontestifying defendants, in violation of the <u>Bruton</u> rule, even
though the confessions had been redacted and even though the jury
had been given limiting instructions.

Moreover, the court reached its decision despite the fact
that the properly admitted evidence <u>might have been sufficient</u> to
sustain a guilty verdict:

> Thus, while the properly admitted evidence could
> be enough to sustain a guilty verdict, we simply do not
> know what the jury would have done had it been
> presented only with [the eyewitness'] rebutted
> testimony and considered only that much of the co-
> defendants' confessions which properly fell into the
> hearsay exception. . . . Our obligation to view all
> evidence in the light most favorable to the
> Commonwealth cannot be extended so far as to allow us
> to put aside the bulk of the evidence because of its
> prejudicial effect, then search the record for some bit
> of inconclusive and impeached testimony and use it to

> construct a hypothetical scenario in which the jury
> might have reached the same verdict. Rather, we must
> hold that [the defendant] was unfairly prejudiced by a
> violation of the <u>Bruton</u> rule, and deserves a new trial.

635 A.2d at 1046.

This court distinguished <u>Commonwealth v. Wharton</u>, <u>supra</u>, in which the Supreme Court held that, although the <u>Bruton</u> rule might have been violated, any such violation was harmless in light of the other overwhelming evidence of the defendant's guilt.

The statement in question in this case is the alleged statement of co-defendant Wesson admitting that, while two others served as lookouts, he and "one other guy" went into Eric DeLegal's house, tussled with guns, and shot DeLegal (N.T. 681-86; Exhibits C-15, C-18).

Although any references to Murray were redacted from Wesson's statement and the jury was instructed that the statement was not admissible against anyone but Wesson (N.T. 6/21/83, p. 1622-23), admission of Wesson's statement violated the <u>Bruton</u> rule because the statement clearly implied that Murray was a participant in the shooting of Eric DeLegal.

The redaction was grossly inadequate because a review of the statement, together with the trial testimony of Douglas Haughton, makes it quite simple to fill in the blanks with the other individuals' names. Just as Haughton described the planning meeting among himself and the three defendants at Holden's house, the redacted statement discussed the planning session involving "three other guys at one of their houses." And just as Haughton testified to the break-down of the group between the two lookouts

40

(he and Holden) and the two who entered DeLegal's house (Murray and Wesson), the redacted statement similarly divides the group between the two lookouts ("Two guys") and the two who went into DeLegal's house ("Me and one other guy").

Obviously, after listening to Haughton's testimony, the jury would have had no problem filling in the name "Murray" for the "guy" who accompanied Wesson into DeLegal's house.

In fact, the redacted version that was introduced at trial in this case made it even easier for the jury to narrow down the names of the individuals and to fill in the blanks than the statement in <u>Oliver</u>, due to the fact that the version that was read into evidence in this case did not redact any of the references to either Larry Thorpe or Elliot Burton (N.T. 6/15/83, p. 681-86; Exhibits C-15, C-18; <u>See</u> Interrogatories Addressed to Prior Counsel, Record Document No. D-31).[4] As in <u>Oliver</u>, with such a clear, undisguised statement, it would have been difficult for the factfinder to ignore the redacted testimony in assessing the defendant's guilt.

Furthermore, as in <u>Oliver</u> (and in contrast to <u>Wharton</u> and <u>Commonwealth v. Bond</u>, 539 Pa. 299, 652 A.2d 308 (1995) (in which the evidence of the defendant's guilt, including the defendant's own confession, was overwhelming), the other evidence against Murray was far from overwhelming. Indeed, the only evidence

_____

[4] The redacted version read to the jury differed from the one agreed to before the pretrial court on May 18, 1983. Unlike the redaction that Murray's trial counsel's had agreed to, the version read to the jury (at Wesson's counsel's insistence) did not redact any of the references to Larry Thorpe (N.T. 6/2/83, p. 474-81).

against Murray—the testimony of Haughton—is quite contradictory and tenuous.

