# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRUCE MURRAY, | : | |
|   Petitioner, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | No. 98-5866 (AB) |
| DONALD VAUGHN, et al., | : | |
|   Respondents. | : | |

## RESPONDENTS' 60(b)(6) RESPONSE

Petitioner Bruce Murray was convicted of second-degree murder and related offenses in 1983 on the basis of testimony from a single co-conspirator who later recanted. In November 2022, Murray filed his third 60(b) motion for relief from final judgment.

After careful review, and considering all of the evidence included in Murray's recent filing, Respondents agree that Murray has satisfied the actual innocence gateway for excusing procedural default announced in *Schlup v. Delo*, 513 U.S. 298 (1995), and that his habeas proceeding should be reopened to permit review of the merits of his claims. Respondents take no position at this stage on whether Murray is entitled to habeas relief from his conviction.

1

**I. FACTUAL AND PROCEDURAL HISTORY**

**A. The crime and investigation.**

Eric DeLegal was killed in his house in South Philadelphia on December 16, 1980. He was killed by a shotgun blast and multiple shots from handgun. After a joint trial, three men were convicted of murdering DeLegal: Tryone Wesson, Gregory Holden, and Bruce Murray. That conviction rested almost entirely on the testimony of a fourth conspirator, Douglas Haughton, who admitted involvement in the murder and testified against the other three in exchange for a plea deal. Houghton told the court that the two men who entered DeLegal's home and killed him were Wesson and Murray, and that he and Holden stood lookout across the street.

When the murder happened, police did not have any immediate leads. Near the beginning of their investigation, an informant and member of a local street gang named Elliott Burton told a prosecutor that a 16-year-old named Gregory Strickland was in the victim DeLegal's cellar at the time of the crime. ECF Nos. 101-13, 14; *Commonwealth v. Watts*, 412 A.2d 474, 476 (Pa. 1980). The police then interviewed Strickland, who told them that he was indeed in DeLegal's cellar at the time of the crime. Strickland told them he heard the gunshots and what sounded like two people go up and down

the stairs, but didn't see anyone. *See* ECF No. 101-10.[1] Strickland told the police he waited in the cellar after the men left for about 12 minutes before going upstairs, where he saw a neighbor tending to DeLegal's wounds. Strickland again denied seeing anything relevant to the shooting. *Id*.

The police also spoke to a second informant who told them that Strickland told him that he had seen Douglas Haughton in DeLegal's house and didn't see anyone else. The police re-interviewed Strickland, who denied this, and then they administered a polygraph exam that indicated deception by Strickland on the questions of who killed DeLegal and what Strickland saw. ECF Nos. 101-27, 28. The results of Strickland's polygraph exam were not disclosed to the defense. *See* ECF No. 101-88.

Yet a third informant then gave police their first lead that Gregory Holden was also involved. (Holden, again, was one of the three trial c0-defendants who allegedly served as a lookout with Haugton.) This informant said that Holden told him that he was in possession of the shotgun used in the murder and that the crime was committed by

---

[1] In between receiving the tip from Burton and interviewing Strickland, another man told the police that he saw Elliott Burton leave DeLegal's residence carrying a shotgun on the day of the crime. Police attempted to run down this tip, but it appears nothing came of it. This was never disclosed to the defense. ECF Nos. 101-14, 88.

Haughton, "Bruce," and "another male." Based on this tip, police obtained a search warrant for Holden's residence.

Police further investigated Holden the following month, when the police used Burton to have a recorded conversation with Holden. In it, Holden confirmed his belief that this "Bruce" was involved in the killing. ECF Nos. 101-17, 19. However, Holden also said that "Bruce" was shot in the upper left arm by DeLegal. This later became significant after police learned that the person actually shot in the upper left arm was co-defendant Tyrone Wesson, and that when Wesson went to the hospital for treatment of the gunshot wound he gave his name as "Bruce Murray." Neither the contents of this search warrant nor the audio recording was disclosed to the defense before trial. *See* ECF No. 101-88.

