**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **BRUCE MURRAY,** | **CIVIL ACTION** |
| **Petitioner,** | |
| **v.** | **No. 98-cv-5866** |
| **GINA CLARK, SUPERINTENDANT OF SCI-CHESTER; THE DISTRICT ATTORNEY FOR THE COUNTY OF PHILADELPHIA, and THE ATTORNEY GENERAL OF THE COMMONWEALTH OF PENNSYLVANIA,** | **Anita B. Brody, S.J.** |
| **Respondents.** | |

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

---

**STRADLEY RONON STEVENS & YOUNG, LLP**
Michael J. Engle, Esquire (PA I.D. No. 85576)
Ryan Aloysius Smith, Esquire (PA ID No. 329246)
One Commerce Square
2005 Market Street, Suite 2600
Philadelphia, PA 19103
T: (215) 564-8737
F: (215) 564-8120
mengle@stradley.com
rsmith@stradley.com

Dated: May 2, 2023          *Counsel for Petitioner Bruce Murray*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................... vi

**TABLE OF EXHIBITS TO MEMORANDUM OF LAW** ..................................... xvii

**PRELIMINARY STATEMENT** ..............................................................................1

**JURISDICTION AND VENUE** ...............................................................................2

**PARTIES** .................................................................................................................2

**PROCEDURAL HISTORY** .....................................................................................3

    I.    State Court Proceedings ..................................................................................3

        A.  Trial and Direct Appeal ...........................................................................3

        B.  Post-Conviction Proceedings ..................................................................4

    II.   Federal Court Proceedings .............................................................................9

        A.  Original Petition for Writ of Habeas Corpus .........................................9

        B.  Rule 60(b) Motions and Application for Leave to File Successive Petitions .............10

**STATEMENT OF THE CASE** ...............................................................................12

    I.    Jury Selection ...............................................................................................12

    II.   Bruce Murray's Actual Innocence ...............................................................17

**STANDARD OF REVIEW** ....................................................................................17

**ARGUMENT** .........................................................................................................19

    I.    The *Brady* Claims (Grounds Four Through Fourteen) ...............................19

        A.  The Commonwealth suppressed evidence and information favorable to the defense, including exculpatory and impeachment material. ................................... 21

            1.   The Commonwealth suppressed handwritten notes and a police activity sheet that were admissible impeachment evidence and also would have led to admissible exculpatory evidence and additional impeachment evidence in the form of Strickland's trial testimony. .................................................................. 22

2. The Commonwealth suppressed Strickland's polygraph results that would have led to admissible exculpatory evidence in the form of his trial testimony. ...........23

3. The Commonwealth suppressed George Young's polygraph description of the shorter, skinnier male that would have led to admissible exculpatory evidence in the form of Young's trial testimony.................................................................... 28

4. The Commonwealth suppressed the tip from John Howard that was admissible impeachment evidence and exculpatory evidence pointing towards Elliott Burton as an alternative suspect. .......................................................................................32

5. The Commonwealth suppressed the affidavit of probable cause to search Gregory Holden's residence and the audio recording of his conversation with Burton, which tended to exculpate Murray........................................................................34

6. The Commonwealth suppressed information pertaining to Burton's role as an informant in the police investigation, which trial counsel could have been used to impeach the paltry police investigation into Kaboobie's death. ...........................37

7. The Commonwealth suppressed police paperwork reflecting that police initially believed that Haughton was one of the two men who went into Kaboobie's house and killed him, and trial counsel could have used this evidence to impeach the paltry police investigation. .................................................................................... 44

B. The suppressed evidence and information are material because their nondisclosure undermines confidence in the verdict. .........................................................................45

1. The prosecution's case against Murray was inherently weak because it rested solely on Haughton's uncorroborated accomplice testimony. .............................. 45

2. The prosecution offered no competent evidence to rebut Murray's credible alibi defense, aside from Haughton's uncorroborated accomplice testimony. ..............49

3. The Commonwealth committed at least 11 separate *Brady* violations................. 49

   a. Suppression of Gregory Strickland's Polygraph Report (Ground Five)......... 50

   b. Suppression of the Fact that Strickland Saw Haughton Inside Kaboobie's House (Ground Six) ....................................................................................50

   c. Suppression of Strickland's Polygraph Results, the Fact that Strickland Saw Haughton Inside Kaboobie's House, the Affidavit of Probable Cause to Search Holden's House, and Strickland's Refusal to Accuse Murray Before the Canceled Police Lineup (Ground Seven)....................................................51

   d. Suppression of George Young's Description of the Skinnier, Shorter Male (Ground Eight) ...................................................................................................52

e.   Suppression of John Howard's Tip About Elliott Burton (Ground Nine) ....... 52

f.   Suppression of the Affidavit of Probable Cause to Search Gregory Holden's Residence and the Audio Recording of His Conversation with Burton (Ground Ten) ................................................................................................. 53

g.   Suppression of the Information Pointing to Haughton as the Other Man Inside Kaboobie's House (Ground Eleven) ................................................................. 53

h.   Suppression of the John Howard Tip and the Information About Elliott Burton's Role as an Informant (Ground Twelve) ............................................. 54

i.   Suppression of the Undisclosed Information Concerning Gregory Strickland (Ground Thirteen) ............................................................................................ 55

j.   Suppression of the Paperwork Reflecting that Police Initially Suspected Haughton Was One of the Two Shooters Who Went Inside Kaboobie's House and Killed Him (Ground Fourteen) .................................................................. 58

k.   Collective Materiality of the Suppressed Evidence and Information (Ground Four) ................................................................................................................ 58

C.   Conclusion .......................................................................................................... 59

II.   The *Bruton* Claim (Ground One) ..................................................................................... 59

A.   Murray's *Bruton* claim satisfies the exhaustion requirement, and his actual-innocence claim overrides the procedural-default rule. ............................................................. 59

B.   The prosecution's use of Tyrone Wesson's confession at the joint trial violated Murray's confrontation rights under the Sixth Amendment because Wesson's redacted confession implicated Murray as "the other guy" who went inside Kaboobie's house. ................................................................................................... 60

C.   The *Bruton* error was not harmless. .......................................................................... 64

1.   Wesson's statement was important to the prosecution's case against Murray because the only other evidence inculpating Murray came from the accomplice testimony of Douglas Haughton, whom the trial prosecutor conceded had credibility issues. ............................ 65

2.   Wesson's statement was not merely cumulative of Haughton's testimony. .................... 66

3.   Aside from Haughton's testimony, which contradicted Wesson's confession on material points, there was no evidence corroborating Wesson's inculpation of Murray. .............. 67

4.   Murray had no opportunity to cross-examine Wesson because Wesson did not testify at their joint trial. ................................................................................................. 68

5. The prosecution's case against Murray was inherently weak because it rested solely on Haughton's uncorroborated, since-recanted accomplice testimony.................................. 68

6. Murray raised a credible alibi defense at trial................................................ 71

7. Murray has proven his factual innocence. ........................................................ 72

D. Conclusion ........................................................................................................72

III. The *Batson* Claim (Ground Two) ...............................................................................73

A. Murray's *Batson* claim satisfies the exhaustion requirement, and his actual-innocence claim overrides the procedural-default rule. ..............................................73

B. *Batson* applies retroactively to Murray's case because his conviction and sentence were not yet final at the time of the *Batson* decision..................................................73

C. The prosecution's discriminatory use of peremptory challenges in the selection of the jury at Murray's trial violated his right to equal protection under the Fourteenth Amendment...................................................................................................75

1. Step One: The record presents a prima facie case of purposeful discrimination...76

2. Step Two: ADA Marano failed to offer a race-neutral explanation. ...................78

3. Step Three: ADA Marano engaged in purposeful discrimination by using his peremptory challenges against black citizens based on their race. .......................80

D. Murray is automatically entitled to relief on the *Batson* claim because the *Batson* violation was a structural error that led to a fundamentally unfair trial......................83

E. Conclusion ........................................................................................................84

IV. The *Swain* Claim (Ground Three)...............................................................................84

A. Murray's *Swain* claim satisfies the exhaustion requirement, and his actual-innocence claim overrides the procedural-default rule. ...............................................84

B. The prosecution's use of peremptory challenges violated Murray's right to equal protection under the Fourteenth Amendment because in his case the Philadelphia District Attorney's Office applied its unofficial policy of using peremptory challenges against black jurors based on race. ............................................................ 84

1. ADA Marano's use of peremptory challenges in Murray's case is not entitled to the presumption of correctness because he volunteered his reasons for using them against black venirepersons. ...............................................................................85

iv

2.   Murray has established a prima facie case under *Swain* because there is evidence that Philadelphia District Attorney's Office had a policy of using peremptory challenges against black venirepersons based on their race, and that ADA Marano implemented that policy in his case. .................................................................... 87

C.   Murray is automatically entitled to relief on the *Swain* claim because the *Swain* violation was a structural error that led to a fundamentally unfair trial......................96

D.   There is good cause for discovery into the District Attorney's Office policy of using peremptory strikes against black citizens and ADA Marano's use of peremptory challenges in other cases ............................................................................................ 96

E.   Conclusion .................................................................................................................97

**CONCLUSION** ..................................................................................................................**98**

## TABLE OF AUTHORITIES

*Abu-Jamal v. Horn (Abu-Jamal II),*
520 F.3d 272 (3d Cir. 2008)........................................................................................73, 89, 92

*Almeida v. Jeffes (Almeida II),*
566 F. Supp. 852 (E.D. Pa. 1983) ..................................................................................48, 67, 69

*Andrews v. Scuilli,*
853 F.3d 690 (3d Cir. 2017)....................................................................................................29

*Arnold v. United States,*
94 F.2d 499 (10th Cir. 1938) ...................................................................................................66

*Barney v. Adm'r of N.J. State Prisons,*
48 F.4th 162 (3d Cir. 2022) ....................................................................................................18

*Batson v. Kentucky,*
476 U.S. 79 (1986)..................................................................................................... *passim*

*Bennett v. Superintendent Graterford SCI,*
886 F.3d 268 (3d Cir. 2018)....................................................................................................18

*Bond v. Beard,*
539 F.3d 256 (3d Cir. 2008)....................................................................................................71

*Bowen v. Maynard,*
799 F.2d 593 (10th Cir. 1986) .................................................................................................21

*Bracy v. Gramley,*
520 U.S. 899 (1997)................................................................................................................97

*Brady v. Maryland,*
373 U.S. 83 (1963).................................................................................................... *passim*

*Brecht v. Abrahamson,*
507 U.S. 619 (1993)..........................................................................................................17–18

*Brinson v. Vaughn,*
398 F.3d 225 (3d Cir. 2005)..............................................................................................89, 96

*Bruton v. United States,*
391 U.S. 123 (1968).................................................................................................. *passim*

*Butler v. Long,*
752 F.3d 1177 (9th Cir. 2014) ...................................................................................................2

*Caspari v. Bohlen*,
510 U.S. 383 (1994) ............................................................................................74

*Castille v. Peoples*,
489 U.S. 346 (1989) ...........................................................................59, 73, 84

*Commonwealth v. Abu-Jamal (Abu-Jamal I)*,
Nos. 1357-1358, Jan. Term, 1982 (Pa. C.P. Phila.) .......................................94

*Commonwealth v. Almeida (Almeida I)*,
452 A.2d 512 (Pa. Super. 1982) ...................................................................48, 67

*Commonwealth v. Basemore*,
744 A.2d 717 (Pa. 2000) ....................................................................................88

*Commonwealth v. Bosworth*,
22 Pick. 397 (Mass. 1839) ................................................................................48

*Commonwealth v. Brown*,
417 A.2d 181 (Pa. 1980) ...................................................................................91

*Commonwealth v. Cook*,
952 A.2d 594 (Pa. 2008) ...................................................................................90

*Commonwealth v. Cox*,
17 A. 227 (Pa. 1889) .........................................................................................48

*Commonwealth v. Dinwiddie*,
601 A.2d 1216 (Pa. 1992) .................................................................................90

*Commonwealth v. Edney*,
464 A.2d 1386 (Pa. Super. 1983) .....................................................................91

*Commonwealth v. Emmett*,
74 Pa. Super. 86 (1920) ...............................................................................48, 66

*Commonwealth v. Epps*,
148 A. 523 (Pa. 1930) .......................................................................................35

*Commonwealth v. Fowler*,
393 A.2d 844 (Pa. Super. 1978) (en banc) ......................................................91

*Commonwealth v. Green*,
400 A.2d 182 (Pa. Super. 1979) .......................................................................91

*Commonwealth v. Hardcastle (Hardcastle I),*
No. 3288-93, June Term, 1982 (Pa. C.P. Phila.).........................................................94

*Commonwealth v. Henderson,*
438 A.2d 951 (Pa. 1981) ............................................................................................ 90

*Commonwealth v. Jackson,*
562 A.2d 338 (Pa. Super. 1989).............................................................................82, 91

*Commonwealth v. Johnson,*
437 A.2d 1175 (Pa. 1981) .......................................................................................39, 41

*Commonwealth v. Jones,*
371 A.2d 957 (Pa. Super. 1977).................................................................................91

*Commonwealth v. Jones,*
247 A.2d 624 (Pa. Super. 1968).................................................................................67

*Commonwealth v. Turner,*
80 A.2d 708 (Pa. 1951) ..............................................................................................69

*Commonwealth v. Watts,*
412 A.2d 474 (Pa. 1980) .........................................................................................38, 41

*Commonwealth v. Weaver,*
568 A.2d 1252 (Pa. Super. 1989)...............................................................................91

*Davis v. Ayala,*
576 U.S. 257 (2015)....................................................................................................17

*Delaware v. Van Arsdall,*
475 U.S. 673 (1986) ...............................................................................................65–68

*Dennis v. Sec., Pa. Dep't of Corrs.,*
834 F.3d 263 (3d Cir. 2016).................................................................20, 23–24, 43

*Deputy v. Taylor,*
19 F.3d 1485 (3d Cir. 1994)........................................................................................ 76

*Diggs v. Vaughn (Diggs I),*
Civ. A. No. 90-2083, 1990 WL 117986 (E.D. Pa. Aug. 8, 1990)...............................90

*Diggs v. Vaughn (Diggs II),*
Civ. A. No. 90-2083, 1991 WL 46319 (E.D. Pa. Mar. 27, 1991)...............................75

*Eley v. Erickson*,
712 F.3d 837(3d Cir. 2013)...........................................................................61

*Ford v. Norris*,
67 F.3d 162 (8th Cir. 1995) .....................................................................86, 96

*Ford v. Georgia*,
498 U.S. 411 (1991).................................................................................73, 85

*Freeman v. Capozza*,
517 F. Supp. 3d 407 (E.D. Pa. 2021) ...........................................................64

*Freeman v. Superintendent Fayette SCI*,
62 F.4th 789 (3d Cir. 2023) .................................................................. *passim*

*Garrett v. Morris*,
815 F.2d 509 (8th Cir. 1987) ........................................................................86

*Giglio v. United States*,
405 U.S. 150 (1972).......................................................................................19

*Gray v. Maryland*,
523 U.S. 185 (1998).................................................................................60, 64

*Griffith v. Kentucky*,
479 U.S. 314 (1987).......................................................................................74

*Hardcastle v. Horn (Hardcastle II)*,
368 F.3d 246 (3d Cir. 2004).....................................................................75–81

*Hardcastle v. Horn (Hardcastle III)*,
521 F. Supp. 2d 388 (E.D. Pa. 2007) ...........................................................90

*Harris v. Nelson*,
395 U.S. 286 (1969).......................................................................................97

*Harrison v. Ryan*,
909 F.2d 84 (3d Cir. 1990)......................................................................75, 90

*Haskins v. Superintendent Greene SCI*,
755 Fed. App'x 184 (3d Cir. 2018)................................................................32

*Hassine v. Zimmerman*,
160 F.3d 941 (3d Cir. 1998)..........................................................................18

*Henderson v. Johnson*,
710 F.3d 872 (9th Cir. 2013) ...................................................................2

*Holloway v. Horn*,
355 F.3d 707 (3d Cir. 2004)...................................................................89

*Horton v. Zant*,
941 F.2d 1449 (11th Cir. 1991) .............................................................87

*Jackson v. Herring*,
42 F.3d 1350, 1357 (11th Cir. 1995) .....................................................88

*Jerrell v. Balkcom*,
735 F.2d 1242 (11th Cir. 1984) .............................................................32

*Johnson v. Folino*,
705 F.3d 117 (3d Cir. 2013).................................................................20

*Johnson v. Lamas*,
850 F.3d 119 (3d Cir. 2017)...........................................................17–18

*Johnson v. Superintendent Fayette SCI*,
949 F.3d 791 (3d Cir. 2020)...........................................................60–62

*Johnston v. Love*,
165 F.R.D. 444 (E.D. Pa. 1996)..........................................................97

*Jones v. Davis*,
835 F.2d 835 (11th Cir. 1988) ..............................................................87

*Jones v. Ryan*,
987 F.2d 960 (3d Cir. 1993)..................................................................76

*Kyles v. Whitley*,
514 U.S. 419 (1995).................................................................. *passim*

*Lark v. Beard (Lark I)*,
Civ. A. No. 01-1252, 2006 WL 1489977 (E.D. Pa. May 23, 2006) ............................95

*Lark v. Beard (Lark III)*,
Civ. A. No. 01-1252, 2012 WL 3089356 (E.D. Pa. July 30, 2012)..............................89

*Lark v. Sec'y, Pa. Dep't of Corr. (Lark II)*,
645 F.3d 596 (3d Cir. 2011)..................................................................95

*Lark v. Sec'y Pa. Dep't of Corr. (Lark IV)*,
566 Fed. App'x 161 (3d Cir. 2014)..................................................................89

*Lindsey v. King*,
769 F.2d 1034 (5th Cir. 1985) .......................................................................21

*Love v. Jones*,
923 F.2d 816 (11th Cir. 1991) .......................................................................85

*McKendrick v. Zimmerman*,
Civ. A. No. 89-4783, 1990 WL 135712 (E.D. Pa. Sept. 12, 1990) ...............87

*McQuiggin v. Perkins*,
569 U.S. 383 (2013).......................................................................... *passim*

*Mendez v. Artuz*,
303 F.3d 411 (2d Cir. 2002)...........................................................................90

*Munchinski v. Wilson*,
694 F.3d 308 (3d Cir. 2012)...........................................................................23

*O'Neal v. McAninch*,
513 U.S. 432 (1995).................................................................................17–18

*Palmer v. Hendricks*,
592 F.3d 386 (3d Cir. 2010)...........................................................................18

*Powers v. Ohio*,
499 U.S. 400 (1991)...............................................................................83, 86

*Priester v. Vaughn*,
382 F.3d 394 (3d Cir. 2004)...........................................................................61

*Purkett v. Elem*,
514 U.S. 765 (1995) (per curiam) ...........................................................78–79, 81

*Reeves v. Fayette SCI*,
897 F.3d 154 (3d Cir. 2018)......................................................................72, 97

*Rhines v. Weber*,
544 U.S. 269 (2005).........................................................................................2

*Richardson v. Marsh*,
481 U.S. 200 (1987).......................................................................................60

*Rico v. Leftridge-Byrd,*
340 F.3d 178 (3d Cir. 2003)..............................................................76

*Riley v. Taylor,*
277 F.3d 261 (3d Cir. 2001) (en banc)..............................................81

*Rollins v. Horn,*
Civ. A. No. 00-1288, 2005 WL 1806504 (E.D. Pa. 2005) ...............90

*Rose v. Lundy,*
455 U.S. 509 (1982).............................................................................2

*Rose v. Mitchell,*
443 U.S. 545 (1979)...........................................................................83

*Schlup v. Delo,*
513 U.S. 28 (1995).............................................................................72

*Simmons v. Beyer,*
44 F.3d 1160 (3d Cir. 1995)..............................................................75

*Sistrunk v. Vaughn,*
96 F.3d 666 (3d Cir. 1996).........................................................85, 89

*Smith v. Cain,*
565 U.S. 73 (2012).............................................................20, 50, 58

*Smith v. Holtz,*
210 F.3d 186 (3d Cir. 2000)..............................................................32

*Smith v. Horn,*
120 F.3d 400 (3d Cir. 1997)..............................................................18

*Smith v. Wetzel,*
Civ. A. No. 13-2410, 2016 WL 8761773 (E.D. Pa. June 30, 2016) ...........90

*Smith v. Yeager,*
465 F.2d 272 (3d Cir. 1972)..............................................................85

*State v. Brown,*
371 So.2d 751 (La. 1979) ..................................................................88

*State v. Washington,*
375 So.2d 1162 (La. 1979) ..........................................................88–89

*Strauder v. West Virginia*,
100 U.S. 303 (1879)..................................................................................75, 84

*Strickler v. Greene*,
527 U.S. 263 (1999)............................................................................................19

*Swain v. Alabama*,
380 U.S. 202 (1965)................................................................................... *passim*

*Tillery v. United States*,
411 F.2d 644 (5th Cir. 1969) ...........................................................................45, 69

*Trevino v. Texas*,
503 U.S. 562 (1992)............................................................................................73

*United States v. Adigun*,
998 F. Supp. 2d 356 (M.D. 2014) .....................................................................83

*United States v. Agurs*,
427 U.S. 97 (1982)..............................................................................................27

*United States v. Alvin*,
30 F. Supp. 323 (E.D. Pa. 2014) ...................................................................32, 43

*United States v. Bagley*,
473 U.S. 667 (1985).......................................................................................19–20

*United States v. Casoni*,
950 F.2d 893 (3d Cir. 1991)..............................................................................27

*United States v. Clemons*,
843 F.2d 741 (3d Cir. 1988)..................................................................76–77, 80

*United States v. Cross*,
308 F.3d 308 (3d Cir. 2002)............................................................................. 66

*United States v. Gardner*,
244 F.3d 784 (10th Cir. 2001) ..........................................................................69

*United States v. Hale*,
422 U.S. 171 (1975)............................................................................................95

*United States v. Henke*,
222 F.3d 633 (9th Cir. 2000) ............................................................................95

*United States v. Harris*,
192 F.3d 580, 588 (6th Cir. 1999) ................................................................. 83

*United States v. Ives*,
609 F.2d 930 (9th Cir. 1979) ........................................................................ 66

*United States v. Lafferty*,
387 F. Supp. 500 (W.D. Pa. 2005) ................................................................ 95

*United States v. Reyeros*,
537 F.3d 270 (3d Cir. 2008) ......................................................................... 19

*United States v. Richards*,
241 F.3d 335 (3d Cir. 2001) ......................................................................... 61

*United States v. Schnanerman*,
150 F.2d 941 (3d Cir. 1945) ......................................................................... 65

*United States v. Williams*,
81 F.3d 1434 (7th Cir. 1996) ........................................................................ 66

*United States v. Williams*,
463 F.2d 393 (10th Cir. 1972) ...................................................................... 69

*United States v. Zirpolo*,
450 F.2d 424 (3d Cir. 1971) ......................................................................... 85

*United States ex rel. Hubbard v. Page*,
985 F. Supp. 820 (N.D. Ill. 1997) ................................................................... 3

*Vazquez v. Wilson*,
550 F.3d 270 (3d Cir. 2008) .................................................................... 61–62

*Walton v. Caspari*,
916 F.2d 1352 (8th Cir. 1990) ...................................................................... 86

*Watson v. Commonwealth*,
95 Pa. 418 (1880) ............................................................................... 48, 66–67

*Weary v. Cain*,
577 U.S. 385 (2016) ............................................................................ 20, 50, 58

*Weathersby v. Morris*,
708 F.2d 1493 (9th Cir. 1983) ................................................................. 86–87

*Weaver v. Massachusetts*,
137 S. Ct. 1899 (2017) ........................................................................................19

*Wood v. Bartholomew*,
516 U.S. 1  (1995) ..............................................................................................45

*Williams v. Beard*,
637 F.3d 195 (3d Cir. 2011) ...............................................................................89

*Williams v. Folino*,
625 Fed. App'x 150 (3d Cir. 2015) .........................................................60, 62–63

*Yohn v. Love*,
76 F.3d 508 (3d Cir. 1996) .................................................................................18

**Statutes and Federal Rules**

28 U.S.C. § 2101(d) (1982) ................................................................................74

28 U.S.C. § 2254 ..................................................................................................2

28 U.S.C. § 2254(b)(3) ........................................................................................2

Fed. R. Evid. 801(d)(2)(B).................................................................................95

Rules Governing Section 2254 Cases in the U.S. District Courts, Rule 2(a) .................3

Rules Governing Section 2254 Cases in the U.S. District Courts, Rule 2(b) ................3

Rules Governing Section 2254 Cases in the U.S. District Courts, Rule 6(a) ..............96

Rules of the Supreme Court of the United States, Rule 13 (1980) ...............................74

**Books**                                                                 **Page(s)**

SEAN PATRICK GRIFFIN, BLACK BROTHERS INC. (2005) ........................................37–39

SEAN PATRICK GRIFFIN, PHILADELPHIA'S BLACK MAFIA: A SOCIAL AND POLITICAL HISTORY
(2003) ............................................................................................................37–38

## <u>TABLE OF EXHIBITS TO MEMORANDUM OF LAW</u>

**Exhibit 1**      Commonwealth's Rule 60(b) Response (01/18/23)

**Exhibit 2:**     Douglas Haughton Affidavits (04/11/85), attached to Bruce Murray's Motion for Remand (05/13/85)

**Exhibit 3:**     Deposition of the Honorable Lydia Kirkland (10/28/92)

**Exhibit 4:**     Commonwealth Discovery Transmittal Letter (12/28/82)

**Exhibit 5:**     Edward Randolph First Statement on Kaboobie's Death (03/11/81)

**Exhibit 6:**     Handwritten Police Notes (Undated)

**Exhibit 7:**     Police Activity Sheet (03/11/81)

**Exhibit 8:**     Gregory Strickland Polygraph Report (03/13/81)

**Exhibit 9:**     Gregory Strickland Affidavit (07/20/11)

**Exhibit 10:**    Letter from Gregory Strickland to Centurion Ministries (12/01/00)

**Exhibit 11:**    Gregory Strickland Police Statement (01/06/81)

**Exhibit 12:**    George Young Polygraph Report (12/16/80)

**Exhibit 13:**    Prosecutor Copy of Douglas Haughton's First Police Statement

**Exhibit 14:**    Criminal Complaint Against Douglas Horton (03/23/82)

**Exhibit 15:**    Criminal Complaint Against Gregory Holden (03/17/81)

**Exhibit 16:**    Douglas Haughton Presentence Report (12/14/82)

**Exhibit 17:**    George Young Police Statement (12/16/80)

**Exhibit 18:**    Tyrone Wesson Form 229 (09/11/82)

**Exhibit 19:**    Hospital of the University of Pennsylvania Medical Records (12/16/81)

**Exhibit 20:**    Police Homicide Record (12/17/80)

**Exhibit 21:**    Bruce Murray Mugshot (07/05/81)

**Exhibit 22:**    Tyrone Wesson Mugshot (11/23/81)

**Exhibit 23:**    Tyrone Wesson Criminal Extract

**Exhibit 24:**    Myles Bryant Mugshot (11/09/80)

**Exhibit 25:**    Social Security Record for Douglas Haughton

**Exhibit 26:**    Gregory Holden Mugshot (11/24/80)

**Exhibit 27:**    Police Activity Sheet (01/05/81)

**Exhibit 28:**    Tyrone Wesson Unredacted Statement (09/11/82)

**Exhibit 29:**    Search Warrant and Probable Cause Affidavit (02/25/81)

**Exhibit 30:**    Audio Recording Labeled "Recording of Phone Conversation, Elliot – Gregory Holden"

**Exhibit 31:**    Declaration of Brenda Murray (02/20/23)

**Exhibit 32:**    Bruce Murray Notice of Alibi Defense (02/18/83)

**Exhibit 33:**    Tyree Johnson, *Black Mafia Returns in Wake of Gang Feud*, PHILA. DAILY NEWS (Aug. 23, 1976)

**Exhibit 34:**    Elliott Burton Criminal Extract and Mugshot (10/10/80)

**Exhibit 35:**    Police Activity Sheet (01/05/81)

**Exhibit 36:**    Elliott Burton Social Security Administration Death Record

**Exhibit 37:**    Edward Randolph Polygraph Report (03/11/81)

**Exhibit 38:**    Post-Arrest Paperwork for Douglas Haughton (04/01/82)

**Exhibit 39:**    Gregory Strickland Police Statement (03/13/81)

**Exhibit 40:**    Tyrone Wesson Redacted Confession

**Exhibit 41:**    Commonwealth Response to Original Habeas Petition

**Exhibit 42:**    David C. Baldus et al., *Racial Discrimination and the Death Penalty in the Post-Furman Era: An Empirical and Legal Overview with Recent Findings from Philadelphia*, 83 CORNELL L. REV. 1368 (1998)

**Exhibit 43:**    David C. Baldus et al., *The Use of Peremptory Challenges in Capital Murder Trials: A Legal and Empirical Analysis*, 3 U. PA. J. CON. L. 1 (2001)

**Exhibit 44:**    Jury Selection with Jack McMahon Transcript

Petitioner Bruce Murray, by and through his attorneys Michael J. Engle, Esquire, and Ryan Aloysius Smith, Esquire, hereby submits this Memorandum of Law in Support of his Amended Petition for Writ of Habeas Corpus.

