UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____
                                          :
Bruce Murray,                             :           Docket Number
                                          :             98-5866
            Petitioner,                   :
                                          :        Honorable Anita B. Brody
            v.                            :        United States District Judge
                                          :
Gina Clark, Superintendent,               :
SCI Chester, et al.,                      :
                                          :
            Respondents.                  :
_____          :


**JOINT STIPULATIONS OF FACT
AND PROPOSED CONCLUSIONS OF LAW**

Petitioner, Bruce Murray, through his counsel Michael Engle and Ryan

Aloysius Smith, and Respondents, through their counsel, the District Attorney of

Philadelphia and his assistants David Napiorski and Katherine Ernst, jointly move

the Court to accept and adopt the following stipulated facts and the parties' proposed

conclusions of law, derived from the record and the parties' independent post-

conviction investigations.[1]

---

[1] Factual stipulations are "'formal concessions ... that have the effect of withdrawing
a fact from issue and dispensing wholly with the need for proof of the fact.'"
*Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v.
Martinez*, 561 U.S. 661, 677–78 (2010) (quoting 2 K. Broun, McCormick on
Evidence § 254, p. 181 (6th ed. 2006) (footnote omitted)).

1

## I.     STIPULATED FACTS

1.     Murray was charged with murder, robbery, and related firearms offenses under docket number CP-51-CR-1111091-1982 for the killing of victim Eric DeLegal.

### Grounds Four through Fourteen

3.     The following factual stipulations are relevant to Murray's Grounds Four through Fourteen (the "*Brady* claims") in his counseled memorandum of law, *i.e.*, that the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose favorable and material evidence.

4.     Near the beginning of the police's investigation into DeLegal's murder, an informant and member of a local street gang named Elliott Burton told a prosecutor that a 16-year-old named Gregory Strickland was in the victim DeLegal's cellar at the time of the crime.

5.     Strickland initially told police that he did not see anything relevant to the shooting.

6.     The police then spoke to a second informant who told them that Strickland told him that he had seen Douglas Haughton in DeLegal's house and didn't see anyone else. The police re-interviewed Strickland, who denied this, and then they administered a polygraph exam that indicated deception by Strickland on the questions of who killed DeLegal and what Strickland saw. The police also spoke

with Edward Randolph, who gave a statement saying that Strickland told him he'd seen Haughton in the house. The results of Strickland's polygraph exam and Randolph's full statement were not disclosed to the defense.

7.     Yet a third informant then gave police their first lead that Gregory Holden was also involved. This informant said that Holden told him that he was in possession of the shotgun used in the murder and that the crime was committed by Haughton, "Bruce," and "another male." Based on this tip, police obtained a search warrant for Holden's residence. That affidavit of probable cause was not shared with the defense.

8.     The police also received a tip that their informant, Elliott Burton, was seen leaving the scene with a shotgun. This was also not shared with the defense.

9.     The following month, in a recorded conversation with Burton, Holden confirmed his belief that this "Bruce" was involved in the killing. However, Holden also said that "Bruce" was shot in the upper left arm by DeLegal. In fact it was Tyrone Wesson, not Murray, who had been shot in the upper left arm. When Wesson went to the hospital for treatment of the gunshot wound he gave his name as "Bruce Murray." This audio recording was not shared with the defense.

10.     A year later, Douglas Haughton was arrested on an unrelated matter and interviewed by police regarding the murder of DeLegal.

11.     Haughton told police that he, Wesson, Holden, and Murray were all involved in the murder.

12.     In exchange for his cooperation, Haughton pleaded guilty to third-degree murder and received a 5–10-year sentence to run concurrently to a federal sentence for bank robbery.

13.     At trial, the only evidence linking Murray to the crime was Haughton's testimony that Murray and Wesson committed the murder and Tyrone Wesson's partially redacted statement implicating Murray. It also came out during Haughton's testimony that a couple months before this crime, Haughton robbed Murray's sister and girlfriend at gunpoint. In response, before the events of this case, Murray and a friend beat up Haughton with a large stick. Murray was convicted of robbery, second-degree murder, and firearm offenses.