As previously discussed, instance after instance of contradictory statements that had been given by Haughton was pointed out to the jury at trial. See section II of this argument, supra. Also at trial, the jury learned of the Haughton's agreement with the Commonwealth whereby he had agreed to testify against Murray and the other defendants in return for a maximum sentence of only ten to twenty years for his part in DeLegal's murder, which was to run concurrently with the five-year sentence for bank robbery that he was then serving in Colorado (N.T. 6/1/83, p. 215). Moreover, the jury was told that Haughton, also known as Brian Miles, had been convicted of all of the following crimes in the recent past:  bank robbery in April 1982; robbery in June 1980; theft in October 1981; and robbery, conspiracy and third-degree murder in September 1982 (N.T. 6/1/83, p. 197-99).

Without the benefit of the statement by co-defendant Wesson, the jury would have been left with only the contradictory testimony of a convicted thief and liar.  It is hard to believe that the jury could have based its verdict solely upon such weak evidence.  Rather, it is obvious that the jury relied heavily upon the redacted statement of co-defendant Wesson.  Conversely, without the benefit of Wesson's statement, the jury would not have had sufficient evidence to convict Murray.

Thus, not only did the introduction of Wesson's redacted statement violate the Bruton rule, but this violation prejudiced

42

defendant Murray to such an extent as to warrant a new trial. Under these circumstances, the court below abused its discretion in refusing to sever the trial of the co-defendants.

Nevertheless, although trial counsel raised on appeal the issue of prejudice to the defendant due to the denial of the motion to sever, she failed to timely file a petition for allowance of appeal and thereby failed to preserve this issue before the Supreme Court. There was no reasonable basis for counsel's omission; indeed, counsel at all prior times preserved this issue. Moreover, the prejudice to the defendant constitutes "clear and important reasons" for allowing an appeal to the Supreme Court. Pa. R. App. P. 1114. Accordingly, defendant Murray was denied the effective assistance of counsel.[5]

Furthermore, because the claim that the jury improperly was allowed to base its verdict on a co-defendant's statement that inculpated the defendant goes to the innocence of the defendant, it must be concluded that counsel's ineffectiveness so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

Accordingly, the PCRA court erred in failing to allow Bruce Murray to file a petition for allowance of appeal nunc pro tunc.

---

[5] Although the docket entries and notes of testimony reflect that Murray's motion for severance was denied by the pretrial court (N.T. 1/20/83, p. 12-13), trial counsel subsequently "withdrew" the motion, based upon an agreement with the prosecutor as to which redacted version would be used at trial (N.T. 5/18/83). If, in fact, trial counsel did withdraw the motion, then her action in doing so, as well as prior post-conviction counsel's failure to raise the issue of such ineffectiveness, constitute ineffectiveness of counsel.

IV.  THE COURT ILLEGALLY SENTENCED DEFENDANT
     MURRAY FOR BOTH POSSESSION OF AN INSTRUMENT
     OF CRIME AND CRIMINAL CONSPIRACY.

The defendant was sentenced for both criminal conspiracy,
under 18 Pa. C.S. §903, and possession of an instrument of crime,
under 18 Pa. C.S. §907.  This sentence violated 18 Pa. C.S. §906
as it existed at that time.

Prior to February 9, 1987, section 906 provided:

A person may not be convicted of more than one offense
defined by this chapter [Chapter 9 of the Crimes Code]
for conduct designed to commit or to culminate in the
commission of the same crime.

18 Pa. C.S. §906 (Multiple convictions barred).

Pursuant to this provision, a defendant's convictions of
both criminal conspiracy and possession of an instrument of crime
(both of which fall within Chapter 9 of the Crimes Code) were
improper where both offenses were perpetrated with one objective
in mind.  Commonwealth v. Gonzalez, 297 Pa. Super. 66, 443 A.2d
301 (1982).  An improper conviction of two inchoate crimes under
section 906 rendered the resulting sentence illegal.
Commonwealth v. Jackson, 280 Pa. Super. 522, 421 A.2d 845 (1980).
Under these circumstances, the appropriate remedy is to vacate
the judgment of sentence and arrest judgment on one conviction or
the other.  Commonwealth v. Hassine, 340 Pa. Super. 318, 490 A.2d
438 (1985).

In this case, it is clear that defendant Murray was
improperly convicted of both conspiracy and possession of an
instrument of crime for conduct designed to culminate in the

44

commission of the same crime, and that the resulting sentence is illegal.