This case then seemingly went cold until over a year after the murder, when in February 1982 Douglas Haughton was arrested on unrelated federal bank robbery charges. Again, Haughton had been implicated before by Burton, who had told police that Strickland told him that he saw Haughton in the house participating in the murder. Haughton was interrogated by the FBI as well as Philadelphia Police Detectives Gilbert and Gerrard about his alleged role in DeLegal's death. In sum, Haughton told police that he conspired with Wesson, Murray, and Holden to rob DeLegal,

4

and that he and Holden stayed outside while Wesson and Murray went inside and killed DeLegal. Ultimately, Haughton pleaded guilty to third-degree murder in exchange for a lenient sentence and his cooperation in prosecuting Murray and his two co-defendants. After testifying at Murray's trial, Haughton was sentenced to 5-10 years imprisonment to run concurrently with his federal bank robbery sentence. He was released on parole in 1989. *See* ECF No. 101-45.

Seven months after Haughton's arrest, Philadelphia police arrested Murray for the murder of Eric DeLegal after being implicated by Haughton. A preliminary hearing was held at which Haughton testified against Murray and Wesson. Haughton testified that on the day of the crime, he, Murray, Wesson, and another co-defendant (Holden) all decided to rob DeLegal. He told the court that Wesson had a shotgun and Murray had a .32 pistol and that he and Holden served as lookouts from a schoolyard across the street while Murray and Wesson knocked on DeLegal's door. DeLegal let them in, after which Haughton heard a number of gunshots and fled the scene. N.T., 11/4/1982 at 8–12, 47–50. Haughton then told the court that, after fleeing the scene, he went to Murray's house, where Wesson and Murray admitted their involvement in the shooting. *Id.* at 13–15. The court

held the case for trial and Murray was arraigned for murder, robbery, and related firearm offenses.

**B. The trial**

Murray proceeded to a joint jury trial in May and June 1983 with Tyrone Wesson and Gregory Holden as co-defendants. The prosecution presented testimonial evidence from Douglas Haughton, uniformed police officers and detectives, and the assistant medical examiner.

Haughton again testified that he was with Murray and his co-defendants on the day of the murder when the four of them decided they wanted to rob DeLegal. N.T., 6/1/1983 at 223–24. He testified that they all agreed that he and Holden would serve as lookouts because DeLegal would not open the door for them due to an ongoing dispute over money and marijuana. *Id*. at 233–34, 247. Haughton again testified that Wesson carried a shotgun and Murray carried a .32 pistol. *Id*. at 226. Murray and Wesson knocked on the door, someone opened it, and they went inside. *Id*. at 241.

A couple of seconds after they entered the house, Haughton told the jury, he heard the sound of a shotgun blast followed by three shots coming from a handgun. N.T., 6/1/1983 at 242–43. At that point, Haughton turned and started walking through the schoolyard across from DeLegal's house and went to his brother's house. Twenty minutes later, Haughton went to

Murray's, where he saw Wesson bleeding from the arm and both men allegedly admitted to shooting DeLegal after a scuffle. *Id*. at 244–45.[2]

Though no firearms were recovered, police did recover a 20-gauge shotgun bolt and a spent shotgun shell from the scene, along with marijuana and drug paraphernalia. N.T., 5/31/1983 at 63–65; 72–74. The assistant medical examiner testified that DeLegal was shot once by a shotgun and at least four times by a revolver. *Id*. at 143–46. Also, Detective Lubiejewski read into the record a redacted version of Wesson's police statement confessing to the shooting and implicating "another guy" in the killing. N.T., 6/15/1983 at 681–86. The prosecution argued to the jury that this "other guy" was Bruce Murray, consistently with Haughton's testimony.

In his defense, Murray called three alibi witnesses and testified himself consistently with his alibi. Neither Gregory Strickland (the boy in the basement) nor any of the three informants were called by anyone.

---

[2] It also came out during Haughton's testimony that a couple months before this crime, Haughton robbed Murray's sister and girlfriend at gunpoint. N.T., 6/16/1983 at 888. In response, before the events of this case, Murray and a friend beat up Haughton with a large stick. *Id*. at 966–68, 970–75.

**c. Conviction, sentencing, and appellate proceedings**

After deliberating three full days, the jury convicted Murray and both his co-defendants of second-degree murder, robbery, and related offenses.

At the defendants' joint sentencing, Wesson told the court that he did not realize that he could have taken the stand at trial and that, if he had, he would have "cleared the other two defendants," meaning Murray and Holden. N.T., 4/23/1984 at 16–17. Murray and Holden also testified and told the court that they were innocent of the crime. *Id*. at 20, 24. Murray was sentenced to a mandatory term of life in prison without parole. Murray's conviction and sentence were affirmed by the Superior Court on direct appeal and no further appeal was taken. *Commonwealth v. Murray*, No. 01505 EDA 1984 (Pa. Super. Nov. 1, 1985).