## PRELIMINARY STATEMENT

Petitioner Bruce Murray has spent more than 40 years in prison for a murder that he did not commit. Murray has always asserted his factual innocence, and this Honorable Court vindicated his actual-innocence claim by granting his Motion for Relief from Final Order and Judgment Pursuant to Federal Rule of Civil Procedure 60(b)(6) ("Counseled and Amended Rule 60(b) Motion"). Murray's conviction rests solely on the uncorroborated accomplice testimony of Douglas Haughton, whose recantation the Commonwealth of Pennsylvania has conceded is credible in light of the new evidence presented in support of Murray's actual-innocence claim.[1] The Commonwealth also conceded Murray had proven that, in light of the new evidence, any reasonable juror, acting reasonably, would have had reasonable doubt about his guilt.

Murray's wrongful conviction resulted from a myriad of reversible constitutional violations, including the Commonwealth's suppression of material exculpatory and impeachment evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny; the Commonwealth's use of a codefendant's confession that implicated Murray, in violation of *Bruton v. United States*, 391 U.S. 123 (1968), and its progeny; the Commonwealth's brazenly discriminatory use of peremptory challenges against black venirepersons, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986); and the prosecution's systematic use of peremptory challenges against black venirepersons based solely on race over a period of time, in violation of *Swain v. Alabama*, 380 U.S. 202 (1965).

---

[1] A copy of the Philadelphia District Attorney's Office response to Murray's Rule 60(b) Motion is attached hereto as Exhibit 1. The Office's response with be referred to hereafter as "Commonwealth Rule 60(b) Response."

This Amended Petition for Writ of Habeas Corpus (the "Amended Petition") raises properly exhausted claims under *Bruton*, *Batson*, and *Swain*, which are not subject to the procedural-default rule or the Anti-Terrorism and Effective Death Penalty Act's (AEDPA) statute of limitations because Murray has satisfied the actual-innocence exception. *See McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). The Amended Petition also raises a myriad of *Brady* claims and requests that the Commonwealth waive the exhaustion requirement given the strength of those claims.[2]  For the reasons set forth below, Petitioner Bruce Murray respectfully requests that this Honorable Court grant the Amended Petition, vacate his convictions and sentences, and issue a conditional writ of habeas corpus and an order directing that the Commonwealth either retry him or release him within ninety (90) days of the writ's issuance.

## JURISDICTION AND VENUE

Jurisdiction is based on 28 U.S.C. § 2254, which provides Murray with the right to bring this Amended Petition because he is in state custody in violation of his federal constitutional rights. Venue is proper because Murray was convicted and sentenced by the Court of Common Pleas of Philadelphia County, which is located within the Eastern District of Pennsylvania.

## PARTIES

Murray is incarcerated by the Pennsylvania Department of Corrections and is currently confined in the State Correctional Institution (SCI) at Chester, serving a life sentence without the

---

[2]    The district court may consider the merits of an unexhausted claim if "the State, through counsel, expressly waives the requirement." 18 U.S.C. § 2254(b)(3). If the Commonwealth declines to waive the exhaustion requirement as to the *Brady* claims, Murray respectfully requests that the Court grant him "leave to amend the petition to delete any unexhausted claims and to proceed on the exhausted claims." *Butler v. Long*, 752 F.3d 1177, 1180 (9th Cir. 2014) (quoting *Henderson v. Johnson*, 710 F.3d 872, 873 (9th Cir. 2013)); *see also Rhines v. Weber*, 544 U.S. 269, 279 (2005) ("[A petitioner] can always amend the petition to delete the unexhausted claims, rather than returning to state court to exhaust all of his claims." (alteration in original) (quoting *Rose v. Lundy*, 455 U.S. 509, 522 (1982))).

possibility of parole. Respondent Gina Clark is the Superintendent of SCI Chester.[3] The Philadelphia District Attorney's Office is the prosecutor's office for the County of Philadelphia and represents the Commonwealth in all criminal prosecutions brought within the City and County of of Philadelphia, including the prosecution of Murray.[4]

## PROCEDURAL HISTORY

### I.  State Court Proceedings

#### A.  Trial and Direct Appeal

On September 11, 1982, Petitioner Bruce Murray was arrested and charged with offenses related to the murder of Eric "Kaboobie" DeLegal. On November 4, 1982, after a joint preliminary hearing, Murray and one other man (Tyrone Wesson) were held for court on the murder charge and related charges. The prosecution was conducted by Assistant District Attorney (ADA) Robert Marano for the Philadelphia District Attorney's Office.

On June 24, 1983, after a joint jury trial with Judge David Savitt presiding, Murray and two other men (Gregory Holden and Tyrone Wesson) were found guilty of murdering DeLegal and related offenses. Murray was convicted of second-degree murder, criminal conspiracy, robbery, and possession of an instrument of a crime. A copy of the verdict report against Murray

---

[3]   Murray is required to "name as respondent the state officer who has custody," which refers to his immediate custodian. *See* Rules Governing Section 2254 Cases in the U.S. District Courts, Rule 2(a). Rule 2(a) requires that the petitioner name his immediate custodian as the respondent. Murray's original habeas corpus had identified Donald Vaughn, the then-warden of SCI Graterford, where Murray was confined when he filed his original petition. Mr. Vaughn has been substituted out as a respondent because Murray was transferred from SCI Graterford (which was closed in 2018) and now is in the immediate custody of Superintendent Gina Clark at SCI Chester.

[4]   The Attorney General of the Commonwealth of Pennsylvania is not named as a respondent to this proceeding because Murray is currently in custody under the state-court judgment being contested, and the Attorney General should be named as a respondent only "[i]f the petitioner is not yet in custody—but may be subject to future custody—under the state-court judgment being contested." *See* Rules Governing § 2254 Cases, Rule 2(a), (b); *see also United States ex rel. Hubbard v. Page*, 985 F. Supp. 820, 820 n.1 (N.D. Ill. 1997) ("Only when the petitioner may be subject to future custody should the petition name as respondent both the state officer who presently has custody over the applicant and the state attorney general."). The Philadelphia District Attorney's Office has been named as a respondent because it has previously been designated as the Respondent on the behalf of the Commonwealth in this proceeding.

is attached to the Amended Petition as Attachment 1. On April 23, 1984, Murray was sentenced to mandatory life imprisonment without the possibility of parole. Copies of the trial court's judgment of conviction and sentence are attached to the Amended Petition as Attachment 2.

On or about November 1, 1985, the Pennsylvania Superior Court denied Murray's direct appeal from his conviction and sentence. Copies of the Superior Court's judgment and memorandum opinion are attached to the Amended Petition as Attachment 3.  On or about December 5, 1985, Murray's first appellate counsel filed an untimely petition for allowance of appeal to the Pennsylvania Supreme Court. A copy of a December 10, 1986 letter from Murray's direct appellate counsel acknowledging the untimeliness of the petition is attached to the Amended Petition as Attachment 4.[5] On November 26, 1986, the Pennsylvania Supreme Court denied Murray's petition for allowance of appeal due to noncompliance with state timeliness rules. A copy of the Supreme Court's order is attached to the Amended Petition as Attachment 5.

### B.  Post-Conviction Proceedings

On December 30, 1986, Murray filed a pro se petition for relief under the Pennsylvania Post-Conviction Hearing Act (PCHA). A copy of the PCHA petition is attached to the Amended Petition as Attachment 6. On March 14, 1988, after obtaining the assistance of counsel, Murray filed an amended PCHA petition. A copy of the amended PCHA petition is attached is attached to the Amended Petition as Attachment 7. The issues raised in the amended PCHA petition included the following:

> 1.  Whether first appellate counsel was ineffective in failing to raise in Murray's direct appeal the issue of the prosecutor's use of peremptory challenges in a racially discriminatory fashion in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986);

---

[5]    Murray has been unable to locate a copy of the petition for allowance of appeal. In 2000, Magistrate Judge Diane M. Welsh noted that a copy had not been provided as part of Murray's original habeas corpus petition. *See* Second Report and Recommendation at 3 (attached to Amended Habeas Petition as Attachment 38).

2.  Whether Murray's Sixth Amendment rights were violated by the prosecution's use of codefendant Tyrone Wesson's redacted confession which alluded to and clearly identified Murray; and

3.  Whether after-discovered exculpatory evidence consisting of Wesson's and Douglas Haughton's recantations should have been considered because of their relevancy to Murray's actual innocence.

On July 25, 1991, an evidentiary hearing was held before Judge James C. McCrudden on certain issues raised in Murray's and his codefendant Gregory Holden's respective PCHA petitions. At the hearing, Wesson and Haughton recanted their prior statements inculpating Murray and Holden and testified that both men were actually innocent.[6] A third witness, Eugene Thomas, also testified and corroborated Haughton's recantation.

On June 9, 1993, Murray filed a supplemental brief in the PCHA proceedings, wherein he reiterated his actual innocence, argued in support of the issues in his amended PCHA petition, and raised a freestanding *Batson* claim. A copy of Murray's supplemental brief is attached to the Amended Petition as Attachment 8. On November 30, 1995, Judge Savitt denied Murray's amended PCHA petition. A copy of Judge Savitt's opinion dated February 6, 1996 is attached to the Amended Petition as Attachment 9.

On December 18, 1995, Murray filed a timely appeal from Judge Savitt's order to the Pennsylvania Superior Court. On November 13, 1996, the Superior Court affirmed the denial of postconviction relief as to the claims identified above. The Superior Court vacated the judgment of sentence imposed for possession of an instrument of a crime because Pennsylvania law bars sentencing for two inchoate offenses.[7] Copies of the Superior Court's judgment and memorandum

---

[6]  Wesson initially recanted at his joint sentencing hearing with Murray and Holden on April 23, 1984. (Sentencing N.T. 04/23/1983 at 16–17). Haughton initially recanted in two affidavits in April 1985 and a letter to Murray's then counsel in May 1985. (Ex.2B, Douglas Haughton Affidavits (04/11/85), attached to Bruce Murray's Motion for Remand (05/13/85)).

[7]  Murray had received two separate sentences for conspiracy and possession of an instrument of a crime, which in Murray's case were both inchoate offenses of second-degree murder. (Attachments 1 and 2 to Amended Petition).

opinion are attached to the Amended Petition as Attachment 10. Murray then filed a timely petition for allowance of appeal to the Pennsylvania Supreme Court. On November 10, 1997, the Supreme Court denied Murray's petition of allowance of appeal. A copy of the Supreme Court's order is attached to the Amended Petition as Attachment 11.

On or about February 3, 2006, Murray filed a pro se second petition for postconviction relief under the Pennsylvania Post-Conviction Relief Act (PCRA). A copy of Murray's second postconviction relief petition is attached to the Amended Petition as Attachment 12. On May 13, 2008, the Common Pleas Court dismissed Murray's pro se second postconviction relief petition as untimely. Copies of the court's order and opinion are attached to the Amended Petition as Attachment 13. On March 17, 2009, the Superior Court affirmed the dismissal of Murray's pro se second postconviction relief petition. A copy of the Superior Court's memorandum opinion is attached to the Amended Petition as Attachment 14. On September 15, 2009, the Pennsylvania Supreme Court denied Murray's petition for allowance of appeal from the Superior Court's order affirming the denial of his pro se second postconviction relief petition. A copy of the Supreme Court's order is attached to the Amended Petition as Attachment 15.

On or about July 26, 2011, Murray filed a pro se third postconviction relief petition. A copy of Murray's pro se third petition is attached to the Amended Petition as Attachment 16. On October 4, 2013, the Common Pleas Court dismissed Murray's pro se third postconviction relief petition as untimely. Copies of the court's order and opinion are attached to the Amended Petition as Attachment 17. On June 19, 2014, the Superior Court affirmed the dismissal of Murray's pro se third postconviction relief petition. A copy of the Superior Court's memorandum opinion is attached to the Amended Petition as Attachment 18. On December 12, 2014, the Pennsylvania Supreme Court denied Murray's petition for allowance of appeal from the Superior Court's order

affirming the dismissal of his third postconviction relief petition. A copy of the Supreme Court's order is attached to the Amended Petition as Attachment 19.

On or about August 12, 2014, a fourth pro se postconviction relief petition that Murray had filed in the Civil Trial Division was transferred to the Criminal Division of the Philadelphia Court of Common Pleas. A copy of Murray's fourth postconviction relief petition is attached to the Amended Petition as Attachment 20. On February 3, 2016, the Common Pleas Court dismissed Murray's fourth postconviction relief petition as untimely. Copies of the court's order and opinion are attached to the Amended Petition as Attachment 21.[8] On February 12, 2016, Murray filed a timely notice of appeal from the Common Pleas Court's order dismissing his fourth postconviction relief petition.

On February 24, 2016, while his appeal of the dismissal of his fourth postconviction relief petition was still pending, Murray filed a pro se fifth postconviction relief petition. A copy of Murray's fifth postconviction relief petition is attached to the Amended Petition as Attachment 22. On March 8, 2017, the Common Pleas Court dismissed Murray's fifth postconviction relief petition as premature. A copy of the court's order is attached to the Amended Petition as Attachment 23.

On April 28, 2017, while his appeal of the dismissal of his pro se fourth postconviction relief petition was still pending, Murray filed a sixth petition for postconviction relief. A copy of Murray's sixth postconviction relief petition attached to the Amended Petition as Attachment 24. On June 6, 2017, the Common Pleas Court dismissed Murray's pro se sixth postconviction relief petition as premature. Copies of the court's order and opinion are attached to the Amended Petition as Attachment 25.

---

[8]   In its opinion, the Common Pleas Court incorrectly listed the date of the fourth petition as April 10, 2015.

On July 18, 2017, while his appeal of the dismissal of his fourth pro se postconviction relief petition was still pending, Murray filed a habeas corpus petition in the Civil Trial Division of the Court of Common Pleas. On July 27, 2017, the court transferred the petition to the Criminal Trial Division. On August 15, 2007, Murray responded to the transfer of his petition by filing a supplemental memorandum titled "Writ of Quo Warranto and Habeas Corpus Relief." The Court of Common Pleas treated these filings as Murray's seventh postconviction relief petition. A copy of Murray's seventh postconviction relief petition is attached to the Amended Petition as Attachment 26. On October 27, 2017, the Common Pleas Court dismissed Murray's seventh postconviction relief petition as premature. A copy of the court's order is attached to the Amended Petition as Attachment 27.

On January 17, 2018, the Superior Court affirmed the dismissal of Murray's fourth postconviction relief petition. A copy of the Superior Court's memorandum opinion is attached to the Amended Petition as Attachment 28. On March 26, 2018, the Superior Court affirmed the dismissal of Murray's sixth postconviction relief petition. A copy of the Superior Court's memorandum opinion is attached to the Amended Petition as Attachment 29. On July 13, 2018, the Superior Court affirmed the dismissal of Murray's seventh postconviction relief petition. A copy of the Superior Court's memorandum opinion is attached to the Amended Petition as Attachment 30.

On November 20, 2018, the Pennsylvania Supreme Court denied Murray's petition for allowance of appeal from the Superior Court's order affirming the dismissal of his fourth postconviction relief petition. A copy of the Supreme Court's order is attached to the Amended Petition as Attachment 31. On April 10, 2019, the Pennsylvania Supreme Court denied Murray's petition for allowance of appeal from the Superior Court's order affirming the dismissal of his

seventh postconviction relief petition. A copy of the Supreme Court's order is attached to the Amended Petition as Attachment 32.

On May 24, 2019, Murray filed a pro se eighth postconviction relief petition. A copy of Murray's eighth postconviction relief petition is attached to the Amended Petition as Attachment 33. On July 5, 2022, the Common Pleas Court dismissed Murray's eighth postconviction relief petition. Copies of the court's order and opinion are attached to the Amended Petition as Attachment 34. On July 25, 2022, Murray filed a timely appeal of the dismissal of his eighth postconviction relief petition. On March 14, 2023, after Murray obtained pro bono counsel to represent him in his state court proceedings,[9] the Superior Court granted his counseled application to discontinue the appeal of his eighth pro se PCRA petition, providing Murray a clear procedural path to file a ninth PCRA petition raising *Brady* claims based on newly discovered evidence.

## II.    Federal Court Proceedings

### A.  Original Petition for Writ of Habeas Corpus

On November 5, 1998, Murray filed his original Petition for Writ of Habeas Corpus ("Original Petition"). A copy of Murray's Original Petition is attached to the Amended Petition as Attachment 35. On September 9, 1999, Magistrate Judge Diane M. Welsh issued her First Report and Recommendation "that an evidentiary hearing be held to afford the Respondent an opportunity to produce race neutral explanations for each peremptory challenge of a black venireperson the prosecutor exercise during jury selection in the Petitioner's 1983 trial." (ECF No. 17).

On December 8, 1999, this Court declined to approve and adopt the First Report and Recommendation, disagreeing with Magistrate Judge Welsh's "determination that Petitioner is presently raising, and has properly exhausted a Fourteenth Amendment *Batson* claim" because

---

[9]    Murray's attorneys in the instant proceedings are serving as his pro bono counsel in his state court proceedings.

"[n]o *Batson* claim was exhausted in the state court system or alleged in the habeas petition." (ECF No. 25). The Court remanded the Original Petition to Magistrate Judge Welsh for consideration of three claims:

1. Whether Murray's direct appellate counsel was ineffective for failing to raise a claim that the prosecutor had exercise his peremptory strikes in a racially discriminatory manner, in violation of *Batson*;

2. Whether the admission into evidence at Murray's trial of a non-testifying codefendant's redacted confession violated *Bruton*; and

3. Whether Murray's direct appellate counsel was ineffective for failing to file a timely petition for allowance of appeal to the Supreme Court of Pennsylvania that would have properly preserved the freestanding *Batson* claim.

On January 31, 2000, Magistrate Judge Welsh issued a Second Report and Recommendation, recommending that the Original Petition be denied. A copy of the Second Report and Recommendation is attached to the Amended Petition as Attachment 36. Magistrate Judge Welsh recommended that each claim of the Petition be denied for different reasons:

1. The first claim did not entitle Murray to relief because the state court's decision as to whether direct appellate counsel was ineffective for failing to raise the *Batson* issue was neither contrary to established U.S. Supreme Court precedent nor an unreasonable application of U.S. Supreme Court precedent. *Id.* at 12–23.

2. The second claim was procedurally barred because Murray's direct appellate counsel failed to file a timely petition for allowance of appeal to the Pennsylvania Supreme Court that preserved the *Bruton* issue for habeas corpus review. *Id.* at 4.

3. The third claim was not cognizable in habeas corpus, and therefore could not be considered, because "there can be no claim based upon the federal constitution that an attorney rendered ineffective assistance of counsel in pursuing a discretionary state appeal." *Id.* at 3.

On March 1, 2000, this Court approved and adopted the Second Report and Recommendation and denied the Original Petition. (ECF No. 27).

### B. Rule 60(b) Motions and Applications for Leave to File Successive Petitions

On October 5, 2004, Murray filed his first pro se motion for relief under Fed. R. Civ. P.

10

60(b). (ECF No. 29). On May 19, 2005, this Court issued an order denying Murray's First Rule 60(b) Motion. A copy of the Court's order is attached to the Amended Petition as Attachment 37. Murray sought a certificate of appealability from this Court's order in the Third Circuit Court of Appeals, which denied his request. *See Murray v. Vaughn*, No. 05-2899 (3d Cir. Apr. 6, 2006).

On or about December 15, 2009, Murray filed in the Third Circuit an application for leave to file a successive habeas petition. A copy of Murray's application is attached to the Amended Petition as Attachment 38. On April 8, 2010, the Third Circuit denied Murray's application on the grounds that he had not satisfied the requisite standard. A copy of the Third Circuit's order is attached to the Amended Petition as Attachment 39.

On or about June 28, 2013, Murray filed in the Third Circuit another application for leave to file a successive habeas petition. A copy of Murray's application is attached to the Amended Petition as Attachment 40. On August 22, 2013, the Third Circuit denied Murray's application on the grounds that he had not satisfied the requisite standard. A copy of the Third Circuit's order is attached to the Amended Petition as Attachment 41.

On or about January 9, 2015, Murray filed his second pro se motion for relief under Fed. R. Civ. P. 60(b) Motion. A copy of Murray's Second Rule 60(b) Motion is attached to the Amended Petition as Attachment 42. On June 25, 2015, this Court issued an order denying Murray's Second Rule 60(b) Motion. A copy of the Court's order is attached to the Amended Petition as Attachment 43. Murray sought a certificate of appealability from this Court's order in the Third Circuit Court, which denied his request on December 30, 2015. A copy of the Third Circuit's order is attached to the Amended Petition as Attachment 44.

On or about August 17, 2015, Murray filed another application for leave to file a successive habeas petition. A copy of Murray's application is attached to the Amended Petition as Attachment

45. On August 27, 2015, the Third Circuit denied Murray's application on the grounds that he had not satisfied the requisite standard. A copy of the Third Circuit's order is attached to the Amended Petition as Attachment 46.

On or about January 23, 2018, Murray filed his third pro se motion for relief under Fed. R. Civ. P. 60(b). A copy of Murray's Third Rule 60(b) Motion is attached to the Amended Petition as Attachment 47. On December 2, 2020, the Court appointed undersigned counsel to represent Petitioner in the above-captioned matter for purposes of his motion for relief from final order and judgment. On November 16, 2022, Murray filed his Counseled and Amended Rule 60(b) Motion as well as a Motion to Expand the Factual Record. A copy of Murray's Counseled and Amended Rule 60(b) Motion is attached hereto as Attachment 48.

On January 18, 2023, the Philadelphia District Attorney's Office filed a response to Murray's Counseled and Amended Rule 60(b) Motion and conceded that he had satisfied the actual-innocence exception. On March 27, 2023, this Court granted Murray's Counseled and Amended Rule 60(b) Motion and his Motion to Expand the Factual Record, and issued an order permitting him to file an Amended Petition for Writ of Habeas Corpus on or before May 26, 2023. A copy of this Court's order is attached hereto as Attachment 49.

## STATEMENT OF THE CASE

Petitioner Bruce Murray incorporates fully herein the Factual Background section of his Memorandum of Law in Support of his Counseled and Amended Rule 60(b) Motion. (ECF No. 101-1). Murray also states as follows regarding his case:

## I. **Jury Selection**

Jury selection in Murray, Holden, and Wesson's joint trial spanned five days, from May 19, 1983, through May 27, 1983. Murray, Holden, and Wesson are black males. The notes of

testimony from the voir dire examination in Murray's case show that of the nineteen peremptory challenges used by the prosecutor (Assistant District Attorney Robert Marano), he exercised at least fourteen, and possibly as many as seventeen, to exclude black individuals from those ultimately selected to serve on the jury at trial.[10]

On the first day of voir dire, Murray's trial counsel raised her first objection after ADA Marano had exercised his first two peremptory challenges to exclude black venirepersons Deborah Barnes and Willie Reynolds. (Voir Dire N.T. 05/19/83 at 105, 145–46). Murray's counsel noted at that early stage that it appeared to be the prosecutor's "practice of striking every black juror." (*Id.* at 146). When ADA Marano used two more peremptory challenges that day to exclude venirepersons Clyde Jones and Thomas Hart, Murray's counsel objected both times, noting that both prospective jurors were black. (*Id.* at 204, 214–15). On the second day of voir dire, ADA Marano exercised another peremptory challenge to exclude a black person, Orilee Simpson. (Voir Dire N.T. 05/20/83 at 282–83). Murray's counsel again objected and requested that the court declare that a pattern of excluding black venirepersons was taking place. (*Id.* at 283).