14.     At the defendants' joint sentencing, Wesson told the court that he did not realize that he could have taken the stand at trial and that, if he had, he would have "cleared the other two defendants," meaning Murray and Holden.

15.     The following year, in 1985, Haughton recanted his trial testimony and pretrial statement in two affidavits claiming he was physically coerced by Detective Gerrard into inculpating Murray. Haughton then sent a letter to Murray's lawyer, again recanting his testimony and exculpating Murray. These recantations ultimately became the subject of Murray's first state postconviction petition.

15.     At a 1991 state-court hearing regarding the recantations, Haughton (who had been released on parole) testified consistently with his recantations that he had lied earlier, explaining that he lied both because he received a favorable deal and because he was coerced by police. Tyrone Wesson also testified, recanting his police statement and reiterating what he said at the sentencing hearing, i.e., that Murray was not involved in the crime. He also added that the police tricked him into signing a premade statement confessing to the crime and implicating Murray without an attorney present. The petition was denied.

16.     In 2001, Gregory Strickland, the boy in the basement, wrote a letter to the Innocence Project of Centurion Ministries claiming that he knew the other man in the house was Haughton and not Murray and that he didn't say anything out of fear. Strickland also alleged in the letter that Detective Gerrard and an unknown ADA took Strickland to a lineup and tried to get him to identify Murray as the other man but that he refused on counsel of his father, so they canceled the lineup.

17.     In 2011, Strickland signed an affidavit reiterating what he had put in his prior letter.

18.     During voluntary discovery engaged in as part of this litigation, Murray found in the police department's homicide file confirmation that a lineup was scheduled for February 1983 and that Strickland and his father were transported to participate in it and that, upon arriving, the lineup was canceled. This information

was never disclosed to the defense, is favorable, and corroborates Strickland's repeated and consistent accounts.

## II. PROPOSED CONCLUSIONS OF LAW

### A. *Brady* standard

19. The Commonwealth has an obligation to disclose to the defense information that is favorable to the guilt or punishment of the defendant. *Brady v. Maryland*, 373 U.S. 83 (1963). To prove a *Brady* violation, the evidence must have been (1) favorable to the accused, meaning either exculpatory or impeaching, (2) suppressed by the state, either willfully or inadvertently, and (3) material enough that prejudice resulted from its suppression, meaning that there is a reasonable probability of a different result. *Dennis v. Secretary, Penn. Dep't of Corrs.,* 834 F.3d 263, 284–85 (3d Cir. 2016) (en banc). A reasonable probability is one sufficient to undermine confidence in the outcome. Materiality of suppressed evidence must be "considered collectively, not item by item." *Id*. at 312.

#### 1. Suppression and favorability

20. The parties agree, based on the above-stipulated factual record, that the prosecution failed to disclose: (1) evidence that Gregory Strickland saw Douglas Haughton, and not Bruce Murray, in DeLegal's house after the murder, including Strickland's polygraph results; (2) evidence pointing to the possible involvement of informant Elliott Burton; and (3) the affidavit of probable cause to search Holden's

house and the audio recording of his conversation with Burton. There is no requirement that the prosecution's failure be in bad faith or otherwise with intention. *Brady*, 373 U.S. at 87.

21.    The parties further agree and contend that the above-stipulated suppressed evidence was favorable to the guilt and/or punishment of Murray either as exculpatory or impeaching evidence. Indeed, evidence that Gregory Strickland saw Douglas Haughton leaving DeLegal's house and lied about it is exculpatory, as is evidence that Gregory Holden initially implicated Tyrone Wesson and not Murray in the crime. Similarly, evidence pointing to Elliott Burton as a possible alternative suspect would have been valuable impeachment evidence for Murray. All of this evidence is considered favorable under guiding precedent. *See*, *e.g*., *Dennis*, 834 F.3d at 286–87 (holding that evidence can be favorable as either exculpatory or impeaching, it does not need to conclusively establish innocence, it does not need to "wholly undermine the prosecution's theory of guilt," and it may corroborate favorable testimony that otherwise received little reinforcement).