Therefore, the PCRA court erred in denying Murray's petition as to this claim, and the sentence on the charge of either possession of an instrument of crime or criminal conspiracy must be vacated. See, e.g., Commonwealth v. Barnes, 388 Pa. Super. 327, 565 A.2d 777 (1989) (sentence imposed on charge of possession of instrument of crime vacated); Commonwealth v. Krysiak, 369 Pa. Super. 293, 535 A.2d 165 (1987), appeal denied, 518 Pa. 637, 542 A.2d 1366 (sentence imposed on charge of possession of instrument of crime vacated).

## CONCLUSION

For the foregoing reasons, it is respectfully requested that the sentence on the charge of either possession of an instrument of crime or criminal conspiracy be vacated and, as to the remaining charges, that the defendant be granted a new trial. In the alternative, the case should be remanded for an evidentiary hearing at which the prosecutor must be called upon to explain the basis for exercising between thirteen and sixteen of his eighteen peremptory challenges against African-American jurors. Also in the alternative, permission should be granted to the defendant to file a petition for allowance of appeal nunc pro tunc.

Respectfully submitted,

SHERYL S. CHERNOFF, ESQUIRE
ATTORNEY FOR APPELLANT

COUNTY OF PHILADELPHIA        :SS
                              :

I, DOUGLAS HAUGHTON, being duly sworn according to law, &
and say that the following statements are true and correct t
best of my knowledge, information and belief:

Attached to this Affidavit are two affidavits recently pre
by me in which I discuss and recant my confession and test
concerning the death of Eric DeLegal, also known as Kaboo
These affidavits were not notarized at the time they were
because I am incarcerated in prison and did not have access
Notary Public. However, the statements made in those docu
are true and correct.

I was arrested on February 24, 1981, and taken to the Fe
Building in Philadelphia. I was kept there for approximat
half a day without being able to talk to an attorney and wi
being told of my rights to have a lawyer or to be silent. A Fe
agent named Carpinelli told me that they had photographs and i
proving my involvement in a bank robbery. I was also questione
Philadelphia detective named Girard about the murder of Eric "Ka
ie" DeLegal. I was punched, shoved, and slapped in the face by
Carpinelli, who threatened me with a very stiff sentence on the
robbery and with a murder charge. Detective Girard kept sugg
that I cooperate. They bullied and insisted that I sign stat
naming Bruce Murray and Gregory Holden in this murder, as we
Tyrone "Scotty " Wesson. I was frightened and I believed that
would not stop and that things would not get better until I
the statements that they wanted and agreed to testify at the tr:

What really happened when "Kaboobie" died is this: I met '
tie" on 22d Street and he asked where we could go to buy
reefer. We went to "Kaboobie's" house because "Kaboobie" ov
$150.00. We could see that "Kaboobie" was high on drugs as so
we went in his house. "Kaboobie" noticed that there was a
and he reached for a sawed off shot gun that he kept right i
the front door. As he reached for it the gun fell and "S
grabbed "Kaboobie" and the gun. "Kaboobie" got loose and g
the gun and got his finger on the trigger and they kept scu
and the gun went off and hit "Kaboobie" in the chest. "Kab
went down and I saw him going for his gun while he was
floor. "Kaboobie" started shooting and he hit "Scotty" i
arm: at that time I grabbed "Kaboobie" and the gun and h
himself twice while I was trying to stop him from shooting "Kab
again.

Sworn to and subscribed before me
this 11 day of April 19 85

This is my affidavit 1/11/85 Douglas Haughton

Arlene  Rudney  ARLENE RUDNEY HALPERN        EXHIBIT A
                Notary Public, Phila, Phila Co

A guy I know had been talking about robbing Kaboobie for several days. On the day of the incident, I saw this guy, Larry Thorpe, and three other guys at one of their houses. The first guy I know was planning this robbery. Larry Thorpe was like overseeing the whole thing. Kaboobie had worked for Elliot Burton dealing drugs. he was doing marijuana, cocaine, [681/682] cough syrup, and things like that. There was this thing between Larry Thorpe, the second guy, and Elliot Burton over some guns, and they wanted to get even, so they decided on robbing Kaboobie. We all decided that two of us would be lookouts, while me and another guy went in.

We all walked over to Montrose Street, where Kaboobie lived. Two guys waited outside somewhere. I don't know exactly where they waited, but they waited. Larry Thorpe didn't go in with us. I don't know where he went.