The following year, in 1985, Haughton recanted his trial testimony and pretrial statement in two affidavits claiming he was physically coerced by Detective Gerrard into inculpating Murray. *See* ECF No. 101-36. Haughton then sent a letter to Murray's lawyer, again recanting his testimony and exculpating Murray. ECF No. 101-72. These recantations ultimately became the subject of Murray's first state postconviction petition.

At a 1991 state-court hearing regarding the recantations, Haughton (who had been released on parole) testified consistently with his

recantations that he had lied earlier, explaining that he lied both because he received a favorable deal and because he was coerced by police. N.T., 7/25/1991 at 22–31. Tyrone Wesson also testified, recanting his police statement and reiterating what he said at the sentencing hearing, *i.e.*, that Murray was not involved in the crime. He also added that the police tricked him into signing a premade statement confessing to the crime and implicating Murray without an attorney present. *Id.* at 46–47, 53–55. In their hearing testimony, Haughton and Wesson gave largely matching descriptions of the crime to the court: that the two of them went to DeLegal's house alone to buy marijuana, that only Haughton was armed at the time, that DeLegal pulled out a shotgun that Wesson grabbed, leading to a struggle during which the shotgun went off into DeLegal's chest, and then Haughton and DeLegal fired shots at each other. *See id.* at 19–23, 40–43. Haughton's former cellmate also testified, stating that Haughton had confessed to the crime and told him that Murray was innocent. N.T., 7/25/1991 at 4–7. The state postconviction court found both Haughton and Wesson not credible and denied relief. The Superior Court affirmed and the Pennsylvania Supreme Court denied allowance of appeal. *Commonwealth v. Murray*, No. 4273 EDA 1995 (Pa. Super. Nov. 13, 1996), *appeal denied*, 704 A.2d 636 (Pa. Nov. 10, 1997) (Table).

In 1998, Murray filed a timely federal habeas petition raising two claims: a *Batson* claim and an ineffective assistance of counsel claim. This Court denied Murray's *Batson* claim as procedurally defaulted and his ineffective counsel claim as meritless. *See* ECF No. 26.[3]

In 2001, Gregory Strickland, the boy in the basement, wrote a letter to the Innocence Project of Centurion Ministries claiming that he knew the other man in the house was Haughton and not Murray and that he didn't say anything out of fear. ECF No. 101-12. Strickland also alleged in the letter that Detective Gerrard and an unknown ADA took Strickland to a lineup and tried to get him to identify Murray as the other man but that he refused on counsel of his father, so they canceled the lineup. *Id*. The substance of Strickland's letter was presented to the state courts in Murray's 2006 PCRA petition, which was dismissed as untimely. *See Commonwealth v. Murray*, 972 A.2d 558 (Pa. Super. Mar. 17, 2009) (Table), *appeal denied*, 980 A.2d 607 (Pa. Sept. 15, 2009) (Table).

In 2011, Strickland signed an affidavit reiterating what he had put in his prior letter. In his letter and affidavit, Strickland again said that Haughton was the second man and that the police had presented him with a lineup in

---

[3] In between the time that Murray filed his first federal habeas petition and his current 60(b) motion, Murray filed two separate Rule 60(b) motions that were both denied because they relied on law that was inapposite.

1982 and asked him to ID Murray. He stated that he told the police that Murray was not there and he could not make such an ID. He stated that the lineup was canceled, and he was never contacted again. The substance of this affidavit was presented to the state courts in Murray's third PCRA petition, which also was dismissed as untimely. *Commonwealth v. Murray*, No. 3039 EDA 2013, 2014 WL 10917648 (Pa. Super. June 19, 2014).

During voluntary discovery engaged in as part of this litigation, Murray found in the police department's homicide file confirmation that a lineup was scheduled for February 1983 and that Strickland and his father were transported to participate in it and that, upon arriving, the lineup was canceled. This information was never disclosed to the defense, is favorable, and corroborates Strickland's repeated and consistent accounts.

In 2015 Murray filed a *pro se* motion under Rule 60(b)(6) of the Federal Rules of Civil Procedure, seeking to reopen his habeas proceeding based on his showing of actual innocence. ECF No. 45. This Court dismissed his motion as untimely. ECF No. 50. In 2018, Murray filed another *pro se* 60(b) motion arguing actual innocence and relying on *McQuiggin v. Perkins*, 569 U.S. 383 (2013), and *Satterfield v. Dist. Att'y of Phila.*, 872 F.3d 152 (3d Cir. 2017), arguing that his motion should be treated as timely. ECF Nos. 56, 79. This Court agreed that the Third Circuit's then-recent decision in *Satterfield*

11

rendered the 60(b) motion timely and *sua sponte* appointed counsel to file a supplement to Murray's motion arguing his actual innocence. ECF No. 83.