After noting that five of the Commonwealth's six peremptory challenges thus far were used to exclude black venirepersons, the court stated: "I have been presiding in several murder cases, and it does appear that there are substantial number of challenges where the defendants are black and it is out of proportion to what would ordinarily be expected." (*Id.* at 284–85). The court also acknowledged "what is occurring," alluding to ADA Marano's disproportionate use of peremptory challenges to exclude black venirepersons from the jury. (*Id.* at 287). ADA Marano later used

---

[10]   Counsel respectfully submits that, upon another review the voir dire transcripts, Murray's prior counsel miscounted the number of peremptory challenges used by ADA Marano. Murray's prior counsel counted eighteen total peremptory challenges and determined that at least thirteen, and possibly as many as sixteen, were used to exclude black venirepersons. However, prior counsel overlooked that ADA Marano used a peremptory challenge against Charlotte Gaines, whose race was recorded on the record. Murray's trial counsel noted on the record that Ms. Gaines was black.

another peremptory challenge to exclude John Daniel, whose background and area of residence suggest that he was also black, though the record did not make that fact clear. (*Id.* at 324–30).

On the third day of voir dire examination, ADA Marano exercised two peremptory challenges to exclude Edward Boyd and Geneva Womack, both of whom were black. (Voir Dire N.T. 05/25/83 at 436, 438, 484–85). On the fourth day of voir dire examination, ADA Marano used seven peremptory challenges, six of which were used to exclude the following black venirepersons: Marcus Jones, Helen Williams, Dorothy Janifer, Charlotte Gaines, Gloria Courtney, and Reginald Johnson. (Voir Dire N.T. 05/26/83 at 591, 636–37, 764, 771, 783, 807). On the final day of voir dire examination, ADA Marano used three peremptory challenges, at least one of which was used to exclude a black individual, Harvey Smaw. (Voir Dire N.T. 05/27/83 at 898). The record does not indicate the race of the two individuals (venirepersons Mamie Mercedes Foster and Mary O. Tillman) who were excluded by ADA Marano's other two peremptory challenges. (*Id.* at 893, 963).

With regard to eight of the Commonwealth's peremptory challenges, ADA Marano simply maintained his silence after defense counsel lodged objections to his use of peremptory challenges to strike black venirepersons. (Voir Dire N.T. 05/19/83 at 146 (Barnes and Reynolds); *id.* at 204 (Jones); *id.* at 214–15 (Hart); Voir Dire N.T. 05/25/83 at 485 (Womack); Voir Dire N.T. 05/26/83 at 764 (Janifer); *id.* at 771 (Gaines); Voir Dire N.T. 05/27/83 at 898 (Smaw)).

The trial court called upon ADA Marano three times to explain his use of peremptory challenges as to venireperson Orilee Simpson and to comment on an alleged policy within the Philadelphia District Attorney's Office of excluding black jurors. (Voir Dire N.T. 05/20/83 at 284–85, 291). In response to the trial court's requests for ADA Marano to explain his use of peremptory challenges against Ms. Simpson, ADA Marano twice replied that he had "nothing at all" to say.

(*Id.* at 284, 291). In response to the trial court's other request, ADA Marano gave a vague response: "My position is that the Court has awarded 21 peremptory challenges to the Commonwealth, and the Commonwealth can use them as it best sees fit to choose a fair, unprejudiced, impartial and competent juror, and that's what the Commonwealth is doing." (*Id.* at 285). ADA Marano made a similarly vague statement with regard to venireperson Reginald Johnson, remarking that he was "using his peremptory challenges to pick a jury that he feels would be fair, unprejudiced, impartial and competent in this case." (Voir Dire N.T. 05/26/83 at 809–10).

ADA Marano challenged Edward Boyd for cause, arguing that because of a recent burglary to his home, Boyd might "lean against the criminal element." (Voir Dire N.T. 05/25/83 at 427). The trial court denied ADA Marano's challenge against Boyd for cause, noting that "[t]hat would be a reason for the defense challenging him." (*Id.* at 425). Defense counsel also pointed out that Boyd had made it clear upon further questioning that he had no preconceived notions about this case, that he could apply the court's instructions, that he understood his duty to separate the burglary from the facts of this case, and that he felt he could be fair at that particular time. (*Id.* at 411, 415, 419–20, 429).

ADA Marano found a white venireperson (Hugh McNally) acceptable and argued against a defense motion to strike McNally for cause, despite McNally testifying that he might draw a negative inference against a defendant based merely on the fact that a policeman had arrested the defendant. (Voir Dire N.T. 05/26/83 at 650–52, 655–57).

ADA Marano attempted to challenge Helen Williams for cause but, after the challenge was denied, used another peremptory challenge, arguing that Williams had indicated that she might be influenced by the youth of the defendants because she had a young son. (Voir Dire N.T. 05/26/83 at 636–37). The court noted that Williams had stated that she would follow the court's instructions.

(*Id.*).

When defense counsel objected to the peremptory challenge against Marcus Jones, ADA Marano responded (inaccurately) that the defense "has struck all white veniremen, the last several veniremen all this morning." (Voir Dire N.T. 05/26/83 at 591). After the defense objected to his use of a peremptory strike against another black venireperson (Gloria Courtney), ADA Marano stated: "The one previously was a white venireman." (*Id.* at 783–84).

In total, out of nineteen peremptory challenges exercised by ADA Marano, fourteen were noted on the record to have been used to exclude black venirepersons. The record reflects that two of the other four venirepersons (Alexandra Lajoux and Nicolette Parisi) was white. Below is a chart showing the races of the venirepersons whom ADA Marano peremptorily challenged, per the record:

| No. | Day | Name | Race | Transcript Citation |
|-----|-----|------|------|---------------------|
| 1 | Day One | Nicolette Parisi | White[11] | N.T. 05/19/83 at 68 |
| 2 | Day One | Deborah Barnes | Black | *Id.* at 105 |
| 3 | Day One | Willie Reynolds | Black | *Id.* at 145–46 |
| 4 | Day One | Clyde Jones | Black | *Id.* at 204 |
| 5 | Day One | Thomas Hart | Black | *Id.* at 214–15 |
| 6 | Day Two | Orilee Simpson | Black | N.T. 05/20/83 at 282–83 |
| 7 | Day Two | John Daniel | Not Recorded | *Id.* at 324–30 |
| 8 | Day Three | Edward Boyd | Black | N.T. 05/25/83 at 436, 438 |
| 9 | Day Three | Geneva Womack | Black | *Id.* at 484–85 |
| 10 | Day Four | Marcus Jones | Black | N.T. 05/26/83 at 591 |
| 11 | Day Four | Helen Williams | Black | *Id.* at 636–37 |
| 12 | Day Four | Dorothy Janifer | Black | *Id.* at 764 |
| 13 | Day Four | Charlotte Gaines | Black | *Id.* at 771 |
| 14 | Day Four | Alexandra Lajoux | White | *Id.* at 772–80, 784 |
| 15 | Day Four | Gloria Courtney | Black | *Id.* at 783 |
| 16 | Day Four | Reginald Johnson | Black | *Id.* at 807 |
| 17 | Day Five | Harvey Smaw | Black | N.T. 05/27/83 at 898 |
| 18 | Day Five | Mamie Mercedes Foster | Not Recorded | *Id.* at 893 |
| 19 | Day Five | Mary O. Tillman | Not Recorded | *Id.* at 963 |

---

[11]  Although her race was not noted for the record at the time of the peremptory challenge, the trial court's observation that the prosecutor had used five of his six peremptory challenges against black venirepersons indicates establishes that Ms. Parisi was white. (N.T. 05/20/83 at 282–85).

Ultimately, Murray was tried by a juror consisting of, in all likelihood, one black juror,[12] with *possibly* one black alternate juror.[13] (Ex. 3, Dep. Judge Lydia Kirkland at 18–19 (10/28/92)).

## II. **Bruce Murray's Actual Innocence**

As explained more fully in the Memorandum of Law in Support of his Counseled and Amended Rule 60(b) Motion (ECF No. 101-1), Murray is actually innocent of the crimes for which he is currently serving life imprisonment without the possibility of parole. The Commonwealth has conceded that Murray has proven his actual-innocence claim. (ECF No. 108). This Court granted Murray's Counseled and Amended Rule 60(b) Motion on the grounds that he had satisfied the actual-innocence exception and was entitled to relief from the final order and judgment denying his Original Petition for Writ of Habeas Corpus. (ECF No. 110).

## **STANDARD OF REVIEW**

To obtain federal habeas corpus relief on the basis of a constitutional error that occurred at the petitioner's trial, the "petitioner must establish that the trial error 'had [a] substantial and injurious effect of influence in determining the jury's verdict.'" *Johnson v. Lamas*, 850 F.3d 119, 132 (3d Cir. 2017) (alteration in original) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). The petitioner is entitled to habeas corpus relief if the court has "'grave doubt' as to whether the error at trial had a substantial and injurious effect or influence." *Id.* at 132–33 (quoting *Davis v. Ayala*, 576 U.S. 257, 268 (2015)); *see also O'Neal v. McAninch*, 513 U.S. 432, 435 (1995) ("When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that

---

[12]   Kenneth Robinson, Sr. was the only black juror. (Voir Dire 05/26/83 at 789, 791).
[13]   Questions posed to the two alternate jurors suggest that they were both white. Specifically, each alternate juror was specifically asked whether the fact that the defendants were black would affect their ability to reach a fair and impartial verdict. (Voir Dire 05/27/83 at 989–91, 995).

error is not harmless. And, the petitioner must win."). The petitioner must demonstrate "more than a 'reasonable probability' that the error was harmful." *Johnson*, 850 F.3d at 133 (quoting *Ayala*, 507 U.S. at 637).

The court should grant the petitioner habeas corpus relief "if, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error[,] . . . the uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict." *Bennett v. Superintendent Graterford SCI*, 886 F.3d 268, 288 (3d Cir. 2018) (alteration and omission in original) (quoting *O'Neal*, 513 U.S. at 435).

"The crucial inquiry is the impact of the error on the minds of the jurors in the total setting. It is thus inappropriate to ask whether there was sufficient evidence to support the result, apart from the phase of the trial affected by the error. The correct inquiry is whether the error had a substantial influence on the verdict despite sufficient evidence to support the result apart from the error." *Smith v. Horn*, 120 F.3d 400, 418 (3d Cir. 1997) (alteration omitted) (citations omitted in original) (quoting *Yohn v. Love*, 76 F.3d 508, 523 (3d Cir. 1996)).

When the petitioner demonstrates that the conviction resulted from a structural error, the harmless-error analysis is generally inapplicable because structural errors are "defects in the trial mechanism itself, affecting the entire trial process, and [are] per se prejudicial." *Hassine v. Zimmerman*, 160 F.3d 941, 949 (3d Cir. 1998) (quoting *Yohn*, 76 F.3d at 522). Accordingly, the petitioner is automatically entitled to habeas corpus relief if a structural error occurred at the petitioner's trial, *see Palmer v. Hendricks*, 592 F.3d 386, 397 n.6 (3d Cir. 2010) ("Structural defects are *per se* reversible even in habeas cases." (citing *Brecht*, 507 U.S. at 629–30)), and the error "'[l]ed to a fundamentally unfair trial' and . . . 'deprive[d] the defendant of a reasonable probability of a different outcome," *Barney v. Adm'r of N.J. State Prisons*, 48 F.4th 162, 165 (3d

18

Cir. 2022) (quoting *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1911, 1913 (2017)).

## ARGUMENT

## I.  The *Brady* Claims (Grounds Four Through Fourteen)

Under *Brady v. Maryland* and its progeny, a prosecutor has a duty to disclose all favorable evidence material to the accused's guilt, including exculpatory and impeachment evidence. *See Kyles v. Whitley*, 514 U.S. 419, 438 (1995). The suppression of evidence favorable to the accused violates due process, "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The prosecutor's office is an entity and the knowledge of one member of the office is attributable to the office as a whole. *Giglio v. United States*, 405 U.S. 150, 154 (1972). The *Brady* rule also "encompasses evidence 'known only to police investigators and not to the prosecutor.'" *Strickler v. Greene*, 527 U.S. 263, 280–81 (1999) (quoting *Kyles*, 514 U.S. at 438).

To prove that a *Brady* violation, the petitioner must establish three elements: "[T]he evidence at issue must be favorable to the defendant; it must be material; and it must have been suppressed by the prosecution." *United States v. Reyeros*, 537 F.3d 270, 281 (3d Cir. 2008). Favorable evidence is material, and constitutional error results from its suppression by the prosecution, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

In determining whether a "reasonable probability" of a different outcome has been demonstrated, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. 434. The materiality standard is not a sufficiency of the evidence test. *Id.* Rather, a "reasonable probability" of a

different result is shown when the prosecution's suppression of evidence "undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678. The petitioner must demonstrate "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

The court must "evaluate the tendency and force of the undisclosed evidence item by item" and then afterwards "evaluate its cumulative effect for purposes of materiality separately." *Id.* at 437 n.10. Materiality must be considered "collectively, not item by item." *Id.* at 437. Additionally, the materiality standard does not require that the petitioner "show that he 'more likely than not' would have been acquitted had the new evidence been admitted." *Weary v. Cain*, 577 U.S. 385, 392 (2016) (omissions in original) (quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012)). Rather, the petitioner "must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Id.* As a result, the petitioner "can prevail even if . . . the undisclosed information may not have affected the jury's verdict." *Id.* at 392 n.6.

Admissibility is not a prerequisite to materiality. *Dennis v. Sec., Pa. Dep't of Corrs.*, 834 F.3d 263, 309 (3d Cir. 2016) (en banc). As the Third Circuit has explained,

> [I]nadmissible evidence may be material if it could have led to the discovery of admissible evidence. Furthermore . . . we think that inadmissible evidence may be material if it could have been used effectively to impeach or corral witnesses during cross-examination. Thus, the admissibility of the evidence itself is not dispositive for *Brady* purposes. Rather, the inquiry is whether the undisclosed evidence is admissible itself or could have led to the discovery of admissible evidence that could have made a difference in the outcome of the trial sufficient to establish a "reasonable probability" of a different result.

*Id.* at 310 (omissions and alteration in original) (quoting *Johnson v. Folino*, 705 F.3d 117, 130 (3d Cir. 2013)).

Here, the Philadelphia Police Department and the District Attorney's Office committed a slew of *Brady* violations by willfully or inadvertently suppressing favorable, material evidence of

exculpatory and impeachment value. The Commonwealth's failure to disclose this information prejudiced Murray's defense and impaired his counsel's trial preparation. The disclosure of this information would have prompted his counsel to present the exculpatory trial testimony of available eyewitnesses (Gregory Strickland, George Young, and Brenda Murray), pursue new lines of cross-examination for impeaching the uncorroborated accomplice testimony of the key prosecution witness (Douglas Haughton), investigate and present evidence concerning a potential alternative suspect (Elliott Burton), and impeach the paltry police investigation into Kaboobie's death. The Commonwealth's suppression of this information violated Murray's due-process rights under the U.S. Constitution. Therefore, Murray is entitled to habeas relief.

**A. The Commonwealth suppressed evidence and information favorable to the defense, including exculpatory and impeachment material.**

The suppressed information in Murray's case includes exculpatory evidence and evidence that would have impeached the credibility of the uncorroborated accomplice testimony of the key prosecution witness (Douglas Haughton). The undisclosed information also could have been used to attack the police's slovenly investigation into Kaboobie's death. *See Kyles*, 514 U.S. at 446 & n.15; *id.* at 446 ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or decision to charge the defendant, and we may consider such use in assessing a possible *Brady* violation." (quoting *Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986))); *id.* (recognizing that *Brady* material may include evidence that "carrie[s] within it the potential . . . for the . . . discrediting . . . of the police methods employed in assembling the case" (omissions in original) (quoting *Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985))). The tendency and force of each undisclosed piece of information are discussed below in turn.

21

1.  **The Commonwealth suppressed handwritten notes and a police activity sheet that were admissible impeachment evidence and also would have led to admissible exculpatory evidence and additional impeachment evidence in the form of Strickland's trial testimony.**

The prosecution disclosed to Murray's counsel a statement by Edward Randolph that omitted the fact that Randolph told homicide detectives that Strickland had said he saw Douglas Haughton run down the stairs inside Kaboobie's house after the shootout. (Ex. 4, Commonwealth Discovery Transmittal Letter (12/28/82)). The statement indicated that "Gregory [Strickland] saw the guy who ran down the stairs," and implied that Randolph learned "the person who ran down the steps was Douglas Haughton" only from his separate conversation with Gregory Holden. (Ex. 5, Edward Randolph First Statement on Kaboobie's Death (03/11/81)). Omitted from this statement was the fact that Randolph expressly told homicide detectives that "Strickland told him he . . . saw Douglas Haughton run down the steps." (Ex. 6, Handwritten Police Notes (Undated); Ex. 7, Police Activity Sheet (03/11/81)). This fact was memorialized in handwritten notes by a homicide detective and in a police activity sheet around the time of Randolph's March 1981 interview. (*Id.*).

This evidence, if not admissible itself, would have led to admissible evidence in the form of exculpatory trial testimony by Strickland, whom ADA Marano acknowledged was available to testify. (Trial N.T. 06/20/83 at 1470).  Strickland's testimony that he saw Haughton run down the stairs would have exculpated Murray because it would have established that Haughton was the third participant in the three-person shootout with Kaboobie and Wesson. Even if Strickland would have denied that he saw Haughton at the scene, this newly discovered evidence would have impeached Strickland's denial and, by extension, undermined Haughton's testimony that he never went inside the house. In short, the evidence that Strickland saw Haughton inside Kaboobie's house was "material" because, at the very least, it would have impeached the testimony of the

prosecution's "star witness," *Dennis*, 834 F.3d at 274, and more likely than not would have "call[ed] into question the Commonwealth's entire theory of the case." *Munchinski v. Wilson*, 694 F.3d 308, 338 (3d Cir. 2012); *see also Kyles*, 514 U.S. at 446 & n.15. Thus, because neither the notes nor the police activity sheet was disclosed to Murray's counsel, this information is clearcut *Brady* material.

### 2. The Commonwealth suppressed Strickland's polygraph results that would have led to admissible exculpatory evidence in the form of his trial testimony.

Although polygraph results are not themselves admissible, admissibility is not a prerequisite to materiality. *See Dennis*, 834 F.3d at 307–08. Indeed, undisclosed polygraph results are *Brady* material if they would have led to admissible evidence. *Id.* In assessing a *Brady* claim on this basis, a court must consider "the way in which the suppression of the polygraph results affected preparation and trial." *Id.* at 308.

Here, the Commonwealth intentionally withheld the polygraph results of Gregory Strickland, which meant Murray's counsel could only speculate as to whether Strickland gave credible police statements. In his polygraph statement, which was disclosed to the defense, Strickland answered "Yes" when asked whether "Elliott [Burton] [t]old [him] that Bruce & Scot shot 'Kaboobie.'" (Ex. 8, Gregory Strickland Polygraph Report (03/13/81)). He also answered "No" in response to the following questions: "Do you know for sure who shot 'Kaboobie'? Did you see anyone shot [*sic*] 'Kaboobie'? Right now can you take me to the Gun used to kill 'Kaboobie'?" (*Id.*). Crucially, the polygraph examiner concluded that Strickland was "[l]ying." (*Id.*). Had the results of Strickland's polygraph test been disclosed, it would have compelled Murray's counsel to pursue further investigation into Strickland and to call him as a witness at trial to impeach Douglas Haughton's uncorroborated accomplice testimony and also exonerate Murray.

Furthermore, had the prosecution disclosed Strickland's polygraph report, the polygraph

examiner's conclusion that Strickland was "[l]ying" would have altered the entire case. (Ex. 8). Strickland denied knowing who shot Kaboobie or seeing anyone shoot Kaboobie, (*id.*). and he has since admitted that he lied when he told police he did not seeing Haughton inside Kaboobie's house because he feared retaliation from Haughton, (Ex. 9, Gregory Strickland Affidavit (07/20/11); Ex. 10, Letter from Gregory Strickland to Centurion Ministries (12/01/00)). If Murray's counsel would have had access to these results and known that Strickland was lying, she almost certainly would have called Strickland as a witness at trial because there was a plethora of evidence corroborating that Strickland did, in fact, see Haughton inside Kaboobie's house.

The polygraph results also would have led to admissible evidence to "challenge detectives at trial regarding their paltry investigation" into two critical leads that would have undermined the reliability of Haughton's trial testimony as well as Wesson's police statement. *See Dennis*, 834 F.3d at 311. Consider the following:

First, the fact that police had grounds to believe Strickland was lying raises significant questions as to why they did not further pursue the lead that Haughton was one of the two males who participated with Kaboobie in the three-person shootout. Randolph told police that Strickland had said he "saw Douglas Haughton run down the steps." (Ex. 6). The extent of the police investigation into this lead was: (1) a follow-up interview of Strickland that included a direct question about whether he told Randolph he had seen Haughton leave Kaboobie's residence; and (2) a question during the polygraph examination that expressly asked who Strickland had seen "run down the stairs?" (Ex. 8). The homicide detectives found out Strickland was lying based on the polygraph examiner's conclusion, yet there is no evidence that they conducted any further investigation into whether Haughton was one of the two participants in the shootout with Kaboobie.

The polygraph results were not the only reason for skepticism of Strickland's denials. Indeed, detectives had every reason to be skeptical of his statement because the information then available to police contradicted key details in his narrative. Strickland claimed that George Young (aka "Reds") told him to call an ambulance, and that he did call an ambulance from his house. (Ex. 11, Gregory Strickland Police Statement (01/06/81)). However, Young did not mention Strickland during his interview with detectives, and Young told them that he personally called 911 after seeing Kaboobie lying on the floor. (Ex. 12, George Young Polygraph Report (12/16/80)). There is also no evidence that Strickland ever called an ambulance.

Additionally, if Strickland had actually waited in the cellar for twelve minutes after the shooting, then the first responders most likely would have encountered him there before he left the house. The shootout occurred at 5:47 p.m., which means Strickland would not have come upstairs until approximately 6:00 p.m. (Ex. 11). Yet, police had arrived at Kaboobie's house before 6:00 p.m., which means they would have encountered him before he left to return home. For instance, Officer Fitzgerald testified that he received the radio call regarding the shooting at around 5:45 p.m. and arrived on-scene with "a minute." (Trial N.T. 05/31/83 at 50). Moreover, Strickland's statement that someone "ran outside" after running down the stairs to the first floor is incredible, on its face, because how could he have known the person ran outside if he was still waiting in the cellar?

Ultimately, the detectives abandoned the lead that Haughton was one of the two perpetrators inside Kaboobie's house once he provided a statement inculpating Murray, Holden, and Wesson, *even though his statement further supported this lead.* Haughton admitted to being aware of Strickland's presence at Kaboobie's residence, and Haughton's explanation for how could have possibly known that Strickland "was in the cellar" if he was never inside the house is

simply incredible. Strickland would not have called out Haughton's name if he had not seen Haughton; indeed, as he explained years later, "I knew Douglas [Haughton] all my life so I called out to him saying why did you have to kill him?" (Ex. 9).

Haughton told police that he was standing outside Kaboobie's residence in the schoolyard across the street, and that he started walking away from his "lookout" spot once he heard the shots. (Ex. 9). It is impossible to fathom how Strickland could have possibly seen Haughton standing across the street from Kaboobie's residence if Haughton had already walked away in the opposite direction. **ADA Marano apparently asked himself the same question at some point during trial preparation when he reviewed Haughton's statement: "Where was Dap [Strickland] when he called out Haughton name[?]"** (Ex. 13, Prosecutor Copy of Haughton First Police Statement)).

The police's decision to rely on Haughton's statement without further investigation into the lead that Strickland saw Haughton inside Kaboobie's house constitutes "slopp[y]" investigative work that "diminish[es]" the probative value of Haughton's statement. *See Kyles*, 514 U.S. at 446 n.15. It is clear that the prosecution was skeptical of Haughton's accusations, considering the March 23, 1982, criminal complaint against him specifically accused him of "shoot[ing] and kill[ing] Eric DeLegal inside of his residence." (Ex. 14, Criminal Complaint Against Douglas Horton (03/23/82)).[14] Police uncovered no evidence to the contrary between March 4, 1982, when Haughton signed the written statement inculpating Murray, and September 7, 1982, when he pled guilty to the lesser charge of third-degree murder. This signifies that the police slovenly decided to trust Haughton over its lead involving Strickland.

---

[14]   By contrast, the criminal complaint against Gregory Holden was carefully worded to reflect that he was not accused of being one of the shooters inside the residence. (Ex. 15, Criminal Complaint Against Gregory Holden (03/17/81)).

Haughton had at least four prior felony convictions and history of using aliases, (Ex. 16, Douglas Haughton Presentence Report (12/14/82)), which he later admitted he used to conceal his criminal activities. (Trial N.T. 06/02/83 at 420–21). Haughton knew the FBI had evidence proving his involvement in the unrelated federal bank robbery. (Trial N.T. 06/02/83 at 547). He also knew police had evidence implicating him in Kaboobie's death because he had read Edward Randolph's statement that Gregory Strickland saw Haughton inside Kaboobie's house. (*Id.* at 516–17). Haughton thus had every motive to falsely accuse someone else because he was facing serious penalties for Kaboobie's shooting death and the unrelated federal bank robbery. *See United States v. Casoni*, 950 F.2d 893, 896–97 (3d Cir. 1991). Yet the police blindly trusted his word anyway.