### 2. Materiality

22.    Suppressed evidence is material if, had the evidence been presented to the jury, there is a reasonable probability of a different result. *Dennis*, 834 F.3d at 284–85. A reasonable probability is one sufficient to undermine confidence in the outcome. In assessing materiality, all the evidence, old and new, is considered

together without regard to admissibility or whether the remaining evidence is sufficient to uphold the conviction. *See Kyles*, 514 U.S. at 434–35. As an example, suppressed evidence that would have bolstered a defendant's defense at trial may put the case in such a different light that *Brady* materiality is satisfied. *Dennis*, 834 F.3d at 295. In addition, suppressed evidence that could have been used to impeach the credibility of a key witness "in a manner not duplicated" by other evidence, or to attack the reliability of the investigation, is similarly sufficient to establish *Brady* materiality. *Id*. at 298, 308. Materiality is to be considered collectively, not item by item. Indeed, the "importance of cumulative prejudice cannot be overstated" in a materiality analysis as it "stems from the inherent power held by the prosecution, which motivated Brady." *Id*. at 312.

23. Here, the parties agree and contend that, taking all of the suppressed evidence together with the initial trial evidence and evidence developed during Murray's collateral proceedings, materiality is satisfied.

24. The prosecution's case against Murray rested on Douglas Haughton's testimony and Tyrone Wesson's inculpatory statement, both of which were recanted almost immediately after trial. As the Commonwealth has previously conceded, these recantations are reliable.

25. Had Murray's counsel known that Strickland allegedly saw Haughton in DeLegal's house on the day of the murder, that his polygraph results indicated

deception on this very issue, and that he refused to implicate Murray before a hastily

canceled lineup, his counsel could have investigated and called Strickland at trial,

giving him the opportunity to tell the court in the first instance what he later admitted

to in letters and affidavits. Competent counsel also could have used all this evidence

to impeach Haughton's self-serving testimony.

26.    Similarly, had Murray's counsel known at the time of trial that Elliott

Burton had been implicated in the crime and/or that Gregory Holden initially

implicated Wesson and not Murray, he could have impeached not only Haughton's

testimony but called the larger police investigation into question.

27.    Thus, pursuant to the above-stipulated factual record, the parties agree

and contend that the above-described suppressed, favorable exculpatory and

impeachment evidence was material under *Brady* because, considered collectively,

it undermines confidence in the outcome of Murray's trial. *See Dennis*, 834 F.3d at

285–311; *see also Kyles*, 514 U.S. at 420, 446 (evidence that could attack the

reliability of an investigation, or that evinces a "remarkably uncritical attitude" on

behalf of police, can be material under *Brady*); *Weary v. Cain*, 577 U.S. 385, 391–

92 (2016) (per curiam) (finding that prosecution violated *Brady* in failing to disclose

evidence that could have corroborated defense at trial and that the state courts, in

holding otherwise, "egregiously misapplied settled law"); *Banks v. Dretke*, 540 U.S.

668, 702 (2004) (suppressed impeachment evidence required reversal of conviction

where evidence was not duplicative of other impeachment evidence); *Haskins v. Superintendent Greene SCI*, 755 F. App'x 184, 189 (3d Cir. 2018) (non-precedential) (holding that suppressed evidence pointing to an alternative suspect that would have given the jury a competing version of events is material under *Brady*); *cf. Strickland v. Washington*, 466 U.S. 668, 696 (1984) ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.").

## III.  CONCLUSION

35.    The parties agree that, based upon the above-stipulated factual record, the prosecution suppressed favorable, material evidence in violation of *Brady v. Maryland*, 373 U.S. 63 (1963), and Murray is owed a new trial.

36.    A proposed order is including with this filing.

**SO STIPULATED**

/s/ Michael Engle                              /s/ David Napiorski
/s/ Ryan Smith                                 /s/ Katherine Ernst

Michael J. Engle, Esquire
Stradley Ronon Stevens & Young
2005 Market Street, Ste. 2600
Philadelphia, PA 19103
mengle@stradley.com