Me and one other guy went to the door. I knocked on the door, and Kaboobie answered. The guy with me asked if he had any reefer. Kaboobie asked what he wanted. The guy with me said he was looking for some weight, an ounce. Kaboobie then said to come in.

Nobody else was inside. Kaboobie went down into the cellar and came back with the marijuana. When he came back, he wanted to see the money. The guy with me was stalling [682/683] around when Kaboobie asked for the money, and Kaboobie noticed the stall, and right after that, he reached for his gun.

He looked at me, and I looked at him, and went to reach for his gun, and I tried to grab it. He had a .32 revolver in his front waist-band under his shirt. It was a .32 short, nickel-plated with plastic rose-colored red handles.

Exhibit B p.1 of 2

We began to tussle for it at the same time. My gun, I had a
sawed-off 20-gauge bolt action shotgun in a paper bag, fell to the
carpet during the struggle. I had grabbed Kaboobie and had hold of
him and his gun, and was trying to pick my gun off the floor, and as
I got hold of it, Kaboobie got a little loose and grabbed the shotgun,
and his fingers was on the trigger, and as we scuffled, the shotgun
went off.

When it went off, it hit Kaboobie in the chest area. Kaboobie
went down, and I lost my grip on the gun, and I saw Kaboobie going fo
[683/684] his gun while he was on the floor, and I just tried to get
away from him, and then I heard the guy with me shooting. By this
time, Kaboobie had gotten his gun out and was shooting, and the guy
with me was shooting back at Kaboobie.

I ran out of the house to one of the other guys' houses.

After the narrative statement, there are questions and answers, which
here are paraphrased:

I don't know what happened to the shotgun, I never saw it
anymore. I got the shotgun at one of the other guys' houses. I don't
know whose gun it was. The guy with me had a revolver. I don't know
what kind. I next saw the guy who went inside with me the same night

Larry Thorpe was advising us about Elliot Burton, about how
Burton is armed and would shoot, telling us the best time to do it,
stuff like that. Thorpe said that all the stuff would be in the base-
ment.

I've known Douglas Haughton through the neighborhood for years.

I've known the other guys for years.

Police photo 566529 is Kaboobie.

I went to 11th grade at Rittenhouse Academy. Anything else I wan
to add? Yes: This shooting was accidental. I was just trying to stop
Kaboobie from shooting me. He pulled on the gun and it went off. I
just ran after that.

Nothing was taken from Kaboobie's house.

$Exhibit$ B p.2 ¶2

IN THE SUPREME COURT OF PENNSYLVANIA
Eastern District

COMMONWEALTH OF PENNSYLVANIA    :    No. 1372 E.D. Allocatur
                                :    Docket 1985
                                :
                                :
                v.              :
                                :
                                :
BRUCE MURRAY                    :
                Petitioner      :

ORDER

AND NOW, this 26th day of November, 1986, the Petition
for Leave to File Petition for Allocatur/Allowance of Appeal is
denied without prejudice to petitioner's right to seek P.C.H.A.
relief.

_____
                Chief Justice

TRUE COPY FROM RECORD
Attest:

_____
Patrick Tassos
Deputy Prothonotary
Supreme Court of Pennsylvania

EXHIBIT C

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

TRIAL DIVISION

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | NOVEMBER TERM, 1982 |
| | | NO. 1109 |
| v. | : | |
| BRUCE MURRAY | : | SUPERIOR COURT |
| | | NO. |

---

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | JANUARY TERM, 1983 |
| | | NO. 2978 |
| v. | : | |
| | | **FILED** |
| GREGORY HOLDEN | : | SUPERIOR COURT |
| | | NO.   FEB  6 1996 |

CRIMINAL APPEALS UNIT
FIRST JUDICIAL DISTRICT OF PA.

## OPINION

SAVITT, J.                                                    FEBRUARY 6, 1996

### PROCEDURAL HISTORY

Bruce Murray and Gregory Holden were tried before this court and a jury which

on June 24, 1983 found each man guilty of second degree murder, robbery (F1), conspiracy and

possession of an instrument of a crime. Post verdict motions were heard and denied on April 23,

1984.