Last year, after completing voluntary discovery, Murray filed a counseled supplement to his pending Rule 60(b) motion, arguing that he has met the "actual innocence" gateway recognized in *Schlup v. Delo*, 513 U.S. 298 (1995) and extended/clarified in *McQuiggin* and *Satterfield*. ECF No. 101.

Respondents now respond.

## II. DISCUSSION

### A. Respondents agree that Murray has made a sufficient showing of actual innocence to allow him to reopen his federal habeas petition.

#### 1. Applicable legal standard

In *Schlup v. Delo*, 513 U.S. 298 (1995), the United States Supreme Court held that a credible showing of actual innocence can allow a habeas petitioner to overcome a procedural bar that would otherwise foreclose review of a defaulted constitutional claim. In *McQuiggin v. Perkins*, 569 U.S. 383 (2013), the Court extended *Schlup*'s fundamental miscarriage of justice exception to allow habeas petitioners to overcome a petition's untimeliness. Finally, in *Satterfield v. District Attorney of Philadelphia*, and relevant here, the Third Circuit held that *McQuiggin* was a change in relevant decisional law sufficient to reopen a habeas petition dismissed on procedural grounds

under Federal Rule of Civil Procedure 60(b)(6), "unless the totality of the circumstances ultimately weigh heavily in the other direction." 872 F.3d 152, 161–63 (3d Cir. 2017).

In order to meet the actual innocence standard announced in *Schlup*, (1) a petitioner must present new, reliable evidence of innocence, and, (2) in light of all the evidence, old and new, it must be more likely than not that any reasonable juror would have a reasonable doubt as to the petitioner's guilt. *House v. Bell*, 547 U.S. 518, 538 (2006).

As none of Murray's evidence was either available or presented at the time of trial, it is "new" for purposes of his Rule 60(b) motion. *Reeves v. Fayette SCI*, 897 F.3d 154, 164 (3d Cir. 2018). Therefore, "[t]he question is whether it is reliable." *Howell*, 978 F.3d at 60. Under *Schlup*'s first step, in determining reliability, "the timing of the petitioner's submission and the likely credibility of the witnesses bear on the probable reliability of that evidence, as well as the circumstances surrounding the evidence and any supporting corroboration." *Id*. (quoting *Reeves*, 897 F.3d at 161). Moving to *Schlup*'s second requirement, Murray must show that it is more likely than not that that no reasonable juror would have convicted him in light of it. *Schlup*, 513 U.S. at 324. In making this determination, the Court must consider "all the evidence, old and new, incriminating and exculpatory,

without regard to whether it would necessarily be admitted under the rules of admissibility that would govern at trial." *House*, 547 U.S. at 538. To meet this standard, "absolute certainty" of innocence is not required, and *House* held that the standard was met even though it was "not a case of conclusive exoneration" and aspects of the prosecution's evidence still supported an inference of guilt. *Id*. at 538, 553–54.

2. **Analysis**

Murray presents an array of new evidence to support his claim of actual innocence including:

- Haughton and Wesson's recantations and PCRA hearing testimony;

- Strickland's 2001 letter and 2011 affidavit as well as his undisclosed polygraph results and other undisclosed material from the police file supporting Strickland's version of events;

- the undisclosed evidence concerning the first informant, Elliott Burton and the tip about Burton fleeing the scene with a shotgun; and

- the undisclosed affidavit of probable cause to search Gregory Holden's residence and the audio recording of him talking to Burton suggesting that Murray was not involved.