By contrast, Strickland was only sixteen years old when questioned by police, and there was no evidence inculpating him in Kaboobie's death. Detectives also knew Strickland was a close friend of Kaboobie, considering he went over to Kaboobie's house "like twice a week," (Ex. 11), which should have caused them to consider Strickland's motive for "[l]ying," (Ex. 8). His motive was completely obvious—he feared retaliation from whomever committed the offense—and the police's failure to realize this constitutes slovenly and negligent investigative work because Strickland told detectives about two separate instances where people were stalking him in public after Kaboobie's death. (Ex. 11). Those incidents corroborate Strickland's sworn statement in his letter and affidavit, where he admitted he did not tell detectives the truth about what he saw— namely, Haughton inside Kaboobie's house at the time the shooting—because he feared retaliation from both Haughton and Elliott Burton. (Ex. 9; Ex. 10).

In short, Strickland's polygraph results were "evidence highly probative of [Murray's] innocence." *See United States v. Agurs*, 427 U.S. 97, 110 (1982) ("If evidence highly probative of innocence is in [the defendant's] file, [the prosecutor] should be presumed to recognize its

27

significance even if he has actually overlooked it."). By the time of trial, the prosecution knew that only two suspects had entered Kaboobie's house and that Wesson was one of those two men. The prosecution also had evidence that Strickland may have seen Haughton inside Kaboobie's house, that Strickland was lying when he denied knowing or seeing the person who shot and killed Kaboobie, and that Strickland had credible motives to lie because he had been stalked in public in the days after the incident. Had the prosecution not withheld the polygraph results, the fallout would have destroyed Haughton's credibility and supported Murray's innocence because Haughton's testimony was the prosecution's only competent inculpatory evidence admissible against Murray.

### 3. The Commonwealth suppressed George Young's polygraph description of the shorter, skinnier male that would have led to admissible exculpatory evidence in the form of Young's trial testimony.

The Commonwealth also intentionally withheld the polygraph report of George Young, which resulted in the suppression of the fact that Young had described the shorter, skinnier male as sixteen years old. (Ex. 12).[15] This evidence was critical because Tyrone Wesson was sixteen years old at the time of the shootout, and he more closely matched the description of the shorter, skinnier male. Additionally, Murray was shorter and skinnier than Wesson, and neither Murray nor Wesson matched the height and weight of the taller, heavier male. Because it is indisputable that Wesson was present at Kaboobie's house,[16] Wesson must have been the shorter, skinnier male.

In his undisclosed polygraph report, Young described the shorter, skinner male as sixteen years old and 5'6" tall, and he described the taller, heavier male as 6 feet tall. (Ex. 12). In his police

---

[15]   Upon information and belief, the "polygraph statement" of George Young referenced in the December 28, 1982 discovery transmittal letter, (Ex. 4), refers to the polygraph statement appended to the end of his December 16, 1980 police statement, (Ex. 17). Only one polygraph statement by Young was disclosed. (Ex. 12).

[16]   The Commonwealth, Wesson, Murray, and Haughton have all agreed that Wesson was one of the two men that fled the house. The physical evidence proves this because Kaboobie shot Wesson inside the house. (Ex. 18, Tyrone Wesson Form 229 (09/11/82); Ex. 19, Hospital of the University of Pennsylvania Medical Records (12/16/80)).

statement, Young described the shorter male as eighteen years old, 5'3" tall, and 130 lbs., and he described the taller male as approximately 19 years old, 6'1" tall, and 185 lbs. (Ex. 17). Young also apparently at some point told police that the shorter male may have weighed up to 150 lbs. and that the taller male might have been 5'11" and 200 lbs. (Ex. 20, Police Homicide Record (12/17/80)).

A July 5, 1981 mugshot indicates that Bruce Murray was only 5'4" tall and weighed only 110 lbs.:



(Ex. 21, Bruce Murray Mugshot (07/05/81)). There is simply no way that Murray was the taller, heavier male. He was at least seven inches shorter and 75 lbs. lighter than the taller, heavier male. The height-and-weight discrepancy between Murray and the taller, heavier male forecloses the possibility that Murray was the taller, heavier male. *Cf. Andrews v. Scuilli*, 853 F.3d 690, 702 n.14 (3d Cir. 2017) ("In the context of a habeas corpus case, where testimony described the shooter as between 5'4" and 5'8" and 130 pounds and the height and weight of the suspect was 6'2" and 190 pounds, the court said: '[t]he contradictory eyewitness testimony about the shooter's height and weight . . . gives us pause. . . . These discrepancies are significant and troubling.'" (alteration and omissions in original) (quoting *Mendez v. Artuz*, 303 F.3d 411, 415 (2d Cir. 2002))).

Crucially, Wesson also could not have been the taller, heavier male. At the time of the

December 16, 1980 shooting Tyrone Wesson was sixteen years old[17]—the same age as the shorter,

skinner male. Wesson also most likely weighed between 130 lbs. and 150 lbs.—the same weight

as the shorter, skinnier male. A November 23, 1981 mugshot of Wesson reflects that he weighed

137 pounds and was 5'10" tall:



(Ex. 22, Tyrone Wesson Mugshot (11/23/81)).[18] Critically, at trial, Haughton testified that Wesson

had "got[ten] a little bit bigger" in terms of "his height and weight" by the time of trial. (Trial N.T.

06/02/83 at 375). Therefore, Wesson most likely was shorter than 5'10" at the time of the shooting.

Indeed, between him and Murray, Haughton is the only one who could possibly fit the

physical description of the second man. Approximately one month before the shooting, Haughton

was 5'9" tall and weighed 156 lbs.:

---

[17]   His birthday was ████, 1964, which establishes that he was only sixteen years old when the shooting occurred. (Ex. 18).

[18]   Wesson was later acquitted of the charges related to his November 23, 1981 arrest because police elicited an illegal confession from him in violation of his rights as juvenile. (Ex. 23, Tyrone Wesson Criminal Extract; Wesson MTS N.T. 05/23/83 at 413, 415).



(Ex. 24, Myles Bryant Mugshot (11/09/80)).[19]

Considering Murray and Haughton are the only suspects who could have been the third participant in the three-person shootout with Kaboobie and Wesson,[20] the fact that Haughton more closely matches the description of the taller, heavier man tends to prove that this man was Haughton. In view of the other evidence inculpating Haughton as a participant, as well as the evidence exculpating Murray of any involvement in the incident, this all but proves that Haughton was the third participant in the shootout with Kaboobie and Wesson.

Despite his availability, the prosecution did not call Young to testify at trial, presumably because doing so would undermine Haughton's testimony that Wesson and Murray were the two men who went inside Kaboobie's house. Based on Young's descriptions, Wesson and Murray could not have both been participants in the three-person shootout with Kaboobie because neither man weighed anywhere close to 185 pounds. Since there is no dispute that Wesson was one of the

---

[19]    The age listed on Haughton's November 9, 1980 mugshot is incorrect. Haughton was born in June 1958, (Ex. 25, Social Security Record for Douglas Haughton), which means he was only twenty-two years old at the time of the December 16, 1980 shooting.

[20]    No one has ever claimed that Gregory Holden was the man who accompanied Wesson inside Kaboobie's house. Moreover, Holden was around the same size as Murray, which means he definitely was not the second man. (Ex. 26, Gregory Holden Mugshot (11/24/80)).

two shooters, Wesson must have been the shorter, skinnier sixteen-year-old that Young saw, and

since Murray could not possibly fit the other man's description, Haughton must have been the

other man. Accordingly, George Young's undisclosed polygraph report is *Brady* material because

it would have led to admissible exculpatory evidence in the form of his trial testimony.

### 4. The Commonwealth suppressed the tip from John Howard that was admissible impeachment evidence and exculpatory evidence pointing towards Elliott Burton as an alternative suspect.

A credible lead regarding an alternative suspect, if suppressed, constitutes "*Brady*

material." *See Smith v. Holtz*, 210 F.3d 186, 196–97 (3d Cir. 2000); *Santiago*, 654 A.2d at 1070

("*Brady* requires the prosecution to produce evidence that someone else may have committed the

crime." (quoting *Jerrell v. Balkcom*, 735 F.2d 1242, 1258 (11th Cir. 1984))). A *Brady* violation

occurs if the alternative-suspect evidence raises "a high likelihood of creating reasonable doubt"

or "generat[ing] other evidence that might have been helpful to [the defendant]." *See United States

v. Alvin*, 30 F. Supp. 323, 338 (E.D. Pa. 2014); *see also Brady*, 373 U.S. at 85–86 (holding that

due-process violation occurred where prosecution withheld a statement in which someone else

confessed to committing the actual killing); *Haskins v. Superintendent Greene SCI*, 755 Fed.

App'x 184 (3d Cir. 2018) (holding that prosecutor's failure to disclose witness's letter indicating

that someone other than the defendant had shot the victim violated *Brady*).

As discussed on pages 8 and 9 of Murray's Memorandum of Law in Support of his

Counseled and Amended Rule 60(b) Motion (ECF No. 101-1), which are incorporated herein by

reference, the prosecution failed to disclose a tip from John Howard stating that after the shooting

on December 16, 1980, he saw Elliott Burton—Kaboobie's marijuana supplier[21]—flee Kaboobie's

residence with a shotgun and jump into a 1977/1978 Buick that then drove away. (Ex. 27, Police

---

[21]   (Ex. 28, Tyrone Wesson Unredacted Statement (09/11/82)). At trial Haughton confirmed Burton was involved in drug trafficking. (Trial N.T. 06/02/83 at 513).

Activity Sheet (01/05/81)). The John Howard tip was credible. He gave police his name and a callback number, and he expressed an intent to speak further with detectives about his observations. (*Id.*). Plus, police never found the shotgun, so they knew someone must have taken it from Kaboobie's house. Although the police were unable to contact Howard via the phone number he provided to police or at his home address, there is no evidence that the police conducted any further investigation to locate Howard aside from surveying an unreported number of neighbors. (Ex. 27).

Police did, however, ask Strickland whether "[a]fter the shooting, when the person/s left the house, did you hear a car drive away[.]" (Ex. 11). Strickland answered: "[N]ot that I remember." (*Id.*). Police also asked Strickland and former ADA Frank DeSimone about Burton's whereabouts, but neither Strickland nor DeSimone knew where Burton was. (Ex. 11; Ex. 27). Although police used Burton as an informant in the homicide investigation, there is no evidence indicating that the police ever had a reasonable basis for dismissing him as a suspect in the case.

The only evidence that definitively rules out Burton as one of the two shooters are Tyrone Wesson's and Douglas Haughton's recantations, as Wesson and Haughton both confessed that they were the two shooters. Nonetheless, their recantations were not available at the time of Murray's trial, and therefore Murray's counsel could have picked up where the police investigation into Howard's tip left off, located Howard and Burton, called one or both of them as trial witnesses, and used the trial testimony as exculpatory evidence to argue that Wesson and Burton were the two shooters. As discussed further below, Murray also could have used the undisclosed tip to impeach the police's investigation and reliance on Burton as an informant. Accordingly, the undisclosed tip about Burton fleeing Kaboobie's house with a shotgun—likely the one used to kill Kaboobie—is favorable exculpatory and impeachment evidence.

**5.   The Commonwealth suppressed the affidavit of probable cause to search Gregory Holden's residence and the audio recording of his conversation with Burton, which tended to exculpate Murray.**

The affidavit of probable cause to search Gregory Holden's house contained information from a confidential informant (Confidential Informant #1) who claimed that Holden said he was in possession of the shotgun used in the murder and that the crime was committed by Haughton, "Bruce," and "another male." The informant also claimed that Holden said Kaboobie fired a handgun and hit "Bruce" in his "upper arm." (Ex. 29, Search Warrant and Affidavit of Probable Cause (02/25/81)). Police attempted to corroborate this allegation by relying on an undisclosed police report that on December 17, 1980 someone identified as "Bruce Murry" had reported "that he had been shot in the *right* arm on the highway at 23rd and Tasker Street." (*Id.*) (emphasis added). Police further investigated Holden the following month when police used Burton to have a recorded conversation with Holden. (Ex. 30, Audio Recording Labeled "Recording of Phone Conversation, Elliot – Gregory Holden," Side B at 00:00–04:53). In it, Holden confirmed his belief that this "Bruce" was involved in the killing. (*Id.*). Holden also confirmed his belief that "Bruce" was shot in the arm by Kaboobie. (*Id.*). Neither the contents of this search warrant nor the audio recording was disclosed to the defense before trial.

Holden's belief that "Bruce" was involved in the murder is significant because the fact that "Bruce" had been shot became material evidence after police learned that the person actually shot in the upper arm was codefendant Tyrone Wesson—and Wesson was shot in his *left* arm. Crucially, when Wesson went to the hospital for treatment of the gunshot wound, he gave his name as "Bruce Murray." (Ex. 19). Although Murray's counsel knew before trial that Haughton had alleged Wesson had been shot in the left arm, she did not know that Wesson had lied about being "Bruce Murray" until the middle of trial, when Detective Gerrard said that Wesson admitted he lied about

34

his name. (Trial N.T. 06/15/83 at 761). Thereafter, the prosecutor and Wesson's counsel stipulated "that an individual by the name of Bruce Murray, or using the name Bruce Murray, came into the hospital; that he indicated that he was twenty years old; that he was a black male; that he had been shot two hours ago in the left forearm by a .32 pistol at eight feet away." (*Id.* at 820–21).

Had Murray's counsel known before trial that police had targeted Murray early in the investigation because of an undisclosed report that a man identified as "Bruce Murray" had been shot in the *right* arm, she could have presented testimony establishing that Murray had never been shot in either arm. She also could have used the audio recording of Burton and Holden's conversation and the fact that there was a discrepancy over whether the real "Bruce Murray" had been shot during the incident as additional reasons for severing Murray from the joint trial of his codefendants.[22] In addition to his alibi defense, Murray could have argued that this was also a case of mistaken identity and that police targeted him based on the false rumor that he was injured during the shootout, when in reality that rumor existed because Wesson had lied and said he was "Bruce Murray."

Furthermore, disclosure of the audio recording and the affidavit of probable cause would have forced Murray's counsel to ask why Wesson lied and claimed he was "Bruce Murray" and, more importantly, how he knew Murray's personal information (which was accurately included on the medical records). If counsel had known about this lie sooner, she would have had an opportunity to investigate whether the real Bruce Murray's "sister," who is referenced in the medical records, actually took Wesson to the hospital for treatment for his gunshot wound. This would have led to the favorable testimony of Murray's sister, Brenda Murray, who was listed as

---

[22]   Although Holden's statement confirmed his belief that "Bruce" was involved in the crime, his statement would not have been admissible against Murray. *See Commonwealth v. Epps*, 148 A. 523 (Pa. 1930) (holding that declarations of an alleged coconspirator or accomplice, made in the absence of the defendant, and after the consummation of the conspiracy or commission of the crime, are not admissible against the defendant).

one of his alibi witnesses and who was available to testify at trial. (Ex. 31, Declaration of Brenda Murray (02/20/23); Ex. 32, Bruce Murray Notice of Alibi Defense (02/18/83)). Brenda Murray has certified that her brother's trial counsel never contacted her about the possibility of her testifying at his trial. (Ex. 31).

Brenda Murray would have testified that on the night in question she drove Tyrone Wesson (her first cousin) to the hospital for treatment because he had been shot. She would have testified that they "were nervous about him using his real name and personal information when he received treatment at the hospital because he was only sixteen years old, and [they] did not know what the consequences might be if he provided his real name and personal information." (Ex. 31). Brenda Murray would have further testified that "[i]nstead of providing Scotty's [aka Wesson's] name and information, [she used her] brother Bruce's identification and personal information, and Scotty lied about being 'Bruce Murray.'" (*Id.*). She also would have "confirm[ed] that [she] provided the emergency room staff the information that appears in the hospital records," and that she is "the 'Sister' referenced in [the hospital records]." (*Id.*). Brenda Murray's testimony would have provided critical context as to why the false rumor existed and have casted further doubt on the prosecution's theory that the real Bruce Murray had been involved in the shooting.

Accordingly, for all the foregoing reasons, the audio recording and the affidavit of probable cause would have been favorable to Murray's trial preparation because they would have impeached the paltry police investigation into whether the real Bruce Murray was involved Kaboobie's death and also prompted his trial counsel to conduct an investigation that would have yielded exculpatory testimony.

36

**6.  The Commonwealth suppressed information pertaining to Burton's role as an informant in the police investigation, which trial counsel could have been used to impeach the paltry police investigation into Kaboobie's death.**

As noted above, the prosecution failed to disclose the credible tip from John Howard stating that after the shooting on December 16, 1980, he saw Elliott Burton—Kaboobie's marijuana supplier—flee Kaboobie's residence with a shotgun and jump into a 1977/1978 Buick that then drove away. (Ex. 27). Police pursued this tip to no avail and specifically asked Burton's attorney and Gregory Strickland about Burton's whereabouts. (Ex. 11, Ex. 27). Clearly, police viewed Burton as a suspect, and there is no evidence that police ever received any information that would have dismissed him as a suspect.

Burton was one of the leaders of 20th and Carpenter Street Gang, which was a violent street gang located in Kaboobie's neighborhood. *See* SEAN PATRICK GRIFFIN, BLACK BROTHERS INC. 146 (2005) [hereinafter GRIFFIN, BLACK BROTHERS, INC.]. The 20th and Carpenter Street Gang also had ties to the Philadelphia Black Mafia—one of the most violent criminal organizations in U.S. history. *See generally* GRIFFIN, BLACK BROTHERS INC.; SEAN PATRICK GRIFFIN, PHILADELPHIA'S BLACK MAFIA: A SOCIAL AND POLITICAL HISTORY (2003) [hereinafter GRIFFIN, PHILADELPHIA'S BLACK MAFIA]. In early 1973, the 20th and Carpenter Gang began working with the Black Mafia, but their relationship soured in late 1973—when Burton was one of the gang's leaders—and eventually a monthslong violent struggle ensued:

> As the Black Mafia enjoyed the ever-increasing profits from their drug and extortion rackets, the 20th and Carpenter Gang regretted the deal they had brokered in May. The gang began operating independently again in late 1973, led by Donald Robinson and Elliott Burton, who were apparently willing to risk battle with their erstwhile partners. Over the next few months, Philadelphians witnessed some of the most violent street warfare in the city's history, including the remarkable sight of teenage gang members on bikes shooting at well-dressed men in Cadillacs. The strife included several firebombings, and on one occasion the target was the Black Brothers, Inc. headquarters in South Street. The 20th and Carpenter crew was far outnumbered, though, and eventually the group forfeited whatever territory it still

claimed back to the Black Mafia.

GRIFFIN, BLACK BROTHERS INC. at 146; *see also* GRIFFIN, PHILADELPHIA'S BLACK MAFIA, at 49–50.

Years later, Elliott Burton was still one of the leaders of the 20th and Carpenter Gang when the "gang developed internal problems when some members went over to the Black Mafia." GRIFFIN, BLACK BROTHERS INC. at 200. Burton and another gang leader named Donald Robinson "each charged the other with trying to lead the gang back into the Black Mafia." *Id.* Burton—and Larry Thorpe, who was also implicated but not charged in Kaboobie's murder—even went to the *Philadelphia Daily News* and accused Robinson of being involved in contract murders. (Ex. 33, Tyree Johnson, *Black Mafia Returns in Wake of Gang Feud*, PHILA. DAILY NEWS (Aug. 23, 1976)). Burton accused Robinson of "trying to lead the gang back to the Black Mafia, but the younger members [of the gang] wanted out because they didn't trust the underworld." (*Id.*).

Robinson, meanwhile, told the *Daily News* that "Thorpe, Burton, and [David] Brown [were] leading the gang back to the Black Mafia, with the promise of fast money." (*Id.*). Robinson later "died in a shootout with renegade gang members who went with the Black Mafia." GRIFFIN, BLACK BROTHERS INC. at 200. As Burton had told the *Daily News*, "The only way out is to be dead." (Ex. 33).

It is unknown whether Burton remained with the 20th and Carpenter Gang or joined the Black Mafia. That said, in Burton testified as the key prosecution witness against two members of the 20th and Carpenter Gang in an unrelated homicide case, where Burton claimed that Robinson ordered three gang members to kill a man whom they suspected "was a spy for a rival gang." *Commonwealth v. Watts*, 412 A.2d 474, 475 (Pa. 1980). He further testified that those three gang members drove the suspected spy to a particular location "on the pretext they were initiating him

into the gang," and then "they shot him while he was in the back seat of the car and again while he was in the front seat, and . . . left his body in the front of the car." *Id.* In a subsequent prosecution of one of the shooters, it was alleged that Burton was the "leader of a splinter group involved in drug dealing" and had a "plan to eliminate, through death or imprisonment, opposition from gang members who opposed the drug trafficking." *Commonwealth v. Johnson*, 437 A.2d 1175, 1177 (Pa. 1981). Considering that Burton testified against members of the 20th and Carpenter Gang, and that his feud with Robinson resulted in Robinson being killed by "gang members who went with the Black Mafia," *see* Griffin, Black Brothers Inc. at 200, one could reasonably infer that Burton was a member of the Black Mafia.

Indeed, Senator Hardy Williams, who represented Murray's codefendant Tyrone Wesson, cross-examined Douglas Haughton at trial about whether Burton (and Thorpe) were members of the Black Mafia, and Haughton simply did not know:

|  |  |
|---|---|
| Sen. Williams: | Sir, in connection with the corner and the shotgun, isn't it true that the shotgun really belonged to Daddy Laddy, being Larry Thorpe? |
| Haughton: | I don't know. |
| Sen. Williams: | Do you know Elliott Burton? |
| Haughton: | Yes. |
| Sen. Williams: | Do you know Mop? |
| Haughton: | Yes. |
| Sen. Williams: | And all these fellows generally associated with the drug traffic; isn't that correct? |
| Haughton: | Yes. |
| Sen. Williams: | And you were also part of the black Mafia drug ring; were you not? |

| Haughton: | No. |
| Sen. Williams: | Were they? |
| Haughton: | I don't know. |

(Trial N.T. 06/02/83 at 513–14).

Burton also had his own extensive criminal history, which included convictions of violent crimes and charges as serious as attempted murder:



(Ex. 34, Elliott Burton Criminal Extract and Mugshot (10/10/80)).

Despite knowing Burton's criminal history, as well as his ties to the 20th and Carpenter Gang and possibly the Black Mafia, police decided to use Burton as an informant to elicit information from Gregory Holden rather than continue to investigate whether Burton was involved in Kaboobie's death.  In their recorded conversation, Burton asked Holden leading questions about the involvement of "Bruce" and "Scottie" in Kaboobie's death and claimed that someone else had accused Holden of planning the incident. (Ex. 30). In response, Holden denied his own involvement and casted blame on "Bruce" and "Scottie." (*Id.*). Although the date of the recording is unknown, there is only one other piece of evidence in the prosecutor files and police files that references confidential informants—the affidavit of probable cause to search Holden's house, which described Confidential Informant #1 as man "who in the past ha[d] provided information to

two (2) arrests and convictions." (Ex. 29). Confidential Informant #1 was the first person to accuse Murray, Haughton, "and another male" of being involved in Kaboobie's death. (*Id.*).

Based on the audio recording, Burton's documented role as the key prosecution witness in two prior murder prosecutions,[23] the Feb. 25, 1981 Search Warrant's reference to Confidential Informant #1's assistance in two prior prosecutions, and the fact that the Search Warrant is the only document in the homicide file that references the use of confidential informants in the investigation of Kaboobie's death, there are sufficient grounds to conclude that Burton was Confidential Informant #1. Indeed, Burton would have known "that a young black male witnessed the murder…and took [Kaboobie's] 32 cal. revolver and fled [the house] with the weapon, (Ex. 29), because Burton was near the scene at the time of the shootout, and he took the shotgun and fled as well, (Ex. 27).

If true, this would mean Burton—the man seen fleeing from Kaboobie's house holding the shotgun likely used in Kaboobie's death—was the first person to inculpate Murray. At a minimum, the Commonwealth's failure to disclose this evidence deprived Murray of the argument that "the police were irresponsible in relying on [Burton] to tip them off to…evidence damaging to [Murray]." *See Kyles*, 514 U.S. at 450 (finding *Brady* violation where the state's failure to disclose evidence tending to show police "fail[ed] to treat [a non-testifying informant] as a suspect and his statements with a presumption of fallibility").

Even if Burton were not Confidential Informant #1, however, the undisclosed evidence raises questions about why police recklessly relied on Burton for information when an uninterested person had left a tip identifying him as a prime suspect. Indeed, when coupled with the evidence of Strickland's fear of retaliation from Burton, (Ex. 10), and the polygraph examiner's undisclosed

---

[23]  *See Johnson*, 437 A.2d 1175, 1177 n.3; *Watts*, 412 A.2d 474, 475.

conclusion that Strickland was "[l]ying" in March 1981 when he stated he could not "take [the police] to the gun used to kill 'Kaboobie[,]'" (Ex. 8), the undisclosed evidence concerning Burton also raises questions about why police did not piece together the highly plausible theory that Howard told police the truth and that Strickland knew Burton had taken the shotgun used to kill Kaboobie. Police had no leads as to what happened to the shotgun—except for Howard's tip and the possibility that Strickland knew where the shotgun was. (Ex. 27). Police were also already aware that Strickland had fears of retaliation from more than one person due to his knowledge of what happened to Kaboobie, (Ex. 11), and that Burton had twice threatened to tell the police Strickland was at Kaboobie's house if Strickland did not volunteer the information himself. (Ex. 11, Ex. 27, Ex. 35, Police Activity Sheet (01/06/81)). Taken together, all the undisclosed evidence concerning Burton suggests that he did, in fact, take the shotgun used to kill Kaboobie and that he pressured Strickland to omit this fact when talking to police.

The John Howard tip *alone* would have compelled Murray's counsel to investigate Burton's role in the shooting's immediate aftermath. Moreover, in addition to calling Howard as a witness after a reasonable investigation into his whereabouts, counsel could have subpoenaed Burton to testify and treated him as a hostile witness, given his roles as an informant, Kaboobie's marijuana supplier, and an alternative suspect. Counsel could have examined Burton regarding what he was doing near Kaboobie's house at the time of the shooting; why he was there; why he took the shotgun and fled in a getaway car; why he tried to pressure Strickland into telling police about what happened to Kaboobie; why he had asked an attorney to contact the District Attorney's Office about Strickland; and whether he told police about his personal stake in the outcome of the investigation into Kaboobie's death. In the course of her investigation, she likely would have discovered Burton's connections to the 20th and Carpenter Gang and possibly the Black Mafia,

and she could have used that information to further cast doubt on Burton's veracity as an informant.