Bruce Murray filed an appeal to Superior Court which affirmed the judgement of

sentence on November 1, 1985. His petition for allowance of appeal was denied by the

Pennsylvania Supreme Court on November 26, 1986. Murray filed a pro se petition on

December 30, 1986 under what was then the Post Conviction Hearing Act. Irene Cotton, Esquire

was appointed to represent him and filed a supplemental petition on March 14, 1988. The

Commonwealth filed a motion to dismiss and on December 12, 1988 Judge James McCruden

D-37

dismissed all but the five of the petitioner's allegations here determined.

Gregory Holden filed his petition under the Post Conviction Hearing Act on November 22, 1985 and on February 28, 1986 the Honorable William A. Meehan, Jr., then in private practice, was appointed to represent him and subsequently filed an amended petition. On February 16, 1988 counsel filed a supplemental amended petition. The Commonwealth's Motion to Dismiss was filed on April 11, 1988 and subsequently denied.

A hearing concerning both petitioners Murray and Holden was held on July 25, 1991 and the matter was continued for testimony of Murray's trial counsel, Pamela Pryor Cohen. On January 16, 1992 the case was transferred to the Honorable Joseph I. Papalini. No further testimony was taken, petitioner Murray's trial counsel having become a judge in the interim. On February 17, 1993 Judge Pamela Pryor Cohen, submitted answers to interrogatories regarding her representation of him and subsequent to that Murray filed a brief in support of his request for PCHA relief.[1]

Following Irene Cotton's death and William Meehan's appointment to the bench, Thomas McGill, Esquire was appointed to represent Murray and Bernard Siegel, Esquire was appointed to represent Holden. The case was transferred to this court on March 2, 1995, which, after affording counsel an opportunity to file supplemental briefs, heard argument on September 21, 1995 and on November 30, 1995 denied both petitioners relief. This appeal followed.

## OPINION

In his petition, petitioner Murray argues that trial counsel was ineffective for

---

[1]The Honorable Lydia Kirkland, who represented Holden at trial was deposed by PCRA counsel William A. Meehan, Jr., Esquire on October 28, 1992.

2

failing to timely file a petition for allowance of appeal to the Pennsylvania Supreme Court. In his petition Holden avers that trial counsel was ineffective for withdrawing the motion to sever the case from that of co-defendant Wesson, and for not advising him of his right to appeal. Both petitioners further argue that they are entitled to a new trial on the basis of the recantation of Douglas Haughton and the after discovered evidence consisting of the testimony of co-defendant Tyrone Wesson.

With respect to the issue of ineffectiveness, counsel is presumed to be effective and the defendant has the burden of proving ineffectiveness. Commonwealth v. Williams, 524 Pa. 218, 570 A.2d 75 (1990); Commonwealth v. McNeil, 506 Pa. 607, 587 A.2d 802 (1985); Commonwealth v. Stinnet, 356 Pa.Super. 83, 514 A.2d 154 (1986). In order to carry this burden the defendant must first show that the claim which counsel failed to raise has arguable merit and that counsel's failure to raise it was without a reasonable basis which would effectuate the defendant's best interests. Strickland v. Washington, 466 U.S. 688 (1984); Commonwealth v. Basemore, 525 Pa. 512, 582 861 (1990); Commonwealth v. Buel, 510 Pa. 363, 508 A.2d 1167 (1986); Commonwealth ex rel Washington v. Maroney, 427 Pa. 599, 235 A.2d 349 (1967). Second, the defendant must show that counsel's ineffectiveness worked to his prejudice. Strickland v. Washington, supra; Commonwealth v. Pierce, 515 Pa. 153, 527 A.2d 973 (1987), Commonwealth v. Buel, supra; Commonwealth v. Garvin, 355 Pa. Super. 560 485 A.2d 36 (1984). In order to show prejudice the defendant must demonstrate that there is a reasonable possibility that, but for counsel's unprofessional errors, the result of the trial could have been different. Strickland v. Washington, supra, Commonwealth v. Pierce, supra. Finally to prevail at a second or subsequent PCRA hearing the petitioner must show that because of counsel's errors

3

a miscarriage of justice occurred. Commonwealth v. Szuchon, supra.