14

Respondents view Haughton and Wesson's recantations and testimony as credible and agree that Murray has overcome section 2254(e)(1)'s presumption of correctness by clear and convincing evidence as to the finding that Haughton and Wesson were not credible. When the PCRA court considered Haughton and Wesson's recantations in 1991, it did not have the benefit of Strickland's letter, affidavit, polygraph results, or the police material strengthening those things. It also did not have the benefit of the affidavit of probable cause for searching Gregory Holden's home, or the information from and about Elliott Burton. All those materials, either undisclosed or not yet in existence at the time of the PCRA hearing, strengthen the recantations, which in turn strengthen each other. *See Howell*, 978 F.3d at 61 (noting that recantations can be "mutually corroborating evidence, with each one having the potential to bolster the reliability of the others). Given this new evidence[4], Respondents agree that Murray has overcome the state court's 1991 finding that Haughton and Wesson were

---

[4] Detective Gerrard, the assigned investigator who took statements from both Haughton and Wesson, has faced numerous misconduct allegations including coercing statements from witnesses. *See, e.g.*, Samantha Melamed, *Sex for Lies*, THE PHILADELPHIA INQUIRER (July 20, 2021), available [here](#). None of this information was available either at the time of Murray's trial or at his 1991 post-conviction hearing. Respondents agree that Detective Gerrard's history of misconduct allegations, in combination with the other evidence presented here, strengthens Haughton and Wesson's accounts of police coercion contained in their recantations.

15

not credible and that this Court is not bound by that determination. *See* 18 U.S.C. sec. 2254(e)(2); *Rolan v. Vaughn*, 445 F.3d 671, 681 (3d Cir. 2006) (state court factual finding not due deference when unsupported by the record); *cf. Wofford v. Woods*, 969 F.3d 685, 697-98 (6th Cir. 2020) (2254(e)(1) satisfied when available evidence refuted trial court's factual finding).

In addition to the recantations and state court testimony, Murray has presented Gregory Strickland's 2001 and 2011 affidavits, the results of his polygraph exam, and the line-up information from the police file. This information tells a consistent story that the second shooter in the house was Douglas Haugton and not Bruce Murray. Indeed, not only are the affidavits and polygraph results consistent with one another, but the recently discovered information from the police file confirms that, consistent with Strickland's version, he went to a line-up with his father that was abruptly cancelled on his arrival.

Murray also presents the undisclosed affidavit of probable cause to search Gregory Holden's residence and the audio recording of his conversation with Burton wherein he confuses Wesson with Murray, referring to "Bruce" as both the man involved and the man who was shot in the arm when that man was actually Wesson. Also, Murray's prior conflict with Haughton over the robbery of Murray's sister both made it

16

unlikely that Murray and Haughton would team up for a crime and gave Haughton a motive to falsely implicate Murray. All of this information then corroborates Haughton and Wesson's recantations in which they both allege that Murray was not involved with DeLegal's killing.

The only evidence of Murray's guilt presented at trial was Haughton's testimony and Wesson's police statement, which both men recanted almost immediately. Indeed, Wesson began recanting his statement as early as the pre-trial motion to suppress, telling the court that his statement was pre-written, he was forced to sign, and he was not allowed to speak with an attorney despite his requests. N.T., 5/23/83 at 387-91, 433.[5] Wesson spoke to the police months after Haughton had already given two written statements in which he implicated Wesson, Murray, and Holden. Haughton told the PCRA court in 1991 that he did not offer Murray's name initially until after he was offered a lenient sentence in exchange for his cooperation. N.T., 7/25/1991 at 27-38.

---

[5] Murray may also assert that the admission of Wesson's statement, which implicates "another man" that the prosecution argued was Murray, violated *Bruton v. United States*, 391 U.S. 123 (1968). *See Vazquez v. Wilson*, 550 F.3d 270, 281 (3d Cir. 2008) (finding a *Bruton* violation where non-testifying's statement referenced "other guy" in case involving only three people).

Given the above, Respondents are constrained to conclude that Murray has made a showing sufficient to satisfy *Schlup.* Considering all the evidence, old and new, regardless of admissibility, Respondents agree that it is likely that any reasonable juror would have had a reasonable doubt as to Murray's guilt if they'd had the complete picture now available to the Court. *Reeves*, 897 F.3d at 161.

Murray has put forward compelling evidence supporting his claim of innocence, and "although the issue is close," *House*, 547 U.S. at 554, Respondents agree that he has satisfied *Schlup* and may reopen his initial habeas petition pursuant to Federal Rule of Civil Procedure 60(b)(6).

        Respectfully submitted,


        */s/ David Napiorski*
        DAVID J. NAPIORSKI
        ASSISTANT DISTRICT ATTORNEY

# CERTIFICATE OF SERVICE

I, David J. Napiorski, hereby certify that on this 18th day of January, 2023, the foregoing response was served via the Court's electronic filing system on all counsel of record.

Respectfully submitted,

/s/ *David Napiorski*
DAVID J. NAPIORSKI
ASSISTANT DISTRICT ATTORNEY