Because nearly forty-two years have passed since the incident, undersigned counsel can only speculate as to what other leads might have resulted if the Commonwealth had not suppressed the evidence about Burton. He died in December 1999,[24] and as a result, he is not available to testify at an evidentiary hearing on Murray's *Brady* claims. However, because "the uncertainty regarding what leads timely disclosure might have generated was created by the extreme length of the Government's evidentiary suppression," this Court should "resolve it against the Government." *Alvin*, 30 F. Supp. 3d at 338. At bottom, the Commonwealth suppression of the information pertaining to Burton violated *Brady* because it impaired trial counsel's ability to investigate alternate defense theories and to formulate trial strategy. *See Dennis*, 834 F.3d at 311 ("Alterations in defense preparation and cross-examination at trial are precisely the types of qualities that make evidence material under *Brady*.").

Furthermore, Murray's counsel could have impeached the homicide detectives regarding their reckless and irresponsible decision to trust **their then-prime suspect** to serve as a confidential informant before they even ruled him out as a possible shooter. *See Kyles*, 514 U.S. at 450–51; *see also Dennis*, 834 F.3d at 311 (recognizing that withheld impeachment evidence is "material" if it could be used to "challenge detectives at trial regarding their paltry investigation"). **At the time the homicide detectives used Burton as a confidential informant, their only investigative lead pointed to Burton**. Until Randolph gave a statement, police had no evidence exculpating Burton as a shooter.[25]

In fact, the only evidence that definitively disproves Burton as one of the two shooters,

---

24   Ex. 36, Elliott Burton Social Security Administration Death Record.
25   Randolph, for his part, had his own credibility issues, most notably his refusal to testify against Holden after inculpating him in Kaboobie's death, (Trial N.T. 06/17/83 at 1260–64); the police's question connecting him to Burton, (Ex. 37, Edward Randolph Polygraph Report (03/11/81)); and, his inconclusive polygraph results, (*id.*).

however, are the confessions of the shooters themselves: Tyrone Wesson and Douglas Haughton. Crucially, the fact that Wesson and Haughton have credibly recanted does not diminish the exculpatory value of the evidence pertaining to Burton. At the time of trial, the information about Burton would have persuaded the jury to consider the role of an alternative suspect and to weigh the prosecution's case more carefully against Murray's credible alibi defense. Clearly, the jury struggled over whether to convict Murray and his codefendants because the jury took three full days to reach its verdicts. Thus, for the foregoing reasons, the prosecution's withholding of evidence related to Elliott Burton is *Brady* violation that unfairly prejudiced Murray in the jury's eyes.

### 7. The Commonwealth suppressed police paperwork reflecting that police initially believed that Haughton was one of the two men who went into Kaboobie's house and killed him, and trial counsel could have used this evidence to impeach the paltry police investigation.

The Commonwealth failed to disclose the fact that police initially believed Haughton was one of the two men who went inside Kaboobie's house and killed him. This fact is reflected in multiple documents found in the police homicide file, including Strickland's polygraph report, which showed that police originally suspected that Haughton was "Scotty," (Ex. 8); a police activity sheet that also reflected that police believed Haughton was "Scotty" (Ex. 7); the criminal complaint filed against Haughton, which accused him of "shoot[ing] and kill[ing]" Kaboobie during "an attempted robbery inside his residence at 2414 Montrose Street," (Ex. 14); and another police form relating to Haughton, which stated that Haughton "did shoot and kill Eric DeLegal inside of his residence," (Ex. 38, Post-Arrest Paperwork for Douglas Haughton (04/01/82)). Aside from Haughton's self-serving police statement, detectives did not thereafter obtain any evidence that rebutted their initial suspicion that Haughton was one of the two men who entered Kaboobie's house and killed him. Murray's trial counsel never knew that police initially suspected that

Haughton was one of the two shooters, and this information could have been used to impeach the police's decision to rely on Haughton's statement. *See Kyles*, 514 U.S. at 446.

**B. The suppressed evidence and information are material because their nondisclosure undermines confidence in the verdict.**

In considering the materiality of the suppressed evidence and information, this Court must consider the strength of the defense presented at trial and the weakness of the prosecution's case against the defendant. *See Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (concluding that undisclosed polygraph results were not material because "the case against [the defendant] was overwhelming"). The stronger the defense and the weaker the prosecution's case, the more probable it is that the outcome of the trial would have been different if the suppressed evidence had been disclosed. Additionally, as explained above, materiality must be viewed "collectively, not item by item." *Kyles*, 514 U.S. at 437.

**1. The prosecution's case against Murray was inherently weak because it rested solely on Haughton's uncorroborated accomplice testimony.**

Here, as explained on pages 109 through 132 and pages 163 through 173 of Murray's Memorandum of Law in Support of his Counseled and Amended Rule 60(b) Motion (ECF No. 101-1), which are incorporated fully herein by reference, the Commonwealth's case against Murray was inherently weak. Aside from Tyrone Wesson's redacted confession (the introduction of which at Murray's trial violated his Confrontation Clause rights),[26] the prosecution's case rested solely on Douglas Haughton's uncorroborated accomplice testimony. Such testimony "is inevitably suspect," *Bruton*, 391 at 136, and "should always be scrutinized carefully by the jury because of its inherent untrustworthiness," *Tillery v. United States*, 411 F.2d 644, 646 (5th Cir. 1969). Indeed, Haughton's trial testimony was not credible for the following reasons:

- Haughton had a motive to falsely accuse Murray to avoid a harsh sentence in

---

[26] See *infra* Section II regarding the *Bruton* claim.

his unrelated federal bank robbery case.

- Haughton had a motive to falsely accuse Murray to avoid a life sentence without the possibility of parole for Kaboobie's murder.

- Haughton had a motive to exact revenge against Murray for the time when Murray and his stepbrother beat up Haughton after Haughton robbed Murray's girlfriend and sisters at gunpoint in their own home.

- Haughton was a career criminal with a history of using aliases to hide his criminal activities, and he had a well-established reputation for being a liar and a thief.

- Law enforcement interrogated Haughton off-the-record about his involvement in Kaboobie's death eight days before he gave a formal statement, which means Haughton had an opportunity to reflect on what police told him and to craft a narrative to protect his own self-interests.

- Haughton read Edward Randolph's statement before giving any formal statement to police, and Randolph's statement tipped Haughton off to the fact that police suspected Murray was involved in Kaboobie's death.

- Physical evidence contradicted Haughton's testimony as to the number of shots allegedly fired by Kaboobie and Murray during the shootout.

- Haughton gave contradictory testimony regarding whether and when Murray had a gun at the time of the incident.

- Haughton gave contradictory testimony regarding from where Murray obtained the gun.

- Haughton gave contradictory testimony regarding whether he himself had a gun at the time of the shootout.

- Haughton gave contradictory testimony about whether the shotgun came from Murray's house or Holden's house.

- Haughton gave contradictory testimony regarding whether he saw Holden later that night after the shootout.

- Haughton gave contradictory testimony regarding when the plan to rob Kaboobie was developed.

- Haughton gave contradictory testimony regarding who knocked on Kaboobie's front door.

- Haughton gave contradictory testimony regarding whether he saw Kaboobie answer the door.

- Haughton gave contradictory testimony regarding which one of Wesson's arms Kaboobie had shot.

- Haughton's testimony that he saw Wesson with a bandage around his arm at Murray's house following the shootout was not credible because Haughton testified that he arrived at Murray's house well before 8:00 p.m., and medical records reflect that Wesson did not receive treatment for his gunshot wound until around 8:32 p.m. and did not leave the hospital until at least 10:55 p.m.

- Haughton was under the influence of marijuana at the time of the shootout.

- Haughton gave contradictory testimony regarding how much marijuana he smoked before the shootout, and he admitted at trial that he lied during Murray and Wesson's preliminary hearing about how much marijuana he smoked before the shootout.

- Haughton gave inconsistent testimony regarding when he had given Kaboobie for the money that gave rise to their personal dispute.

- Haughton gave inconsistent testimony regarding how much marijuana Kaboobie had at his residence.

- Haughton gave contradictory testimony regarding whether Holden planned the robbery alone.

- Haughton gave contradictory testimony regarding which of his brothers he visited immediately after the shootout.

- Haughton gave contradictory testimony regarding whether the school building across from Kaboobie's house blocked his view of Kaboobie's street.

- Haughton's testimony concerning the timeline of events immediately preceding the shootout was not credible.

- Haughton's testimony about what he was able to observe from the schoolyard across from Kaboobie's house was not credible because of the lighting conditions at the time of the shootout.

Additionally, as the Commonwealth has conceded, Haughton reliably recanted his trial testimony.

(Ex. 1, Commonwealth Rule 60(b) Response at 15).

Furthermore, the prosecution offered no evidence corroborating Haughton's identification

of Murray as the person who entered Kaboobie's house with Wesson, which means Haughton's testimony requires the strictest level of scrutiny. There was no physical evidence or eyewitness testimony connecting Murray to the crime, and Wesson's redacted confession cannot corroborate Haughton's identification of Murray because "the testimony of one accomplice may not be used to corroborate the testimony of another accomplice." *Almeida v. Jeffes (Almeida II)*, 566 F. Supp. 852, 854–55 (E.D. Pa. 1983) (quoting *Commonwealth v. Almeida (Almeida I)*, 452 A.2d 512, 518 (Pa. Super. 1982)). Although there is independent evidence that corroborates certain facts contained in both Wesson's statement and Haughton's testimony, such as the shotgun bolt recovered from the crime scene, none of those facts connect Murray to the offense because they are irrelevant to the other shooter's identity. *See Watson v. Commonwealth*, 95 Pa. 418, 424 (1880) ("To prove that the accomplice told the truth in relation to irrelevant and immaterial maters which were known to everybody, would have no tendency to confirm his testimony involving the guilt of the party on trial[.]" (citing *Commonwealth v. Bosworth*, 22 Pick. 397 (Mass. 1839))); *Commonwealth v. Emmett*, 74 Pa. Super. 86, 92 (1920) (explaining that "[c]orroboration in matters not connecting the accused with the offense" is insufficient to support an accomplice's testimony that the defendant participated in the crime); *see also Commonwealth v. Cox*, 17 A. 227, 228 (Pa. 1889) (explaining that evidence corroborating accomplice testimony must tend to connect the defendant with the crime). The only competent evidence the Commonwealth offered that connected Murray to the crime was testimony from Haughton—the man who actually entered Kaboobie's house with Wesson. For the foregoing reasons, there is heightened probability that the outcome of Murray's trial would have been different had the suppressed information been disclosed to the defense.

48

### 2. The prosecution offered no competent evidence to rebut Murray's credible alibi defense, aside from Haughton's uncorroborated accomplice testimony.

As explained on pages 57 through 66 of Murray's Memorandum of Law in Support of his Counseled and Amended Rule 60(b) Motion, which is incorporated fully herein by reference, Murray presented a credible alibi defense. The more credible Murray's alibi defense, the more probable it is that the outcome of his trial would have been different if the withheld exculpatory and impeachment evidence had been disclosed. Murray presented three credible alibi witnesses to support his defense: Robin Johnson, David Elliott, and Deborah Frazier. Murray also waived his privilege against self-incrimination, testified credibly at trial, and corroborated his alibi defense. Aside from Haughton's testimony, the prosecution did not offer any evidence to rebut Murray's defense and instead focused on attacking the credibility of the alibi witnesses. The prosecution did not present any physical or forensic evidence establishing that Murray was there, nor did it offer an individualized motive for Murray's participation in the purported conspiracy. The prosecution also failed to present any eyewitness testimony and unilaterally canceled a court-ordered lineup that was never rescheduled. In short, aside from Haughton's uncorroborated accomplice testimony, the prosecution offered no evidence rebutting Murray's credible alibi defense. For this reason, there is a heightened probability that the outcome of Murray's trial would have been different if the suppressed information had been disclosed to the defense.

### 3. The Commonwealth committed at least 11 separate *Brady* violations.

In light of the strength of Murray's alibi defense, the weakness of the prosecution's case against him, and the nature of the undisclosed, newly discovered evidence, the Commonwealth committed no less than 11 *Brady* violations. The suppressed items are so numerous, so diverse, and so favorable that when the withheld items are grouped together in different ways, each grouping constitutes a separate *Brady* violations. Additionally, some of the individual items are so

favorable that their suppression alone constitutes an independent violation. The suppression of all the items, taken as a whole, also constitutes an independent *Brady* violation.

The materiality assessments for each violation are discussed below in turn, but ultimately, the Court need not determine whether the Commonwealth committed 11 separate *Brady* violations. This is because materiality must ultimately be considered "collectively, not item by item." *Kyles*, 514 U.S. at 437. The separate violations are presented below in order to emphasize the egregiousness of the Commonwealth's suppression of the newly discovered evidence. At bottom, however, Murray must only show that when the individual items are viewed collectively, they are "sufficient to 'undermine confidence' in the verdict." *Weary*, 577 U.S. at 392 (quoting *Smith*, 565 U.S. at 75). As shown below, Murray clearly satisfies this standard.

### a. Suppression of Gregory Strickland's Polygraph Report (Ground Five)

The suppression of Gregory Strickland's polygraph report alone constitutes a *Brady* violation. (Arg. Section I.A.2). Had the polygraph results been disclosed, Murray's counsel would have been prompted to interview Strickland and call him as a trial witness. Strickland was available to testify at trial, and he would have testified that he did not see Murray inside Kaboobie's house, and that Douglas Haughton was the other man who killed Kaboobie. Thus, Gregory Strickland's polygraph results are clearly material, and the prosecution's failure to disclose them to Murray violated his due-process rights.

### b. Suppression of the Fact that Strickland Saw Haughton Inside Kaboobie's House (Ground Six)

For similar reasons, the Commonwealth's suppression of the handwritten notes and police activity report reflecting that Strickland told Edward Randolph, he saw Haughton inside Kaboobie's house constitutes an additional *Brady* violation. (Arg. Section I.A.1). Had this information been disclosed, Murray's counsel would have been prompted to interview Strickland

and call him as a trial witness. Strickland was available to testify at trial, and he would have testified that he did not see Murray inside Kaboobie's house, and that Douglas Haughton was the other man who killed Kaboobie. Thus, the fact that Strickland saw Haughton inside Kaboobie's house is clearly material, and the prosecution's failure to disclose this evidence to Murray violated his due-process rights.

>    **c.   Suppression of Strickland's Polygraph Results, the Fact that Strickland Saw Haughton Inside Kaboobie's House, the Affidavit of Probable Cause to Search Holden's House, and Strickland's Refusal to Accuse Murray Before the Canceled Police Lineup (Ground Seven)**

For similar reasons, the Commonwealth's suppression of the affidavit of probable cause to search Holden's house, Strickland's polygraph results, the fact that Strickland saw Haughton inside Kaboobie's house, and his refusal to accuse Murray before the canceled police lineup, taken together, constitutes an additional *Brady* violation. (Arg. Sections I.A.1, I.A.2, I.A.5).The affidavit contained information from Confidential Informant #1 that the "young boy" who was inside Kaboobie's house at the time of the shooting took Kaboobie's handgun and fled the scene. This "young boy" was clearly Gregory Strickland, and Strickland's polygraph results indicated that he lied to police about what he saw and who killed Kaboobie. Had the affidavit of probable cause, polygraph results been disclosed, and handwritten notes and police report reflecting what Strickland told Edward Randolph had been disclosed, Murray's counsel would have been prompted to interview Strickland about what he did with Kaboobie's gun and then to call Strickland as a trial witness. Strickland was available to testify at trial, and he would have testified that he did not see Murray inside Kaboobie's house, and that Douglas Haughton was the other man who killed Kaboobie. Thus, Gregory Strickland's polygraph results, the handwritten notes and police activity report about what Strickland told Edward Randolph, and the affidavit of probable cause are clearly material. The prosecution's failure to disclose these items violated Bruce

Murray's due-process rights.

### d. Suppression of George Young's Description of the Skinnier, Shorter Male (Ground Eight)

The suppression of George Young's undisclosed polygraph report alone constitutes a *Brady* violation. (Arg. Section I.A.3). In the undisclosed report, Young described Wesson and another man who did not fit Murray's physical description (and who more closely matched Haughton's description). Had this report been disclosed, it would have prompted Murray's counsel to call Young as a trial witness. Young was available to testify at trial, and his testimony about the other man's physical characteristics would have exculpated Murray. Thus, Young's undisclosed polygraph report is clearly material, and the prosecution's failure to disclose it violated Bruce Murray's due-process rights.

### e. Suppression of John Howard's Tip About Elliott Burton (Ground Nine)

The Commonwealth's suppression of John Howard's tip that he saw Burton flee Kaboobie's house after the shootout with a shotgun constitutes an additional *Brady* violation. (Arg. Section II.A.4). Howard's tip would have prompted Murray's counsel to locate Howard and call him as a trial witness to testify about what he saw. The tip also would have prompted Murray's counsel to investigate Burton and call him as a hostile witness to cross-examine him about his whereabouts at the time of Kaboobie's death. Murray's counsel could have used their testimony as exculpatory evidence to argue that Wesson and Burton were the two shooters.[27] Thus, the undisclosed tip is clearly material, and the prosecution's failure to disclose it violated Bruce Murray's due-process rights.

---

[27] The only evidence that definitively rules out Burton as one of the two shooters are Tyrone Wesson's and Douglas Haughton's recantations, as Wesson and Haughton both confessed that they were the two shooters. Their recantations were not available at the time of Petitioner's trial, and they do not diminish the exculpatory value of the John Howard tip at the time of trial.

**f.**   **Suppression of the Affidavit of Probable Cause to Search Gregory Holden's Residence and the Audio Recording of His Conversation with Burton (Ground Ten)**

The Commonwealth's suppression of the affidavit of probable cause to search Holden's residence and the audio recording of his conversation with Burton constitutes an additional *Brady* violation. (Arg. Sections I.A.5, I.A.6). Had this evidence been disclosed, it would have prompted Murray's counsel to investigate the false rumor that "Bruce Murray" had been shot. This would have led her to realize that Tyrone Wesson had lied to hospital staff and gave his name as "Bruce Murray," and to interview her client's sister Brenda, who was referenced in Wesson's hospital records and who was available to testify at trial. Brenda Murray would have provided information tending to exculpate her brother and provided critical context dispelling any doubt in the minds of the jury that Wesson was the one who was shot during the shootout. Thus, for these and other reasons, the undisclosed affidavit of probable cause and the audio recording of Holden and Burton's conversation is material, and the prosecution's failure to disclose them violated Bruce Murray's due-process rights.

**g.**   **Suppression of the Information Pointing to Haughton as the Other Man Inside Kaboobie's House (Ground Eleven)**

In this particular case, where the Commonwealth's key witness (Douglas Haughton) was actually one of only the two perpetrators involved in the murder, all of the exculpatory evidence that points to Haughton as the actual shooter doubles as impeachment evidence. This includes Strickland's polygraph results, the handwritten police notes and police activity report reflecting that Strickland told Randolph that he saw Haughton inside Kaboobie's house, George Young's polygraph report describing Wesson and another man who could not have possibly been Murray and who more closely matched Haughton's description, and the tip from John Howard. Had this evidence been disclosed, it would have prompted Murray's trial counsel to call Gregory Strickland

as a witness, who would have exonerated Murray and testified that Haughton was the other shooter besides Wesson;. The exculpatory evidence establishing that Haughton was the third participant in the three-person shootout with Wesson and Kaboobie necessarily contradicts Haughton's testimony that Murray was the third participant. Thus, all of this exculpatory evidence was material under *Brady* for impeachment purposes as well. As a result, the suppression of the information pointing to Haughton as the other man inside Kaboobie's house constitutes an independent *Brady* violation.

### h. Suppression of the John Howard Tip and the Information About Elliott Burton's Role as an Informant (Ground Twelve)

The Commonwealth's suppression of the Howard tip and the information about Burton's role as an informant constitutes an independent *Brady* violation. (Arg. Sections II.B.4, II.B.6). This evidence demonstrates that the police investigation into Kaboobie's murder was, at a minimum, sloppy and negligent. The police had a credible tip that Elliott Burton was one of the shooters yet recklessly relied on him as a confidential informant without having first ruled him out as a suspect. Indeed, the police used Burton to elicit unreliable information from Gregory Holden through leading questions and false accusations. The police's decision to rely on the prime murder suspect—and known violent gang member—as an informant without first ruling him out as a suspect is indefensible.

The police engaged in similar conduct in *Kyles v. Whitley*, 514 U.S. 419 (1995). In that case, the police had failed to disclose an array of evidentiary items that showed its reliance on an informant who should have been treated as a suspect in the murder investigation that resulted in the defendant's arrest and conviction. *See id.* at 424–31. The Supreme Court recognized that the undisclosed evidence supported the defendant's "argu[ment] that the police were irresponsible in relying on [the informant] to tip them off to the location of evidence damaging to [the defendant],"

*id.* at 450, as there was reason to suspect that the informant had planted incriminating evidence at that location, *id.* at 446. The Court held that a *Brady* violation occurred because the suppression of the material evidence reflected "the unreliability of the investigation" and supported "the defense's attack on [the State's] failure to treat [the informant] as a suspect and his statements with a presumption of fallibility." *Id.* at 451.

Like in *Kyles*, the police should have questioned why Burton was so "eager to cast suspicion on [others]." *See id.* at 425. Burton twice tried to pressure Gregory Strickland into telling the police what he saw and accusing others, and when Strickland did not, Burton contacted the authorities himself. Later, while acting as an informant, he tried to accuse Holden of masterminding Kaboobie's death and asked leading questions that pinned the shooting on "Bruce" and "Scottie." Even worse, unlike in *Kyles*, here the police had a credible tip from an uninterested eyewitness that pointed to the informant (Burton) as a possible suspect.

For these reasons, all of the undisclosed information pertaining to Elliott Burton and his role as an informant constitutes favorable evidence under *Brady*, and this evidence was material because it would have cast doubt on the reliability of the information that led the police to initially target Murray as a suspect. Therefore, the Commonwealth's failure to disclose this information violated Murray's due-process rights.

### i. Suppression of the Undisclosed Information Concerning Gregory Strickland (Ground Thirteen)

The Commonwealth's suppression of the undisclosed information concerning Strickland, from a purely impeachment perspective, constitutes an independent *Brady* violation. (Arg. Sections I.A.1, I.A.2, I.A.5). This evidence includes Strickland's polygraph results, the handwritten notes and police activity report reflecting that he told Randolph he saw Haughton inside Kaboobie's house, the affidavit of probable cause to search Holden's house, and

Strickland's refusal to accuse Murray before the canceled police lineup.

As noted above, the police had several reasons to doubt Gregory Strickland's statements about what he saw and who killed Kaboobie. He told police he was worried that people were following him, and police later found out Strickland might have been lying to them after Edward Randolph told police Strickland said he saw Douglas Haughton inside Kaboobie's house. The fact that there was a "young boy" inside Kaboobie's house at the time of the shooting who took Kaboobie's handgun and fled the house also should have alerted police to the fact that Strickland was lying to them. Police eventually received confirmation that Strickland was lying because he lied during a polygraph test when he was asked questions on what he saw and who killed Kaboobie. Haughton's statement that he heard Strickland (aka "Dap") call his name immediately after the shooting also should have alerted police that Strickland was lying.

Although detectives tried to convince Strickland to tell the truth, the police's decision to rely on Haughton's statement to arrest and convict Murray was negligent, at a minimum. The evidence pointed to Haughton as the other shooter besides Wesson, and in fact the police initially suspected that *Haughton* was "Scotty." (Ex. 8). After learning that Wesson was "Scotty" and had lied about being "Bruce Murray," and that Haughton saw and heard Strickland immediately after the shooting, the police should not have relied on Haughton's statement to pursue charges against Murray. Indeed, the police should have believed Strickland when he told them multiple times that he did not see Murray. Strickland *explicitly* cautioned the police not to believe what other people had said about Murray's involvement in the shooting, (Ex. 39, Gregory Strickland Police Statement (03/13/81)), and we now know this is because Strickland knew Murray was not involved at all, (Ex. 9; Ex. 10). Simply put, the police should have conducted an adequate investigation into Murray before charging him based on false rumors and the false statement of the person that police

had every reason to believe had actually committed the crime.

For these reasons, all of the undisclosed information pertaining to Gregory Strickland constitutes favorable evidence under *Brady*, and this evidence was material because it would have casted doubt on the police investigation and the Commonwealth's decision to rely on Haughton's uncorroborated accomplice testimony as the sole basis for prosecuting Murray. Therefore, the Commonwealth's failure to disclose this information violated Murray's due-process rights.

### j. Suppression of the Paperwork Reflecting that Police Initially Suspected Haughton Was One of the Two Shooters Who Went Inside Kaboobie's House and Killed Him (Ground Fourteen)

The Commonwealth's suppression of the undisclosed police paperwork reflecting that police initially suspected Haughton was one of the two shooters constitutes a *Brady* violation. (Arg. Section I.A.7). As explained above, police had every reason to suspect that Haughton was one of the two shooters because Randolph told them that Strickland said he saw Haughton inside Kaboobie's house, and there was no evidence suggesting that more than two people went inside the house. (Ex. 7; Ex. 6). Police had no doubt that "Scotty" was one of the two shooters, and police initially believed that Haughton was "Scotty." (Ex. 7; Ex. 8). Police did not receive any information casting doubt on their belief that Haughton was "Scotty" until after police interrogated him. Police relied solely on Haughton's statement to obtain a warrant for Murray's arrest, and aside from Wesson's since-recanted statement, police did not receive any information corroborating Haughton's statement.