Petitioner Murray's claim that trial counsel was ineffective for failing to timely file a petition for allowance of appeal to the Pennsylvania Supreme Court has no arguable merit. Review by the Supreme Court following Superior Court review is not constitutionally guaranteed but is purely discretionary and will be granted only when there are special and important reasons therefor. Pa.R.A.P.,Rule 1114, 42 Pa.C.S.A., Commonwealth v. Gilbert, 407 Pa.Super. 491, 595 A.2d 1254, allocatur denied, 529 Pa. 640, 600 A.2d 1258 (1991). No such special or important reasons have been shown here and petitioner is not entitled to a new trial on this basis.

Petitioner Holden's claim that trial counsel was ineffective for withdrawing his motion for severance because the redaction of co-defendant Wesson's statement permitted the jury to infer that Holden was one of the guys named in the statement has no merit.

With respect to the issue of redaction, in Commonwealth v. Wharton, 530 Pa. 127, 607 A.2d 710 (1992) the Pennsylvania Supreme Court ruled on the admissibility of two confessions which had been redacted by replacing names with the "other guy". Where the confession of one defendant involves the co-defendant by contextual implication, the court must consider the other evidence presented at trial in order to determine whether the defendant was prejudiced by the admission of the statement. If the prejudicial effect of the admission of the statement is so insignificant when compared to the other evidence that it issclear beyond a reasonable doubt that the error was harmless, no new trial is required.

In the case at bar the statement was redacted by using the words guy and other guys to replace the names of the defendants. This evidence is merely corroborative of the testimony of Douglas Haughten who described the incident and each defendant's participation in

4

it in detail. Accordingly, there has been no showing that petitioner by the redacted statement was prejudiced and he is not entitled to a new trial on this basis.

There is no merit to petitioner Holden's claim that he is entitled to a new trial because trial counsel failed to advise him of his right to appeal. Petitioner was fully informed of his right to appeal and his right to appointed counsel by this court following his sentencing on April 23, 1984. Further, Judge Kirkland, who had been privately retained, in her deposition, stated that following the outcome of the trial neither the petitioner nor his family ever asked her to appeal. Accordingly, petitioner, is not entitled to a new trial on this basis.

Recanting testimony is exceedingly unreliable, it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true... There is no less reliable form of proof, especially when it involves an admission of perjury. Commonwealth v. Gaddy, 492 Pa. 494, 496, 424 A.2d 1268, 1270 (1981); Commonwealth v. Coleman, 438 Pa. 373, 264 A.2d 649 (1970). Haughton, a co-defendant, testified against Murray and Wesson at trial in return for a plea to third degree murder. His testimony seven years after trial, at the July 1991 hearing bears no indicia of being true and indeed is incredible on its face. He testified at the heaaringthat his testimony at trial was false, but was almost totally unable to recall what that testimony had been. Nor did he remember the terms of his guilty plea to third degree murder. Yet Haughton claimed he could recall the events surrounding the murder which occurred some eleven years prior to his testimony at the PCRA hearing. Finally, Haughton risked no sanctions by so testifying having been sentenced in accordance with the plea agreement and on parole from that sentence at the time he testified. Petitioners are not entitled to a new trial on this basis.

Petitioners' claim that they are entitled to a new trial on the basis of after

5

discovered evidence in the form of Tyrone Wesson's testimony at the July 1991 hearing that petitioners were not involved in the killing has no merit.[2] In order to be entitled to a new trial on the basis of after discovered evidence, a petitioner must show first, that the evidence could not have been obtained prior to the conclusion of trial by the exercise of reasoonablediligence; second, it is not merely corroborative or cumulative; third, is not used solely for impeaching witnesses, and fourth, is of such a nature and character that a different verdict would likely result if a new trial were granted. Commonwealth v. Smith, 518 Pa. 15, 540 A.2d 246 (1988); Commonwealth v. Buehl, 510 Pa. 363, 508 A.2d 1167, cert. denied, Buehl v. Pennsylvania, 488 U.S. 871 (1987).

Not only did Wesson risk nothing by testifying on behalf of petitioner since he was already serving a life sentence for his own conviction, but his testimony at the July 1991 hearing lacked credibility for the same reasons as the testimony of Haughton. Accordingly, this testimony was not of such a nature that a different verdict would result if a new trial were granted and the petitioners are not entitled to relief on this basis.

Petitioners' other claims have no merit and will not be discussed further here.

For the reasons set forth herein petition's PCRA petitions were denied.

_____
                                                    J.

---

[2]Wesson did not testify at trial.

6