Had the evidence identified above been disclosed, Murray's trial counsel could have cross-examined the police witnesses about their initial suspicion that Haughton was "Scotty" and that he was one of the two shooters. Trial counsel could have impeached the police investigation by pointing out that police relied on Haughton's statement to charge Murray despite having no other

evidence rebutting the police's initial suspicion that Haughton was one of the two shooters. Trial counsel also could have used this information to pursue an additional defense theory (i.e., Haughton and Wesson were the two shooters, and Murray was not involved at all) that would have strengthened Murray's alibi. Indeed, had the Commonwealth not suppressed this information, it would have brought Murray's counsel closer to the truth, as there is no longer any dispute that Haughton and Wesson were the two shooters, and that Murray is actually innocent. Thus, the Commonwealth's failure to disclose this evidence violated Murray's due-process rights.

### k.  Collective Materiality of the Suppressed Evidence and Information (Ground Four)

The suppression of the individual items of evidence and information, taken together, constitutes a clearcut *Brady* violation. (Arg. Section I.A). The materiality standard does not require that the petitioner "show that he 'more likely than not' would have been acquitted had the new evidence been admitted." *Weary*, 577 U.S. at 392 (omissions in original) (quoting *Smith*, 565 U.S. at 75). Rather, the petitioner "must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Id.* As a result, the petitioner "can prevail even if . . . the undisclosed information may not have affected the jury's verdict." *Id.* at 392 n.6.

Here, the collective materiality of the undisclosed evidence and information is undeniable because, as shown above, these items are favorable and material even when viewed in separate groups. Had the suppressed exculpatory information been disclosed, Murray would have been able to present additional evidence that would have supported the credible alibi defense he asserted at trial. He also would have been able to present evidence that would have impeached the only trial evidence incriminating Murray: Haughton's uncorroborated accomplice testimony. The undisclosed, newly discovered information also casts doubt on the reliability of the police investigation into Murray and on prosecution's theory of the case against him.

The cumulative effective of the undisclosed evidence plainly satisfies the materiality standard because it is impossible to have any confidence in Murray's murder conviction. As the District Attorney's Office has conceded in federal court, Murray has proven that no reasonable juror, acting reasonably, would have found him guilty of Kaboobie's murder. (Ex. 1, Commonwealth Rule 60(b) Response at 18). Indeed, when viewed as a whole, the evidence demonstrates that Douglas Haughton, not Bruce Murray, was the third participant in the three-person shootout with Tyrone Wesson and Kaboobie.[28]

## C. Conclusion

For the foregoing reasons, the Commonwealth violated Murray's due-process rights by suppressing material information and evidence favorable to his defense. No further harmless-error analysis is required because Murray has satisfied the materiality standard. *See Kyles*, 514 U.S. at 435. Accordingly, the Court must grant Murray habeas relief under *Brady*.

## II.   The *Bruton* Claim (Ground One)

### A.   Murray's *Bruton* claim satisfies the exhaustion requirement, and his actual-innocence claim overrides the procedural-default rule.

Murray has exhausted his available state court remedies on his *Bruton* claim because "it is clear that this claim is now procedurally barred under Pennsylvania law due to state timeliness rules." *See Castille v. Peoples*, 489 U.S. 346, 351 (1989). Adopting Magistrate Judge Welsh's Second Report and Recommendation, this Court previously ruled that Murray's *Bruton* claim was procedurally barred because he failed to raise the issue in a timely petition for allowance of appeal to the Pennsylvania Supreme Court. (ECF No. 27). Because Murray has proven his proven his actual innocence, however, the procedural-default rule does not bar this Court from considering

---

[28]   Even if the Court is not convinced that the evidence proves Haughton was the third participant in the shootout, the newly discovered evidence is favorable and material enough to entitle Murray to habeas relief.

the merits of his *Bruton* claim. *See McQuiggin*, 569 U.S. at 392.

**B. The prosecution's use of Tyrone Wesson's confession at the joint trial violated Murray's confrontation rights under the Sixth Amendment because Wesson's redacted confession implicated Murray as "the other guy" who went inside Kaboobie's house.**

Well-settled law maintains that "a defendant's right to confrontation is violated when a non-testifying codefendant's confession is introduced in a joint trial, and that confession implicates the other defendant." *Johnson v. Superintendent Fayette SCI*, 949 F.3d 791, 795 (3d Cir. 2020) (citing *Bruton*, 391 U.S. 123). A limiting instruction is insufficient in cases where "such 'powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial[.]'" *Id.* (quoting *Bruton*, 391 U.S. at 137). Although redactions could suffice to avoid a *Bruton* violation, the "redactions cannot be so ineffectual that they actually could signal to the jury that the co-defendant's name was deleted." *Id.* at 795–96 (citing *Gray v. Maryland*, 523 U.S. 185, 195 (1998)). The redactions must "eliminate 'not only the defendant's name, *but any reference to his or her existence*.'" *Id.* (emphasis added) (quoting *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)). The court must "take a holistic approach" and "view[] the redaction in the context of the entire record." *Id.* at 796.

The Third Circuit has routinely found that the use of a "generic term" like "the other guy" in place of the defendant's name is insufficient to avoid a *Bruton* violation if "[t]he limited participants in [the] case made it obvious to a juror who 'need only lift his eyes to [Murray], sitting at counsel table,' to determine that he was 'the other guy,' *i.e.* the shooter." *Johnson*, 949 F.3d at 797 (quoting *Gray*, 523 U.S. at 193); *see also*, *e.g.*, *Williams v. Folino*, 625 Fed. App'x 150, 157 (3d Cir. 2015) (finding *Bruton* violation where redacted confession referred to the non-confessing defendant as "his boy," "the jury knew that there were only two people involved in the shooting

60

and only two people were on trial for the crime to which [the codefendant] confessed, and the Commonwealth argued that [the non-confessing codefendant] was the shooter").

The Third Circuit has also held that the use of generic terms cannot avoid a *Bruton* violation if "the confession 'sharply incriminated'" the defendant, *see Johnson*, 949 F.3d at 797 (quoting *United States v. Richards*, 241 F.3d 335, 346 (3d Cir. 2001)), such as when the redacted confession referred to a shooter as "the other guy" and the prosecution theorized that the defendant is the only one who could have possibly been the possible shooter, *see*, *e.g.*, *Vazquez v. Wilson*, 550 F.3d 270, 281 (3d Cir. 2008) (finding *Bruton* violation where the confessing codefendant told police that there were only two possible shooters, including the non-confessing codefendant and an uncharged third person, and the prosecution argued that the non-confessing defendant "fired the fatal shot"). *Compare Priester v. Vaughn*, 382 F.3d 394, 401 (3d Cir. 2004) (finding no *Bruton* violation where the phrase "the other guy" did not implicate the defendant because at least fifteen people were involved in the crime), *with Eley v. Erickson*, 712 F.3d 837, 860–61 (3d Cir. 2013) (holding that *Bruton* violation occurred where non-testifying codefendant's statement "implicated exactly three people in the crimes and exactly three defendants appeared at the joint trial").

The Third Circuit Court has recognized that Pennsylvania state courts have routinely applied *Bruton* and its progeny in violation of U.S. Supreme Court precedent. *See*, *e.g.*, *Freeman v. Superintendent Fayette SCI*, 62 F.4th 789, 802 n.7 (3d Cir. Mar. 17, 2023) ("It is unfortunate and an unnecessary draw on judicial resources that Pennsylvania courts continue to abide by a rule which we have repeatedly held is an unreasonable application of clearly established U.S. Supreme Court precedent.").

In particular, the Third Circuit has explained that it is an unreasonable to apply *Bruton* and its progeny as permitting a trial court to admit into evidence "a statement which used 'the other

guy' as a substitute, and 'left little doubt that the only other accused sitting at the table with [the

defendant who made the statement] was 'the other guy.'" *Id.* (alteration in original) (quoting

*Johnson*, 949 F.3d at 797). The Third Circuit has also held that it is "an unreasonable application

'of clearly established Federal law under the decision of the Supreme Court of the United States'

to hold that [terms like 'the other guy'] always will be sufficient' to satisfy *Bruton*." *Id.* (alteration

in original) (quoting *Vazquez*, 550 F.3d at 282). Indeed, the Third Circuit "ha[s] noted time and

again that substitutions which are merely cosmetic and do not conceal from the jury the actual

identity of an anonymized coconspirator, when that coconspirator is sitting at counsel table, are

unacceptable and unreasonable under U.S. Supreme Court precedent." *Id.* at 804–05.

Here, the prosecution's use of generic terms as substitutes for Murray's name in Wesson's

redacted confession was a clear *Bruton* violation.[29] The substitutions appear throughout Wesson's

statement, starting at the planning session ("three other guys at one of their houses") through the

post-incident meeting at "one of the other guys' houses." (Trial N.T. 06/15/83 at 681–86). The

redacted statement divided the perpetrators into two groups: "two guys" who served as lookouts

(Haughton and Holden) and the actual robbers (Wesson, against whom the statement was

admissible, and Murray). (*Id.*). Crucially, the redacted statement indicated that Wesson "and

another guy went in[to Kaboobie's house]," and it referred to that "guy" as "[t]he guy with

[Wesson]" and "the guy who went inside with [Wesson]." (*Id.*). The prosecution's theory

throughout the state court proceedings was that Murray was the only other man who went inside

Kaboobie's house with Wesson.

Murray's case is legally indistinguishable from a scenario in which the prosecution "use[s]

a generic term in a two-defendant case involving a two-person crime." *Williams*, 625 Fed. App'x

---

[29] A copy of Wesson's redacted confession is attached hereto as Exhibit 40.

at 156–57. Although the joint trial involved three codefendants and one cooperating accomplice, Wesson's description of the division of labor among the four men created a one-on-one situation where Murray was the only person who could have been "the guy who went inside with [Wesson]." (Trial N.T. 06/15/83 at 681–86). As a result, while the jury believed that at least four men were allegedly involved in a conspiracy to commit the robbery, the prosecution led the jury to believe that "there were only two people involved in the shooting": Wesson and Murray. *See Williams*, 625 Fed. App'x 156.

Murray's case is similar to *Washington v. Secretary of Pennsylvania Department of Corrections*, 801 F.3d 160 (3d Cir. 2015), and *Freeman v. Superintendent Fayette SCI*, 62 F.4th 789 (3d Cir. 2023), because all three cases involved multiple codefendants, a cooperating accomplice whose testimony assigned roles to each codefendant, and the introduction of non-testifying codefendant's statement that used generic terms like "the other guy" as substitutes for the codefendants' names. The *Freeman* Court summarized the *Washington* decision as follows:

> In *Washington*, four men committed robbery and murder. One of the men, Taylor, accepted a plea deal and testified against the remaining three coconspirators, Johnson, Washington, and Waddy, at their joint trial. Taylor named Washington as the driver. Co-defendant, Waddy, had given a statement to the police. A detective read that statement into evidence at the trial, with Johnson's and Washington's names replaced with "the guy who went into the store" and "the driver," respectively. The Court gave limiting instructions, and the jury found Washington guilty. We concluded that these redactions were plainly "transparent to the jurors" and were "in violation of the clear Confrontation Clause precepts laid out in *Bruton*."

*Freeman*, 62 F.4th at 801–02 (quoting *Washington*, 801 F.3d at 162–63, 167).

In *Freeman*, after summarizing the *Washington* decision, the Third Circuit stated as follows:

> This case is eerily similar to *Washington*. Here, there were four men who committed the murder. Teel testified, and Miller's statement referred to Teel by name, and to "the first guy" and "the second guy" over and over again. Meanwhile,

there were two defendants at the counsel table sitting next to Miller: Freeman and Collier. The substitutions were a device which likely fooled no one, a device which ultimately "point[ed] directly to the defendant[s], and it accuse[d] the defendant[s] in a manner similar to . . . a testifying codefendant's accusatory finger." In *Washington*, there was no mystery about whose names were being replaced. The District Court got it exactly right in adopting the Magistrate Judge's recommendation, and holding that "Freeman was clearly inculpated by Miller's statements" in a way that violated *Bruton* and its progeny. For these reasons, we agree with the District Court—and disagree with the Pennsylvania Superior Court—in concluding that the use of Omar Miller's statement at joint trial, as redacted, was a violation of Freeman's Sixth Amendment right to confront a witness.

*Id.* at 801 (first quoting *Gray*, 523 U.S. at 194; then quoting *Freeman v. Capozza*, 517 F. Supp. 3d 407, 410 (E.D. Pa. 2021), *reversed by Freeman*, 62 F.4th 789).

Here, like the petitioners in *Freeman* and *Washington*, Murray was clearly incriminated by Wesson's statements in a manner that violated *Bruton* and its progeny. There was no mystery that Murray was the "one other guy [who] went to the door" with Wesson. Based on how the prosecution presented its case and redacted Wesson's statement, all the jury had to do was look up at the three codefendants and see that Murray was the only person who could have been "the other guy who went inside with [Wesson]." Accordingly, the introduction of Wesson's statement into evidence at the joint trial clearly violated Murray's Sixth Amendments right to confrontation.

**C. The *Bruton* error was not harmless.**

This Court must conduct a "harmless-error review de novo" because the state courts denied Murray relief on the *Bruton* claim "without addressing harmlessness." *Freeman*, 62 F.4th at 802. The Third Circuit has explained that when determining whether a *Bruton* error was harmless, the reviewing court should consider the following "five non-exclusive factors":

[1] the importance of the witness' testimony in the prosecution's case, [2] whether the testimony was cumulative, [3] the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, [4] the extent of cross-examination otherwise permitted, and, of course, [5] the overall strength of the prosecution's case.

64

*Id.* (alterations in original) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). Here, all

five *Van Arsdall* factors, plus the strength of Murray's alibi defense, weigh against harmless error.

**1. Wesson's statement was important to the prosecution's case against Murray because the only other evidence inculpating Murray came from the accomplice testimony of Douglas Haughton, whom the trial prosecutor conceded had credibility issues.**

The first factor weighs in favor of prejudicial error because outside of Wesson's statement,

the only evidence inculpating Murray came from the uncorroborated, since-recanted testimony of

Douglas Haughton—and accomplice testimony is "inevitably suspect." *See Bruton*, 391 U.S. at

136; *United States v. Schanerman*, 150 F.2d 941, 943 (3d Cir. 1945) ("The testimony of an

accomplice ought to be viewed with distrust.").

The prosecution conceded that Haughton's credibility hinged on the juror's consideration

of other evidence presented at trial:

> I don't pick Douglas Haughton. I'm not telling you to take Douglas Haughton home with you and have him home for dinner. I am not telling you to take him to any church or social activity that you will be engaged in when you leave this courtroom.
>
> The Commonwealth witness is [*sic*] this case is Douglas Haughton. He is a convicted thief. He is a convicted robber. But, ladies and gentlemen of the jury, before you disregard his testimony in this case, please think about it in light of the other evidence in this case and how it dovetails or interlocks with the other evidence in this case.
>
> Who do you think gets involved in this type of criminal escapade? Do you think it's your brother, your son, your father? It's a man like Douglas Haughton. And, again, I don't tell you that he's the salt of the earth or anything like that. He's the witness in this case, but **before you throw out his testimony in toto, please consider it in light of the other evidence in this case.**

(Trial N.T. 06/20/83 at 1539) (emphasis added).

Wesson's redacted statement is the only other evidence interlocking with Haughton's

testimony that implicated Murray as one of the shooters. There is no other evidence that connects Murray to the offense because, although there is independent evidence that corroborates certain facts contained in both Wesson's statement and Haughton's testimony, such as the shotgun bolt recovered from the crime scene, that evidence is irrelevant to the other shooter's identity. *See Arnold v. United States*, 94 F.2d 499, 507 (10th Cir. 1938) (explaining that evidence corroborating accomplice testimony "must relate to some fact or facts connecting the accused with the act of guilt"); *Watson*, 95 Pa. at 418 (1880) ("[I]t is almost the universal opinion that testimony of the accomplice should be corroborated as to the person of the prisoner against whom he speaks."); *Emmett*, 74 Pa. Super. at 92 (explaining that evidence corroborating the accomplice's testimony "should be to the person of the accused and not simply the fact of the crime," and that "[c]orroboration in matters not connecting the accused with the offense would not meet the requirement"). Accordingly, the first factor weighs against harmless error.

### 2.   Wesson's statement was not merely cumulative of Haughton's testimony.

The second factor requires that the court consider "whether [Wesson's statement] was cumulative" evidence. *See Freeman*, 62 F.4th at 802 (quoting *Van Arsdall*, 475 U.S. at 684). The Third Circuit has recognized that "[e]vidence is 'cumulative' when it adds very little to the probative force of the other evidence in the case." *United States v. Cross*, 308 F.3d 308, 326 (3d Cir. 2002) (quoting *United States v. Williams*, 81 F.3d 1434, 1443 (7th Cir. 1996)); *see also United States v. Ives*, 609 F.2d 930, 933 (9th Cir. 1979) ("Cumulative evidence replicates other admitted evidence.").

Here, Wesson's statement was not merely cumulative of Haughton's testimony for multiple reasons. First,  unlike Haughton's testimony, Wesson's statement suggested to the jury that Murray and the others had an ulterior motive to rob to Kaboobie—namely, "they wanted to get even" with

Elliott Burton because Holden and an uncharged person (Larry Thorpe) had a dispute over guns. (Trial N.T. 06/15/83 at 682). By implicating Thorpe and establishing an ulterior motive, Wesson's statement also suggested to the jury that there was a deeper conspiracy underlying the robbery of Kaboobie. Second, unlike Haughton's testimony, Wesson's statement provided a firsthand account of what actually happened inside Kaboobie's house. (Trial N.T. 06/15/83 at 681–86). Third, Wesson's statement referenced key moments involving Murray that Haughton's testimony did not address. For instance, Wesson's statement indicated that "[t]he guy with me was stalling around when Kaboobie asked for the money," and that this was why Kaboobie "reached for his gun." (Trial N.T. 06/15/83 at 682–83). Additionally, Wesson's statement established that Murray was the one who asked Kaboobie about purchasing marijuana. (*Id.* at 682). Accordingly, the second factor weighs against harmless error.

### 3. Aside from Haughton's testimony, which contradicted Wesson's confession on material points, there was no evidence corroborating Wesson's inculpation of Murray.

The third factor requires that the court consider "the presence of absence of evidence corroborating or contradicting [the non-testifying codefendant's statement] on material points." *See Freeman*, 62 F.4th at 802 (quoting *Van Arsdall*, 475 U.S. at 684). As noted above, corroborative evidence must relate to the identity of the accused, not merely the fact of the crime. *See, e.g.*, *Watson*, 95 Pa. at 418. Additionally, well-settled law provides that "the testimony of one accomplice may not be used to corroborate the testimony of another accomplice." *Almeida II*, 566 F. Supp. at 854–55 (quoting *Almeida I*, 452 A.2d at 518); *see also Commonwealth v. Jones*, 247 A.2d 624, 627 (Pa. Super. 1968) ("The testimony of one accomplice may never be used to corroborate the testimony of another accomplice.").

Here, aside from Haughton's testimony, which cannot even be used to corroborate

Wesson's statement, there was no evidence corroborating the portions of Wesson's statement that inculpated Murray. Additionally, Haughton's testimony contradicted Wesson's statement on material points. For instance, Haughton's testimony regarding Larry Thorpe did not implicate him as a participant in the conspiracy. (Trial N.T. 06/02/83 at 513–16, 520, 526–27). Haughton also denied that the motive for the robbery was to get revenge in connection with a gun dispute. (*Id.* at 526–27). Haughton also testified that the dispute over guns was between Holden and Kaboobie, not Holden and Burton. (*Id.* at 542–43). Furthermore, the prosecution's theory of Murray's participation contradicted Wesson's statement on material points because the prosecution never pursued the theory that Thorpe was a coconspirator and that the men robbed Kaboobie to get revenge against Elliott Burton. Accordingly, the third factor weighs against harmless error.

### 4. Murray had no opportunity to cross-examine Wesson because Wesson did not testify at their joint trial.

The fourth factor requires that the court consider "the extent of cross-examination otherwise permitted." *See Freeman*, 62 F.4th at 802 (quoting *Van Arsdall*, 475 U.S. at 684). Here, there can be no dispute that the fourth factor weighs against harmless error because Wesson did not testify at the joint trial. *See id.* (noting that the Commonwealth had conceded that "the fourth factor, the extent of cross-examination," weighed against harmless error "since [the codefendant who made the statement] did not testify at trial"). Accordingly, the fourth factor weighs against harmless error.

### 5. The prosecution's case against Murray was inherently weak because it rested solely on Haughton's uncorroborated, since-recanted accomplice testimony.

The fifth factor requires that the court consider "the overall strength of the prosecution's case." *See Freeman*, 62 F.4th at 802 (quoting *Van Arsdall*, 475 U.S. at 684). Accomplice testimony "is inevitably suspect," *Bruton*, 391 U.S. at 136, and "should always be scrutinized carefully by

the jury because of its inherent untrustworthiness," *Tillery*, 411 F.2d at 646; *Almeida II*, 566 F. Supp. at 854–55 ("Because of the inherent unreliability of accomplice testimony, such testimony is to be scrutinized with great care."). Such evidence must "be carefully scrutinized, not only because of any interest [the accomplice] might have, but because his testimony is evidence from a corrupt source." *Commonwealth v. Turner*, 80 A.2d 708, 712 (Pa. 1951).

Here, the only inculpatory evidence against Murray presented at trial was Douglas Haughton's uncorroborated accomplice testimony, as it "is the only testimony directly tying [Murray] into the criminal transaction." *United States v. Gardner*, 244 F.3d 784, 789 (10th Cir. 2001) (quoting *United States v. Williams*, 463 F.2d 393, 395 (10th Cir. 1972)). Haughton—the man who actually entered Kaboobie's house with Wesson—was the only person who identified Murray at trial. The prosecution offered no evidence corroborating Murray's identity as the man who entered Kaboobie's house with Wesson, which means Haughton's testimony requires the strictest level of scrutiny. The prosecution conceded during closing argument that Haughton's testimony hinged on other corroborating evidence, (Trial N.T. 06/20/83 at 1539), and no competent evidence corroborated that Murray participated in the conspiracy. (*See* Counseled and Amended Rule 60(b) Motion at 167–73).

Furthermore, Haughton's trial testimony was not credible for the following reasons, all of which are discussed more fully in Murray's Counseled and Amended Rule 60(b) Motion on pages 109 through 132:

- Haughton had a motive to falsely accuse Murray to avoid a harsh sentence in his unrelated federal bank robbery case.

- Haughton had a motive to falsely accuse Murray to avoid a life sentence without the possibility of parole for Kaboobie's murder.

- Haughton had a motive to exact revenge against Murray for the time when Murray and his stepbrother beat up Haughton after Haughton robbed Murray's

girlfriend and sisters at gunpoint in their own home.

- Haughton was a career criminal with a history of using aliases to hide his criminal activities, and he had a well-established reputation for being a liar and a thief.

- Law enforcement interrogated Haughton off-the-record about his involvement in Kaboobie's death eight days before he gave a formal statement, which means Haughton had an opportunity to reflect on what police told him and to craft a narrative to protect his own self-interests.

- Haughton read Edward Randolph's statement before giving any formal statement to police, and Randolph's statement tipped Haughton off to the fact that police suspected Murray was involved in Kaboobie's death.

- Physical evidence contradicted Haughton's testimony as to the number of shots allegedly fired by Kaboobie and Murray during the shootout.

- Haughton gave contradictory testimony regarding whether and when Murray had a gun at the time of the incident.

- Haughton gave contradictory testimony regarding from where Murray obtained the gun.

- Haughton gave contradictory testimony regarding whether he himself had a gun at the time of the shootout.

- Haughton gave contradictory testimony about whether the shotgun came from Murray's house or Holden's house.

- Haughton gave contradictory testimony regarding whether he saw Holden later that night after the shootout.

- Haughton gave contradictory testimony regarding when the plan to rob Kaboobie was developed.

- Haughton gave contradictory testimony regarding who knocked on Kaboobie's front door.
- Haughton gave contradictory testimony regarding whether he saw Kaboobie answer the door.

- Haughton gave contradictory testimony regarding which one of Wesson's arms Kaboobie had shot.

- Haughton's testimony that he saw Wesson with a bandage around his arm at Murray's house following the shootout was not credible because Haughton

testified that he arrived at Murray's house well before 8:00 p.m., and medical records reflect that Wesson did not receive treatment for his gunshot wound until around 8:32 p.m. and did not leave the hospital until at least 10:55 p.m.

- Haughton was under the influence of marijuana at the time of the shootout.

- Haughton gave contradictory testimony regarding how much marijuana he smoked before the shootout, and he admitted at trial that he lied during Murray and Wesson's preliminary hearing about how much marijuana he smoked before the shootout.

- Haughton gave inconsistent testimony regarding when he had given Kaboobie for the money that gave rise to their personal dispute.

- Haughton gave inconsistent testimony regarding how much marijuana Kaboobie had at his residence.

- Haughton gave contradictory testimony regarding whether Holden planned the robbery alone.

- Haughton gave contradictory testimony regarding which of his brothers he visited immediately after the shootout.

- Haughton gave contradictory testimony regarding whether the school building across from Kaboobie's house blocked his view of Kaboobie's street.

- Haughton's testimony concerning the timeline of events immediately preceding the shootout was not credible.

- Haughton's testimony about what he was able to observe from the schoolyard across from Kaboobie's house was not credible because of the lighting conditions at the time of the shootout.

Additionally, as the Commonwealth has conceded, Haughton reliably recanted his trial testimony. (Ex. 1, Commonwealth Rule 60(b) Response at 15). Accordingly, the fifth factor weighs against harmless error.

### 6. Murray raised a credible alibi defense at trial.

The *Van Arsdall* factors are "non-exclusive," *see Freeman*, 62 F.4th at 802, and therefore in conducting the harmless-error analysis the Court should consider the credible alibi defense that Murray raised at trial, *see, e.g.*, *Bond v. Beard*, 539 F.3d 256, 276 (3d Cir. 2008) (considering

comparing the relative strength of the petitioner's alibi defense with the prosecution's evidence).

Aside from Haughton's testimony and Wesson's statement, the Commonwealth offered no evidence to rebut Murray's alibi defense. Murray presented three credible alibi witnesses to support his defense: Robin Johnson, David Elliott, and Deborah Frazier. Murray also waived his privilege against self-incrimination, testified credibly, and corroborated his alibi defense. The Commonwealth has also similarly acknowledged that Murray "testified himself consistently with his alibi." (Ex. 1, Commonwealth Rule 60(b) Response at 7). As explained more fully in Murray's Counseled and Amended Rule 60(b) Motion on pages 163 through 166, Murray's credible alibi defense supported his actual-innocence claim. Accordingly, the strength of Murray's alibi defense weighs against harmless error.

### 7. Murray has proven his factual innocence.

This Court should also consider that Murray has successfully proven his factual innocence. Indeed, it is difficult, if not impossible, to conclude that the *Bruton* error was harmless if it resulted in the wrongful conviction of an innocent person because "the conviction of an innocent person [is] perhaps the most grievous mistake our judicial system can commit." *Cf. Reeves v. Fayette SCI*, 897 F.3d 154, 164 (3d Cir. 2018) (quoting *Satterfield v. Dist. Att'y of Philadelphia*, 872 F.3d 152, 154 (3d Cir. 2017)); *Schlup v. Delo*, 513 U.S. 298, 324–25 (1995) ("[C]oncern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system."). Accordingly, Murray's factual innocence weighs against harmless error.

### D. Conclusion

For the foregoing reasons, the prosecution's use of Tyrone Wesson's redacted confession at trial violated Murray's confrontation rights under the Sixth Amendment because Wesson's redacted confession implicated Murray as "the other guy" who went inside Kaboobie's house, and

this error was not harmless. Accordingly, Murray is entitled to habeas corpus relief on his *Bruton* claim.

III.   **The *Batson* Claim**

A.   **Murray's *Batson* claim satisfies the exhaustion requirement, and his actual-innocence claim overrides the procedural-default rule.**

Murray has exhausted his available state court remedies on his *Batson* claim because, at a minimum, "it is clear that this claim is now procedurally barred under Pennsylvania law due to state timeliness rules." *See Peoples*, 489 U.S. at 351. Murray preserved the *Batson* issue at trial when his counsel raised an objection alleging that the prosecutor's use of peremptory challenges demonstrated a pattern of discrimination.[30] However, Murray procedurally defaulted on his *Batton* claim because his direct appellate counsel failed to file a timely petition of allowance of appeal to the Pennsylvania Supreme Court that raised this issue. *See* Second Report and Recommendation at 4 (attached to Amended Petition as Attachment 38). Because Murray his proven his actual innocence, however, the procedural-default rule does not bar this Court from considering the merits of his *Batson* claim. *See McQuiggin*, 569 U.S. at 392.

B.   ***Batson* applies retroactively to Murray's case because his conviction and sentence were not yet final at the time of the *Batson* decision.**

The U.S. Supreme Court has held *Batson* "applie[s] retroactively to all cases, state or federal, pending on direct review or not yet final" at the time of the *Batson* decision. *See Griffith*

---

[30]   On appeal from the denial of Murray's first postconviction relief petition, the Pennsylvania Superior Court opined that his trial counsel's objection that "the prosecutor's use of peremptory challenges demonstrated a pattern of discrimination" was sufficient to preserve a *Swain* claim but not a *Batson* claim. (Attachment J at 4–5). This, however, was an unreasonable application of clearly established U.S. Supreme Court precedent because "the Supreme Court has held that an objection to the jury selection practices alleging an equal protection violation under *Swain* 'necessarily states an equal protection violation subject to proof under the *Batson* standard. . . .'" *Abu-Jamal v. Horn (Abu-Jamal II)*, 520 F.3d 272, 281 n.5 (3d Cir. 2008) (quoting *Ford v. Georgia*, 498 U.S. 411, 420 (1991)), *judgment vacated on other grounds*, *Beard v. Abu-Jamal*, 558 U.S. 1143 (2010); *see also Trevino v. Texas*, 503 U.S. 562, 566–57 (1992) (finding that defendant in pre-*Batson* case adequately preserved claim that the prosecution's use of peremptory strikes at his trial violated his right to equal protection under the Fourteenth Amendment). Thus, Murray's prior counsel's objection preserved both issues at trial.

*v. Kentucky*, 479 U.S. 314, 328 (1987). "A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." *Caspari v. Bohlen*, 510 U.S. 383, 390 (1994) (citing *Griffith*, 479 U.S. 314, 321 n.6).

Here, it is indisputable that Murray's state conviction and sentence did not become final until after the *Batson* decision. His case was still pending direct appeal when the U.S. Supreme Court decided *Batson* on April 30, 1986. His conviction and sentence did not become final until on or about February 24, 1987, which is when the ninety-day time period for him to file a petition for a writ of certiorari from the Pennsylvania Supreme Court's November 26, 1986 final order denying discretionary review elapsed.[31] Additionally, earlier in these proceedings, the Commonwealth conceded that *Batson* would apply retroactively to Murray's case "if he had forwarded a <u>Batson</u> issue on direct appeal." (Ex. 41, Commonwealth Response to Original Habeas Petition at 9). The Commonwealth argued that because "he did not," under Pennsylvania law his "underlying <u>Batson</u> claim was plainly defaulted in state court when it was not raised on appeal." (*Id.*). This state procedural rule, however, is no longer applicable because Murray has satisfied the actual-innocence exception to the procedural-default rule. *See McQuiggin*, 569 U.S. at 392.

Accordingly, under *Griffith*, the *Batson* decision applies retroactively to Murray's case because his direct appeal was still pending at the time of the *Batson* decision on April 30, 1986, and his state conviction and sentence did not become final until on or about February 24, 1987.

---

[31]    *See* 28 U.S.C. § 2101(d) (1982) ("The time for appeal or application for a writ of certiorari to review the judgment of a State court in a criminal case shall be as prescribed by rules of the Supreme Court."); Rules of the Supreme Court of the United States, Rule 13 (1980) ("A petition for a writ of certiorari seeking review of a judgment of a lower state court that is subject to discretionary review by the state court of last resort is timely when it is filed with the Clerk within 90 days after entry of the order denying discretionary review.").

**C.   The prosecution's discriminatory use of peremptory challenges in the selection of the jury at Murray's trial violated his right to equal protection under the Fourteenth Amendment.**

The Equal Protection Clause of the Fourteenth Amendment prohibits state prosecutors from purposefully using peremptory challenges against venirepersons based on their race. *See Batson*, 476 U.S. at 86 (citing *Strauder v. West Virginia*, 100 U.S. 303, 305 (1879)). "A *Batson* analysis proceeds in three steps: (1) the defendant must make a prima facie showing of a violation, (2) if the defendant succeeds, the prosecution must articulate a race-neutral explanation, and (3) the trial court must then determine whether the defendant has proven purposeful discrimination." *Simmons v. Beyer*, 44 F.3d 1160, 1167 (3d Cir. 1995). The Third Circuit has recognized "that the retroactive application of *Batson* causes unique evidentiary problems for reviewing courts, as the three-step *Batson* inquiry with which we are all now familiar did not occur during *voir dire* in these cases," *Hardcastle v. Horn (Hardcastle II)*, 368 F.3d 246, 255 (3d Cir. 2004), but that this does not preclude a petitioner from proving a *Batson* claim, *see*, *e.g.*, *Harrison v. Ryan*, 909 F.2d 84, 86–88 (3d Cir. 1990) (granting habeas relief on *Batson* claim that applied retroactively to petitioner's case because his case was pending direct appeal at the time of the *Batson* decision); *Diggs v. Vaughn (Diggs II)*, Civ. A. No. 90-2083, 1991 WL 46319, at *1–2 (E.D. Pa. Mar. 27, 1991) (same).

Here, the record presents a prima facie case of purposeful discrimination, and the prosecution refused to provide a race-neutral explanation for its use of peremptory challenges against black venirepersons. The record clearly reflects that ADA Marano engaged in purposeful discrimination by using his peremptory challenges against black citizens based on their race. Accordingly, Murray, a black citizen, is entitled to habeas corpus relief on his *Batson* claim.

1.  **Step One: The record presents a prima facie case of purposeful discrimination.**

The Third Circuit has identified five factors that are relevant to a prima facie case: "(1) how many members of the cognizable racial group are in the venire panel from which the petit jury is chosen; (2) the nature of the crime; (3) the race of the defendant and the victim; (4) the pattern of strikes against racial group jurors in the particular venire; (5) the prosecutor's statements and questions during selection." *Deputy v. Taylor*, 19 F.3d 1485, 1492 (3d Cir. 1994) (formatting altered) (citing *Jones v. Ryan*, 987 F.2d 960, 970–71 (3d Cir. 1993)). The petitioner may "establish a *prima facie* case at step one" by "show[ing] a pattern of peremptory challenges of jurors of a particular race." *Hardcastle II*, 368 F.3d at 256 (quoting *Rico v. Leftridge-Byrd*, 340 F.3d 178, 185 (3d Cir. 2003)). In cases where the defendant is black, "striking a single black juror might be sufficient to make out a *prima facie* case of racial discrimination even when other blacks were seated on the panel." *Id.* (citing *United States v. Clemons*, 843 F.2d 741, 747 (3d Cir. 1988)).

On the first day of jury selection, ADA Marano used two of the prosecution's first three peremptory challenges against black citizens, and later that day used two more peremptory challenges against black citizens. (Voir Dire N.T. 05/19/83 at 145–46, 204, 214). On the second day of jury selection, ADA Marano used two more peremptory challenges against black citizens. (Voir Dire N.T. 05/20/83 at 282–83, 324–30). Over the course of the next two days of jury selection, ADA Marano used seven more peremptory challenges against black citizens. (Voir Dire N.T. 05/25/83 at 436, 484; Voir Dire N.T. 05/26/83 at 591, 636, 764, 771, 783, 807). On the final day of jury selection, ADA Marano used another peremptory strike against a black citizen. (Voir Dire N.T. 05/27/83 at 898). In total, of the nineteen peremptory challenges used by the prosecution in Murray's case, ADA Marano used at least fourteen, and possibly as many as seventeen, peremptory challenges to exclude black citizens from the jury. As a result, there was only one

black citizen on the jury and perhaps one of the alternative jurors was also black.[32] (Ex. 3, Kirkland Deposition at 18–19).

The disproportionate number of peremptory challenges used against black citizens alone is sufficient to establish a prima facie case of purposeful discrimination. *See*, *e.g.*, *Diggs II*, 1991 WL 46319 at *2 (granting habeas corpus relief and ordering new trial where prosecutor used fourteen of sixteen peremptory strikes to exclude blacks from jury). Even the trial court recognized "what [was] occurring," referring to ADA Marano's discriminatory use of peremptory challenges. (Voir Dire N.T. 05/20/83 at 287). Furthermore, considering that "striking a single black juror might be sufficient to make out a *prima facie* case of racial discrimination even when other blacks were seated on the panel," *Hardcastle II*, 368 F.3d at 256 (citing *Clemons*, 843 F.2d at 747), Murray has clearly established a prima facie case of purposeful discrimination.

Additionally, ADA Marano's statements during the voir dire process, which are discussed further below at the second and third steps of the *Batson* analysis, reflect that he used peremptory challenges against black potential jurors based on race. For instance, in response to Senator Hardy Williams's objection to the Commonwealth's peremptory challenge of a black venireperson, ADA Marano responded:

> There are, in fact, people who are members of the black race in the case, and the Commonwealth, again, sir, is using these challenges in the best way that it thinks it should in its respective side, and I personally am not engaging in any kind of policy [of discrimination].

(Voir Dire N.T. 05/26/83 at 810). ADA Marano's response clearly reflects that he used his peremptory challenges against black venirepersons because the three defendants in the case were also black.

---

[32] As noted above, each alternate juror was asked whether the fact that the defendants were black would affect their ability to reach a fair and impartial verdict, (Voir Dire 05/27/83 at 989–91, 995), and these questions suggest that both alternate jurors were white.

Furthermore, Magistrate Judge Welsh also recognized that Murray had established a prima facie case of purposeful discrimination. In her First Report and Recommendation, Magistrate Judge Welsh recommended "that an evidentiary hearing be held to afford the Respondent an opportunity to produce race neutral explanations for each peremptory challenge of a black venireperson the prosecutor exercise during jury selection in the Petitioner's 1983 trial." (ECF No. 17). This Court previously declined to approve and adopt the First Report and Recommendation as to the *Batson* claim solely because Murray did not raise a freestanding *Batson* claim in his Original Petition. (ECF No. 25). Now, however, the freestanding *Batson* claim is properly before this Court. Accordingly, the Court must proceed to the second step of the *Batson* analysis.

**2.  Step Two: ADA Marano failed to offer a race-neutral explanation.**

The second step places on the prosecutor the burden shifts to the prosecutor to provide a race-neutral explanation for the use of the peremptory challenges against the protected class. *Hardcastle II*, 368 F.3d at 257. "[T]he sole issue at step two 'is the facially validity of the prosecution's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam)). Step two of the *Batson* analysis "does not demand an explanation that is persuasive, or even plausible." *Id.* (quoting *Purkett*, 514 U.S. at 767–68). However, as the Third Circuit has explained, "[t]he reasons presented at step two, . . . , must be 'reasons,' not merely a denial of discriminatory motive or an affirmation of good faith." *Id.* at 258 (citing *Purkett*, 514 U.S. at 768–69).

On nearly every instance in Murray's case, ADA Marano did not offer any "reasons" for his use of peremptory challenges against black venirepersons. ADA Marano simply maintained his silence in response to objections to his use of eight peremptory challenges against black

citizens. (Voir Dire N.T. 05/19/83 at 146 (Barnes and Reynolds); *id.* at 204 (Jones); *id.* at 214–15 (Hart); Voir Dire N.T. 05/25/83 at 485 (Womack); Voir Dire N.T. 05/26/83 at 764 (Janifer); *id.* at 771 (Gaines); Voir Dire N.T. 05/27/83 at 898 (Smaw)).

The trial court called upon ADA Marano **three times** to justify his use of the peremptory challenges against black citizens and to comment on the policy within the District Attorney's Office to exclude black citizens. (Voir Dire N.T. 05/20/83 at 284–85, 291). On two occasions, ADA Marano twice replied that he had "nothing at all to say," (*id.* at 284, 291), and on the other occasion he offered a vague response suggesting that he was exercising the peremptory challenges in good faith. (*Id.* at 284–85, 291). After he used a peremptory challenge against another black citizen, ADA Marano again offered a vague response suggesting that he was using the peremptory strikes in good faith. (Voir Dire N.T. 05/26/83 at 809–10). In short, on at least eleven occasions, ADA Marano did not deny that he was purposefully using his peremptory challenges against black citizens based on race, and he brazenly refused to explain his use of the challenges. (Voir Dire N.T. 05/20/83 at 285).

ADA Marano's repeated refusals to offer a race-neutral explanation for his use of peremptory challenges against black citizens and his bare suggestions that he used two of them in good-faith basis are insufficient under *Batson* to rebut Murray's prima facie case of purposeful racial discrimination. *See Hardcastle II*, 368 F.3d at 257 (citing *Puckett*, 514 U.S. at 768–69). Although ADA Marano may have offered facially valid—albeit pretextual—reasons for his use of peremptory challenges against a few black citizens, this is insufficient to excuse his failure to provide a race-neutral explanation when the court called upon him to explain his use of the peremptory challenges against the other black citizens. *See Diggs II*, 1991 WL 46319, at *2 ("[R]ace need not be the only basis for challenge in order to justify relief under *Batson*, and on this

record, the conclusion that race was a substantial factor in the prosecutor's exercise of challenges in very plain.").

Additionally, the mere fact that there was one black juror, and possibly one black alternate juror, is insufficient to establish that ADA Marano used his peremptory challenges in a racially neutral manner. *See Clemons*, 843 F.2d at 747 (holding that the striking of "a single black juror could constitute a prima facie case even when blacks ultimately sit on the panel and even when valid reasons exist for striking other blacks"). Similarly, the fact that ADA Marano had two remaining peremptory strikes that he could have used against any "remaining African-American venirepersons, but chose not to do so, cannot demonstrate the absence of discriminatory intent in the striking of the other [fourteen] African-Americans from the venire." *See Hardcastle II*, 368 F.3d at 258.

Indeed, ADA Marano's failure to explain his use of most of the challenges against black citizens, coupled with his reference to the race of the defendants and his assertion that the prosecution could use them however it pleased, evinces a discriminatory intent. This conclusion may be drawn from Magistrate Judge Welsh's initial recommendation that an evidentiary hearing be held so that the prosecution could offer a race-neutral explanation for the use of peremptory challenge—the implication being that ADA Marano's statements on the record were not race neutral. (ECF No. 17). Thus, the Court must proceed to the third step of the *Batson* analysis.

### 3. Step Three: ADA Marano engaged in purposeful discrimination by using his peremptory challenges against black citizens based on their race.

Although ADA Marano's refusal to offer a race-neutral explanation is indefensible, assuming that the Commonwealth proffers evidence in response to Murray's *Batson* claim, the third step mandates that the court "address[] and evaluate[] all evidence introduced by each side (including all evidence introduced in the first and second steps) that tends to show that race was

or was not the real reason and determine[] whether the defendant has met his burden of persuasion." *Hardcastle II*, 368 F.3d at 259 (alterations and omissions in original) (quoting *Riley v. Taylor*, 277 F.3d 261, 277–78 (3d Cir. 2001) (en banc)). In assessing whether the petitioner has met the burden of persuasion, the court must consider "the persuasiveness of the [prosecutor's] justification" for using the peremptory challenges against members of the protected class. *Id.* at 258 (quoting *Purkett*, 514 U.S. at 768). If the prosecutor's race-neutral explanation is pretextual, then the petitioner has proven the prosecutor engaged in purposeful discrimination. *See id.*

As noted above, ADA Marano repeatedly refused to offer a race-neutral explanation for his use of peremptory challenges against black venirepersons. He maintained his silence on eight occasions, offering bare assertions of good faith on two occasions, and refused to provide any justification at all on two occasions. ADA Marano's bare assertion of good faith did not persuade the trial court, which recognized "what [was] occurring." (Voir Dire N.T. 05/20/83 at 287). Again, an affirmation of good faith does not constitute a race-neutral explanation. *See Hardcastle II*, 368 F.3d at 257.

In addition to refusing to offer a race-neutral explanation on twelve different occasions, ADA Marano's reasons for challenging two other black citizens (Edward Boyd and Helen Williams) were clearly pretextual. ADA Marano initially challenged Boyd for cause, arguing that Boyd had testified that because of a recent burglary to his home, he might "lean against the criminal element." (Voir Dire N.T. 05/25/83 at 427). The trial court denied the challenge for cause, noting that "[t]hat would be a reason for the defense challenging him." (*Id.* at 425). Moreover, as defense counsel pointed out, Boyd had made it clear upon further questioning that he had no preconceived notions about this case, that he could apply the court's instructions, that he understood his duty to separate the burglary from the facts of this case, and that he felt he could be fair at that particular

time. (*Id.* at 411, 415, 419–20, 429).

A clear indication that ADA Marano's stated reason for the challenge against Boyd was merely a pretext is that ADA Marano found white panel member Hugh McNally acceptable—and even argued against a defense motion to strike McNally for cause—despite McNally's testimony that he might draw a negative inference against a defendant based merely on the fact that a policeman had arrested the defendant. (Voir Dire N.T. 05/26/83 at 650–52, 655–57). Any inference that could be drawn from Boyd's statement was no different from that which could be drawn from McNally's statement; the reason proffered by ADA Marano could not have been the true basis for his peremptory challenge against Body but, instead, was evidence of the prosecutor's discriminatory intent. *See, e.g.*, *Commonwealth v. Jackson*, 562 A.2d 338, 350 (Pa. Super. 1989) ("An explanation which at first blush would appear to be clear, specific, and legitimate may be exposed as a pretext for racial discrimination when considered in light of the entire voir dire proceeding.").

Almost the same circumstances were present with regard to Helen Williams: ADA Marano attempted to challenge her for cause but, after the challenge was denied, used another peremptory challenge. ADA Marano then argued to the court that Williams had indicated that because she had a young son, she might be influenced by the youth of the defendants. (Voir Dire N.T. 05/26/83 at 636–37). However, as the court noted, Williams had stated that she would follow the court's instructions, which is why the court denied ADA Marano's challenge for cause. (*Id.*). Murray's counsel and Holden's counsel both agreed that ADA Marano's strike against Williams was "another attempt . . . to strike all black jurors from the jury." (*Id.* at 638).

ADA Marano's responses to defense objections to his use of peremptory strikes also evidence his discriminatory intent: First, when defense counsel objected to the peremptory

82

challenge against black venireperson Marcus Jones, ADA Marano responded (inaccurately) that the defense "has struck all white veniremen, the last several veniremen all this morning." (Voir Dire N.T. 05/26/83 at 591). Second, after the defense objected to his use of a peremptory strike against another black venireperson (Gloria Courtney), ADA Marano stated: "The one previously was a white venireman." (*Id.* at 783–84). Third, in response to a defense objection to his peremptory challenge against black venireperson Reginald Johnson, ADA Marano explicitly cited the race of the defendants. (*Id.* at 809–10). ADA Marano's responses in themselves are an acknowledgment that race was the very basis for his use of the peremptory challenges.

Accordingly, in light of ADA Marano's repeated refusals to offer a race-neutral explanation, his bare assertions of good faith, and his pretextual justifications, Murray has demonstrated that ADA Marano engaged in purposeful discrimination in violation of *Batson*.

### D. Murray is automatically entitled to relief on the *Batson* claim because the *Batson* violation was a structural error that led to a fundamentally unfair trial.

"A *Batson* violation is considered a 'structural' error which defies harmless error analysis," *United States v. Adigun*, 998 F. Supp. 2d 356, 363–64 n.3 (M.D. 2014) (quoting *Ramseur v. Beyer*, 983 F.2d 1215, 1225 n.6 (3d Cir. 1992)); *see also United States v. Harris*, 192 F.3d 580, 588 (6th Cir. 1999) (holding that a *Batson* violation is a structural error). Indeed, the *Batson* Court recognized that if the prosecutor has engaged in purposeful discrimination in using peremptory challenges, "our precedents require that petitioner's conviction be reversed." 476 U.S. at 100. A *Batson* violation is a structural error "because racial discrimination in the selection of jurors 'casts doubt on the integrity of the judicial process,' and places the fairness of a criminal proceeding in doubt." *Powers v. Ohio*, 499 U.S. 400, 411 (1991) (quoting *Rose v. Mitchell*, 443 U.S. 545, 556 (1979)).

The Philadelphia District Attorney's Office has previously acknowledged that "a *Batson*

83

violation is 'deemed a structural error, and a defendant receives a new trial regardless of whether the violation actually caused his conviction.'" *Wilson v. City of Philadelphia*, 177 F. Supp. 3d 885, 912 (E.D. Pa. 2016) (quoting Philadelphia District Attorney's Office motion for summary judgment on Section 1983 claim). Accordingly, because Murray has proved that a *Batson* violation deprived him of a fair trial, he is automatically entitled to have his conviction reversed.

### E. Conclusion

For the foregoing reasons, Murray is entitled to habeas corpus relief on his *Batson* claim. The Court therefore should grant his Amended Petition and issue an order overturning his conviction.

## IV.   The *Swain* Claim

### A. Murray's *Swain* claim satisfies the exhaustion requirement, and his actual-innocence claim overrides the procedural-default rule.

Murray has exhausted his available state court remedies on his *Swain* claim because, at a minimum, "it is clear that this claim is now procedurally barred under Pennsylvania law due to state timeliness rules." *See Peoples*, 489 U.S. at 351. Murray procedurally defaulted on his *Swain* claim because, although the *Swain* claim was preserved at trial, (*see* Attachment 10 to Amended Petition at 5), his direct appellate counsel failed to raise the issue on direct appeal. Because Murray his proven his actual innocence, however, the procedural-default rule does not bar this Court from considering the merits of his *Swain* claim. *See McQuiggin*, 569 U.S. at 392.

### B. The prosecution's use of peremptory challenges violated Murray's right to equal protection under the Fourteenth Amendment because in his case the Philadelphia District Attorney's Office applied its unofficial policy of using peremptory challenges against black jurors based on race.

The Equal Protection Clause of the Fourteenth Amendment prohibits the state from purposefully using peremptory challenges against venirepersons based on their race. *See Strauder*, 100 U.S. at 305. In *Swain v. Alabama*, the U.S. Supreme Court held that state prosecutors cannot

84

use peremptory challenges to exclude black citizens from the jury "for reasons wholly unrelated to the outcome of the particular case on trial" or to deny to black citizens "the same right and opportunity to participate in the administration of justice enjoyed by the white population." 380 U.S. at 224. Although discriminatory use of peremptory challenges in the defendant's individual case is not enough to constitute a *Swain* violation, the *Swain* Court held that a black defendant could make out a prima face case of purposeful discrimination on proof that the peremptory challenge system was "being perverted" by excluding black citizens from jury service based on their race. *Id.* at 223. The defendant bears the burden of "show[ing] a pattern and practice of racial discrimination in jury selection across multiple prosecutions." *Sistrunk v. Vaughn*, 96 F.3d 666, 668 (3d Cir. 1996).[33] Crucially, the defendant is not required to show that the "prosecution always struck every black" venireperson to infer discriminatory intent." *Love v. Jones*, 923 F.2d 816, 818 (11th Cir. 1991).

### 1. The prosecutor's use of peremptory challenges in Murray's case is not entitled to the presumption of correctness because he volunteered his reasons for using them against black venirepersons.

Ordinarily, under *Swain* the prosecutor's use of peremptory challenges in a particular case is cloaked with a presumption of correctness. *Swain*, 380 U.S. at 222 ("The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court."). However, this presumption is inapplicable in

---

[33] Counsel has been unable to identify any cases where the Third Circuit Court of Appeals decided a *Swain* claim on the merits. Only two pre-*Batson* Third Circuit cases citing *Swain* and used the phrase "equal protection," but neither case actually involved a *Swain* claim challenging the prosecution's use of peremptory strikes. *See Smith v. Yeager*, 465 F.2d 272 (3d Cir. 1972) (holding that petitioner had established prima facie case that the "key man system" employed in Essex County, New Jersey invidiously discriminated against black citizens as to violate his right to equal protection); *United States v. Zirpolo*, 450 F.2d 424 (3d Cir. 1971) (holding that federal grand jury selection procedure in Newark, New Jersey impermissibly favored males over females in violation of federal statutory jury selection standards). Although the Third Circuit has opined about *Swain* in the post-*Batson* era, it has never decided a *Swain* claim on the merits post-*Batson*, presumably because the Supreme Court has held that a *Swain* objection is sufficient to preserve a *Batson* claim. *See Ford*, 498 U.S. at 420.

"[c]ases where the prosecutor at trial volunteers his or her reasons for using peremptory challenges to exclude from the petit jury an identifiable group." *Weathersby v. Morris*, 708 F.2d 1493, 1495–96 (9th Cir. 1983), *cert. denied*, 464 U.S. 1046 (1984).

Indeed, Justice White, who authored the majority opinion in *Swain*, later explicitly recognized that under *Swain* the trial court had the discretion "to invalidate peremptory challenges of blacks if the prosecutor, in response to an objection to his strikes, stated that he struck blacks because he believed they were not qualified to serve as jurors, especially in the trial of a black defendant." *Batson*, 476 U.S. at 101 n* (White, J., concurring). As the Ninth Circuit explained in one case,

> The prosecutor's motives have been voluntarily put on the record and the prosecutor can no longer be cloaked by the presumption of correctness. Our reading of *Swain*, convinces us that in such circumstances a court need not blind itself to the obvious and the court may review the prosecutor's motives to determine whether "the purposes of the peremptory challenge are being perverted" by excluding an identifiable group "from juries for reasons wholly unrelated to the outcome of the particular case on trial."

*Weathersby*, 708 F.2d at 1495–96 (quoting *Swain*, 380 U.S. at 224). Accordingly, in cases where the prosecutor has "offered reasons for the exercise of peremptory challenges, a court could, consistent with *Swain*, scrutinize such reasons for compliance with the equal protection clause." *Walton v. Caspari*, 916 F.2d 1352, 1359 (8th Cir. 1990) (citing *Garrett v. Morris*, 815 F.2d 509, 511 (8th Cir. 1987)), *cert. denied*, *Caspari v. Walton*, 499 U.S. 931 (1991); *see also Ford v. Norris*, 67 F.3d 162, 169 (8th Cir. 1995) (finding *Swain* violation where prosecutor offered pretextual justifications for striking black venirepersons). In such cases, the defendant bears a less stringent burden of proof, as the court can consider the prosecutor's statements in addition to evidence of the prosecution's systemic exclusion of black venirepersons in other cases.

Here, because ADA Marano volunteered his reasons for using peremptory challenges

against black venirepersons, his use of peremptory strikes in Murray's case cannot be cloaked with the presumption that he used them in a nondiscriminatory manner. *See Weathersby*, 708 F.2d at 1495–96. As explained above in connection with the *Batson* claim, ADA Marano expressly cited the race of the defendants in one of his justifications for using peremptory challenges against black venirepersons. ADA Marano also offered pretextual reasons for striking two black venirepersons (Edward Boyd and Helen Williams). Accordingly, the presumption of correctness does not apply to ADA Marano's use of peremptory challenges against black venirepersons in Murray's case.

> **2. Murray has established a prima facie case under *Swain* because there is evidence that Philadelphia District Attorney's Office had a policy of using peremptory challenges against black venirepersons based on their race, and that ADA Marano implemented that policy in his case.**

A defendant can establish a *Swain* violation with evidence that other participants in the criminal justice system have observed a pattern or practice of purposeful discrimination in the prosecutor office's use of peremptory challenges across multiple cases. *See Love*, 923 F.2d at 820 (*Swain* claim established where three attorneys, including trial counsel, testified that they had observed a pattern of purposeful discrimination in the prosecutor office's use of peremptory challenges); *Jones v. Davis*, 835 F.2d 835, 838–39 (11th Cir. 1988) (finding *Swain* violation where six defense attorneys testified that they believed the prosecutor's office systematically struck most blacks from jury venires), *cert. denied*, 486 U.S. 1008 (1988); *see also Horton v. Zant*, 941 F.2d 1449, 1455–1457 (11th Cir. 1991) (finding *Swain* violation where evidence showed the prosecutor's office had a policy of striking black citizens, as well as other groups, from juries, and where defendant offered statistical analysis of the prosecuting attorney's use of peremptory strikes in other cases).

Additionally, as the Pennsylvania Supreme Court has observed, although "findings of a *Swain* violation have been rare, admissions by the prosecuting attorney have frequently played a

prominent role." *Commonwealth v. Basemore*, 744 A.2d 717, 732 (Pa. 2000). Indeed, courts have found that *Swain* violations where the prosecutor admitted to having a policy or practice of striking black citizens from petit juries. *See*, *e.g.*, *Jackson v. Herring*, 42 F.3d 1350, 1357 (11th Cir. 1995) (finding *Swain* violation where "[t]here defense attorneys, one former prosecutor, and most significantly, the prosecuting attorney himself, all testified that there was widespread and systematic misuse of peremptoriness by the Tuscaloosa D.A.'s office"); *State v. Brown*, 371 So.2d 751 (La. 1979); *State v. Washington*, 375 So.2d 1162 (La. 1979). The decisions in *Brown* and *Washington* are particularly instructive on this point.

In *Brown*, the Louisiana Supreme Court reversed the defendant's convictions because the defendant had "shown in connection with this prosecutor's use of peremptory challenges a systematic exclusion, a continual and conscious rejection of blacks." 371 So.2d at 754. The prosecutor had used five peremptory challenges against blacks and secured an all-white jury. *Id.* at 752. The defendant presented the testimony of two attorneys who established that the prosecutor had a practice of using peremptory challenges against black citizens based on their race. *Id.* The Louisiana Supreme Court also noted that there were three other cases in recent years where the same prosecutor used peremptory strikes against black citizens in a discriminatory manner. *Id.* at 753. The prosecutor did not testify and failed to show that there was no discrimination. *Id.*

In *Washington*, the Louisiana Supreme Court reversed the defendant's convictions because, although there was one black citizen who served on the jury in that case, the defendant had presented "objective evidence of [the prosecutor's] systematic exclusion of blacks from jury service through blanket use of peremptory challenges over an extended period of time." 375 So2d at 1164 & n.1. There were "no data or records maintained by which as a statistical matter it [could] be determined on how many instances and when the prosecutor had used peremptory challenges

on a racial basis," but there was testimonial evidence establishing that the prosecutor "systematically used his peremptory challenges" against black citizens. 375 So.2d at 1162. Additionally, the prosecutor did not deny the testimonial evidence, and instead "[h]is straightforward testimony evidenced his complete sincerity in his views, which he felt proper to a conscientious prosecutor attempting to gain a conviction of a defendant whom he would not be prosecuting unless he felt he were guilty." *Id.* at 1163.

Here, the evidence raises a strong inference that around the time of Murray's trial in 1983 the Philadelphia District Attorney's Office had an unofficial policy of using peremptory challenges to strike black venirepersons from juries. First, there are numerous cases that, when viewed together, strongly suggest that the Philadelphia District Attorney's Office had such a policy. *See*, *e.g.*, *Lark v. Sec'y Pa. Dep't of Corr. (Lark IV)*, 566 Fed. App'x 161 (3d Cir. 2014) (upholding grant of habeas relief based on *Batson* violation), *aff'g Lark v. Beard (Lark III)*, Civ. A. No. 01-1252, 2012 WL 3089356, at *4 (E.D. Pa. July 30, 2012) (Philadelphia District Attorney's Office used thirteen of fifteen peremptory strikes against black potential jurors); *Williams v. Beard*, 637 F.3d 195, 206 (3d Cir. 2011) (Philadelphia District Attorney Office used fourteen out of sixteen peremptory strikes against black potential jurors in 1986 murder prosecution); *Abu-Jamal v. Horn (Abu-Jamal II)*, 520 F.3d 272, 287 (3d Cir. 2008) (Philadelphia District Attorney's Office used ten of fifteen peremptory challenges against black venirepersons in 1982 murder prosecution); *Brinson v. Vaughn*, 398 F.3d 225, 227–28 (3d Cir. 2005) (Philadelphia District Attorney's Office used thirteen out of fourteen peremptory strikes against black potential jurors in 1986 murder prosecution); *Holloway v. Horn*, 355 F.3d 707, 710–11 (3d Cir. 2004) (Philadelphia District Attorney's Office used eleven of twelve peremptory strikes against potential black jurors in 1985 murder prosecution); *Sistrunk*, 96 F.3d at 674 (Philadelphia District Attorney's Office used

thirteen peremptory strikes against every potential black potential juror in 1981 murder prosecution); *Harrison*, 909 F.2d at 85 (Philadelphia District Attorney's Office used only six peremptory strikes, all against black venirepersons, in 1982 robbery prosecution); *Smith v. Wetzel*, Civ. A. No. 13-2410, 2016 WL 8761773, at *18 (E.D. Pa. June 30, 2016) (Philadelphia District Attorney's Office used 82% of his peremptory challenges against black venirepersons in 1985 murder prosecution); *Hardcastle v. Horn (Hardcastle III)*, 521 F. Supp. 2d 388, 392 (E.D. Pa. 2007) (Philadelphia District Attorney's Office used twelve of fifteen peremptory challenges against black potential jurors in 1982 murder prosecution); *Rollins v. Horn*, Civ. A. No. 00-1288, 2005 WL 1806504, at *30 (E.D. Pa. 2005) (Philadelphia District Attorney's Office used at least six of his the first seven peremptory challenges against black potential jurors before changing tactics and using four peremptory challenges against white potential jurors in 1987 murder prosecution); *McKendrick v. Zimmerman*, Civ. A. No. 89-4783, 1990 WL 135712, at *1 (E.D. Pa. Sept. 12, 1990) (Philadelphia District Attorney's Office peremptorily challenged four of five prospective black jurors and challenged the fifth for cause in 1978 murder prosecution); *Diggs v. Vaughn (Diggs I)*, Civ. A. No. 90-2083, 1990 WL 117986, at *1 (E.D. Pa. Aug. 8, 1990) (Philadelphia District Attorney's Office used fourteen of fifteen peremptory strikes to exclude blacks from jury in 1977 murder prosecution); *Commonwealth v. Cook*, 952 A.2d 594, 590 (Pa. 2008) (Philadelphia District Attorney's Office used fourteen of nineteen peremptory challenges against black venirepersons); *Commonwealth v. Dinwiddie*, 601 A.2d 1216, 1219 (Pa. 1992) (Philadelphia District Attorney's Office used five of six peremptory challenges to exclude black venirepersons in 1986 robbery prosecution); *Commonwealth v. Henderson*, 438 A.2d 951, 952 (Pa. 1981) (Philadelphia District Attorney's Office used peremptory challenges to strike all five black venirepersons in 1977 prosecution for rape, robbery, and aggravated assault); *Commonwealth v.*

*Brown*, 417 A.2d 181, 186 (Pa. 1980) (Philadelphia District Attorney's Office used all sixteen peremptory challenges against potential black jurors in 1977 murder prosecution); *Commonwealth v. Weaver*, 568 A.2d 1252, 1253 (Pa. Super. 1989) (Philadelphia District Attorney's Office used five of eight peremptory challenges to remove all black venirepersons in 1986 prosecution for sexual assault); *Jackson*, 562 A.2d at 341 (Philadelphia District Attorney's Office used all seven peremptory challenges to dismiss black potential jurors in 1986 robbery prosecution); *Commonwealth v. Edney*, 464 A.2d 1386, 1391 (Pa. Super. 1983) (Philadelphia District Attorney's Office used peremptory challenges to exclude all black venirepersons from jury in 1979 robbery prosecution); *Commonwealth v. Green*, 400 A.2d 182, 183–84 (Pa. Super. 1979) (Philadelphia District Attorney's Office exercised seventeen peremptory challenges to exclude black venirepersons from the jury in 1977 robbery conviction); *Commonwealth v. Fowler*, 393 A.2d 844, 846 (Pa. Super. 1978) (en banc) (Philadelphia District Attorney's Office exercised peremptory challenges to exclude all black jurors in 1975 prosecution for aggravated assault); *Commonwealth v. Jones*, 371 A.2d 957, 958 (Pa. Super. 1977) (Philadelphia District Attorney's Office excluded all twenty-two black venirepersons from jury, fourteen by use of peremptory challenges and the rest for cause or other reasons, and exercised only one peremptory challenge against white jurors, in 1974 prosecution for rape and burglary).[34]

Second, a comprehensive study by Professors David Baldus and George Woodworth of the University of Iowa documented a pattern and practice of racial discrimination in jury selection by the Philadelphia District Attorney's Office from 1983 to 1993. In particular, the study found that the District Attorney's Office was more than two-and-one-third times more likely (2.36) to

---

[34] These cases are be cited solely to show a pattern in the use of peremptory challenges by the Philadelphia District Attorney's Office over a period of time. For different reasons, such as waiver or insufficient corroborating evidence, not all of these decisions resulted in findings of purposeful discrimination.

peremptorily strike black venirepersons from the jury than prospective non-black jurors. The study also showed that, during this ten-year-period, the District Attorney's Office struck black venirepersons roughly 55.28% of the time (1,209 strikes of a possible 2,187 jurors), as opposed to a strike rate of only 23.43% for non-black venirepersons (749 strikes of a possible 3,196).[35] *See generally* David C. Baldus et al., *Racial Discrimination and the Death Penalty in the Post-Furman Era: An Empirical and Legal Overview with Recent Findings from Philadelphia*, 83 CORNELL L. REV. 1368 (1998) (attached hereto as Exhibit 42).

A subsequent, similarly comprehensive study by Professors Baldus and Woodworth further documented a pattern and practice of racial discrimination in jury selection by the Philadelphia District Attorney's Office from 1981 to 1997. The prosecutorial strike rate against black venirepersons was 0.53, whereas the prosecutorial strike rate against non-black venirepersons was only 0.22. *See* David C. Baldus et al., *The Use of Peremptory Challenges in Capital Murder Trials: A Legal and Empirical Analysis*, 3 U. PA. J. CON. L. 1, 75, 154 (2001) (attached hereto as Exhibit 43).[36] Taken together, these two studies present strong statistical evidence that the Philadelphia District Attorney's Office had a policy of using peremptory challenges to exclude black citizens from jury service.

Third, all three defense attorneys at Murray's joint trial accused the Philadelphia District Attorney's Office of having an unofficial policy of using peremptory challenges against black

---

[35] "The strike rate is computed by comparing the number of peremptory strikes the prosecutor used to remove black potential jurors with the prosecutor's total number of peremptory strikes exercised." *Abu-Jamal II*, 520 F.3d at 292.

[36] It is important to note that at the time of jury selection, the Commonwealth had not reached a final decision as to whether to pursue the death penalty, which is why the trial court granted the prosecution's challenges for cause against jurors who were unalterably opposed to the death penalty. (Voir Dire N.T. 05/27/83 at 947). ADA Marano used at least one challenge for cause against a black woman because of her views on the death penalty. (*Id.* at 947–48). The trial court routinely granted the prosecution's motions to strike jurors who were unalterably opposed to the death penalty, but the court later "question[]ed whether the Commonwealth is seriously concerned with the death penalty or has any evidence of the death penalty in this case, when you think of accepting a juror who is unalterably opposed." (*Id.* at 885).

venirepersons based on race. (Voir Dire N.T. 05/20/83 at 282–293). Senator Hardy Williams, who

represented Tyrone Wesson, stated after ADA Marano peremptorily challenged Reginald Johnson:

> Your Honor, I would just like to note for the record that another black juror or venireman was struck. I just want to comment he's a young man and he wants to participate. They never get a change. They end up over here. That's part of the reason. *So often you hear young people say we don't have a jury of our peers. They come and they don't get a chance, based on a policy of racial discrimination.* . . .
>
> . . . . [T]he de facto policy of the District Attorney's Office is legally discriminatory based on race and deprives the defendants of a fair trial. I wasn't talking about social policy. I was talking about a legal policy with a personal impact on black people by the state representative of this Commonwealth.
>
> It is no different than Mississippi, where up north people went down Mississippi and said in fact, there is no segregation. I have said up north, this courtroom, this state's policy is a de facto segregation, and that's the basis of my objection.

(Voir Dire N.T. 05/26/83 at 807–09) (emphasis added). The trial judge (Judge Savitt)

acknowledged: "[I]f, in fact, the District Attorney is doing what Mr. Williams suggests they are

doing, th[en] that is highly inappropriate . . . ." (*Id.* at 810).

Tellingly, as discussed further below, ADA Marano never denied the existence of the

unofficial policy to use peremptory challenges against black potential jurors, and in fact he

responded to Senator Williams's objection by stating that *he personally* was not effectuating such

a policy:

> There are, in fact, people who are members of the black race in the case, and the Commonwealth, again, sir, is using these challenges in the best way that it thinks it should in its respective side, and I *personally* am not engaging in any kind of policy.

(Voir Dire N.T. 05/26/83 at 810).

Fourth, Judge Savitt noted that he had observed a pattern of discrimination in other cases:

> I have been presiding in several murder cases, and it does appear that there are substantial number of challenges where the defendants are black and it is out of proportion to what would ordinarily be expected. Now in this case, counsel suggests that there is a pattern to exclude jurors peremptorily because they are black.

(Voir Dire N.T. 05/20/83 at 284–85). Judge Savitt also acknowledged "what [was] occurring." (*Id.* at 287).

Fifth, Judge Savitt was not the only judge to have recognized that the Philadelphia District Attorney's Office had a pattern of using peremptory challenges against black venirepersons. Sometime in 1982 or 1983, the late Justice Juanita Kidd Stout described the peremptory striking of black jurors in homicide cases as "the practice" of the Philadelphia District Attorney's Office. *Commonwealth v. Hardcastle (Hardcastle I)*, No. 3288-93, June Term, 1982 (C.P. Phila.).

Sixth, Anthony Jackson, a former Philadelphia prosecutor, has  acknowledged that around the time of his then-client's 1982 trial: "Trying cases in City Hall, I know most D.A.'s, most homicides, will get rid of as many blacks as they possibly can, first to the death qualification and then peremptory." *Commonwealth v. Abu-Jamal (Abu-Jamal I)*, Nos. 1357-1358, Jan. Term, 1982, PCRA N.T. 07/28/95, at 208.

Seventh, in 1986, ADA Jack McMahon created a training film teaching prosecutors to exclude black citizens from juries. In this video, ADA McMahon explained that "blacks from the low-income areas are less likely to convict"; "you don't want those people on your jury"; and "it may appear as if you are being racist, but again, you're just being realistic." *See* Jury Selection with Jack McMahon Transcript (1986) (attached hereto as Exhibit 44).[37] The ADA McMahon training video reflected an attempt by the Philadelphia District Attorney's Office to modify, in light of the U.S. Supreme Court's decision in *Batson*, the policy that existed at the time of Murray's trial. Although the Jack McMahon training video alone is insufficient to establish that the Philadelphia District Attorney's Office had a policy of using peremptory challenges against black venirepersons based on race, courts have noted that "the McMahon tape 'could conceivably reflect

---

[37]   The full video of the Jack McMahon training video is available on YouTube at this <u>link</u>.

a culture of discrimination that is relevant to . . . [a] *Batson/Swain* claim.'" *Lark v. Sec'y, Pa. Dep't of Corr. (Lark II)*, 645 F.3d 596, 615 n.26 (3d Cir. 2011) (quoting *Lark v. Beard (Lark I)*, Civ. A. No. 01-1252, 2006 WL 1489977, at *8 n.15 (E.D. Pa. May 23, 2006)). When viewed together with the other evidence proffered in support of Murray's *Swain* claim, the McMahon tape is probative of a culture of discrimination that is relevant to his claim.

Finally, ADA Marano's silence in response to accusations that he was implementing his office's policy of using peremptory challenges against black citizens in cases involving black defendants constitutes an adoptive admission of a party opponent. *See* Fed. R. Evid. 801(d)(2)(B), advisory committee note (recognizing that an opposing party adopts a statement by responding with silence if "the person would, under the circumstances, protest the statement made in his presence, if untrue"); *United States v. Lafferty*, 387 F. Supp. 500, 508 (W.D. Pa. 2005) (recognizing that "[a]doption of a statement can be 'manifested' through different means, including 'language, conduct, or silence'" (quoting Weinstein's Federal Evidence § 801.31[3][a] (Joseph M. McLaughlin ed., 2d ed. 2005))). ADA Marano's silence constitutes an adoptive admission by acquiescence because "it would have been natural under the circumstances to object to the assertion" that the Philadelphia District Attorney's Office had a policy of discrimination. *See United States v. Hale*, 422 U.S. 171, 177 (1975).

For similar reasons, ADA Marano's evasiveness and vague responses to the court's requests for him to explain his use of peremptory challenges also constitute an admission of a party opponent because the natural response to such accusations would have been to address or deny it. *Cf. United States v. Henke*, 222 F.3d 633, 642 (9th Cir. 2000) (concluding that defendant, as corporation's chief executive officer, responding "next question please" to an accusation during a press conference that the corporation was "cooking the books" was admissible as an adoptive

admission in insider-trading prosecution). ADA Marano refused to deny the existence of such a policy and instead responded that he had a good-faith basis for using her peremptory challenges against the black citizens. (Voir Dire 05/20/83 at 285). For instance, although not explicitly couched as an adoptive admission, the Third Circuit has recognized that, in certain circumstances, a prosecutor's vague responses to accusations of racial discrimination in the use of peremptory challenges can be treated as "tantamount to an admission." *See Brinson*, 398 F.3d at 234.

Accordingly, this Court should find that a *Swain* violation occurred in Murray's case because the presumption of correctness cannot justify ADA Marano's use of peremptory challenges, and there is evidence that the Philadelphia District Attorney's Office had a policy of using peremptory challenges against black venirepersons based on their race.

### C. Murray is automatically entitled to relief on the *Swain* claim because the *Swain* violation was a structural error that led to a fundamentally unfair trial.

Like a *Batson* violation, and for virtually the same reasons, a *Swain* violation constitutes a structural error because it "involv[es] discrimination in the jury selection process." *See Ramseur*, 983 F.2d at 1225 n.6 ("[H]armless error analysis is inappropriate in cases involving discrimination in the jury selection process."); *Norris*, 67 F.3d at 170 (holding that a *Swain* violation constitutes a structural error). Accordingly, because Murray has proven that a *Swain* violation deprived him of a fair trial, he is entitled to have his conviction reversed.

### D. There is good cause for discovery into the District Attorney's Office policy of using peremptory strikes against black citizens and ADA Marano's use of peremptory challenges in other cases.

Pursuant to Habeas Corpus Rule 6(a), the court may grant the petitioner permission to invoke the available discovery processes under the Federal Rules of Civil Procedure discovery to support his claim upon a showing of "good cause" for discovery. *See* Rules Governing Section 2254 Cases, Rule 6(a). The Supreme Court has explained that "where specific allegations before

the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Bracy v. Gramley*, 520 U.S. 899, 908 (1997) (quoting *Harris v. Nelson*, 395 U.S. 286, 300 (1969)). "[A] court may not deny a habeas corpus petitioner's motion for leave to conduct discovery if there is a sound basis for concluding that the requested discovery might allow him to demonstrate that he has been confined illegally." *Johnston v. Love*, 165 F.R.D. 444, 445 (E.D. Pa. 1996).

Here, in light of the proffered evidence, to the extent additional proof is necessary, there is good cause to allow Murray to seek discovery to support his *Swain* claim. His specific allegations furnish a basis for believing that he will be able to prove his *Swain* claim if he is permitted to develop the facts more fully. Additionally, Murray has no other means to obtain additional information to support his *Swain* claim because the necessary information is only available in the possession and control of the District Attorney's Office or ADA Marano. Furthermore, Murray has proven his actual innocence, and this alone should furnish good cause for discovery to support his *Swain* claim because "the conviction of an innocent person [is] perhaps the most grievous mistake our judicial system can commit." *Cf. Reeves*, 897 F.3d at 164 (quoting *Satterfield*, 872 F.3d at 154). Accordingly, if necessary, the Court should grant Murray permission to obtain discovery to support his *Swain* claim.[38]

### E. Conclusion

For the foregoing reasons, Murray has established a prima facie case under *Swain*. The Court therefore should grant him habeas corpus relief on his *Swain* claim. However, if the Court determines that additional proof is necessary, the Court should grant Murray leave to obtain

---

[38]   Murray submits that his request to obtain discovery in connection with his *Swain* claim would be rendered moot if the Court grants him relief on his *Bruton* claim or *Batson* claim.

discovery to support his *Swain* claim.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Petitioner Bruce Murray respectfully requests that this Honorable Court grant his Amended Petition for Writ of Habeas Corpus, vacate his convictions and sentences, and issue a conditional writ of habeas corpus directing that the Commonwealth either retry him or release him from state custody within ninety (90) days of the writ's issuance.

Respectfully submitted,

SIGNATURE CODE: MJE5849
Michael J. Engle, Esquire (PA I.D. No. 85576)
Ryan Aloysius Smith, Esquire (PA ID No. 329246)
STRADLEY RONON STEVENS & YOUNG, LLP
One Commerce Square
2005 Market Street, Suite 2600
Philadelphia, PA 19103
T: (215) 564-8737
F: (215) 564-8120
mengle@stradley.com
rsmith@stradley.com

Dated: May 2, 2023                    *Counsel for Petitioner Bruce Murray*

## CERTIFICATE OF SERVICE

I, Michael J. Engle, Esquire, hereby certify that on the date appearing below, I electronically filed the foregoing Memorandum of Law in Support of Amended Petition for Writ of Habeas Corpus, and I hereby certify that I thereby electronically served this document upon all counsel of record who are registered with this Court's CM/ECF system.

Date: May 2, 2023

BY: <u>SIGNATURE CODE: MJE5849</u>
Michael J. Engle, Esquire (PA I.D. No. 85576)
Ryan Aloysius Smith, Esquire (PA ID No. 329246)
STRADLEY RONON STEVENS & YOUNG, LLP
One Commerce Square
2005 Market Street, Suite 2600
Philadelphia, PA 19103
T: (215) 564-8737
F: (215) 564-8120
mengle@stradley.com
rsmith@stradley.com

*Counsel for Petitioner Bruce Murray*